EXHIBIT D

7/13/2010          Illumina Inc. v. Affymetrix Inc          John R. Stuelpnagel
Attorneys' Eyes Only

**Page 1**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

ILLUMINA, INC.,          )
        Plaintiff,       )
    vs.                  )   No. 09-cv-277
AFFYMETRIX, INC.,        )       09-cv-665
        Defendant.       )
                         )
_____ )

SUBJECT TO PROTECTIVE ORDER - ATTORNEYS' EYES ONLY
VIDEO DEPOSITION OF
JOHN R. STUELPNAGEL, D.V.M.
JULY 13, 2010
Reported by Veronica Thompson, CSR 6056, RPR, CRR
--------------------------------------------------
DIGITAL EVIDENCE GROUP
1299 Pennsylvania AVe NW, Suite 1130E
Washington, DC 20004
(202) 232-0646

**Page 2**

1              INDEX
2   EXAMINATION                      PAGE
3   By Mr. Shulman            6
4   Lunch recess             155
5   By Mr. Costakos          285
6
7
8              EXHIBITS
9   NUMBER         DESCRIPTION        PAGE
10   1   ILL 3071328-3071345 (18 pages)    24
11   2   3/8/07 Trial Transcript (66 pages)   25
12   3   ILL 3072131-3072207 (76 pages)    33
13   4   Illumina Notice of Annual Meeting of   48
14       Stockholders to be held on June 28, 2005
15       (44 pages)
16   5   ILL 3032700-3032750 (51 pages)    97
17   6   AFMX 1808310-1808314 (5 pages)   109
18   7   AFMX 1808309 (1 page)         112
19   8   AFMX 1808308 (1 page)         115
20   9   AFMX 1808331 (1 page)         117
21   10  AFMX 1808307 (1 page)         120
22   11  AFMX 1808301 (1 page)         124

**Page 3**

1   12  AFMX 1808304-1808306 (3 pages)       127
2   13  AFMX 1808315-1808319 (4 pages)       168
3   14  AFMX 1808319 (1 page)            174
4   15  ILL 3027872-3027912 (41 pages)       179
5   16  ILL 3072252-3072261 (10 pages)       203
6   17  AFMX 1808332-1808335 (4 pages)       207
7   18  International Application (43 pages)  209
8   19  AFMX 1808299-1808300 (2 pages)       212
9   20  Notice of Allowance and Fees Due     250
10       (7 pages)
11   21  Letter from Jerry Hefner to patent office   252
12       (7 pages)
13   22  ILL 3024965 (1 page)             278
14
15
16
17
18
19
20
21
22

**Page 4**

1              APPEARANCES
2
3   For Plaintiff:
4       Foley & Lardner
5       By:  Jeffrey N. Costakos, Esq.
6       777 East Wisconsin Avenue
7       Milwaukee, Wisconsin 53202-5306
8       414-297-5782 (fax 414-297-4900)
9       jcostakos@foley.com
10
11   For Defendant:
12       Wilson Sonsini Goodrich & Rosati
13       By:  Ron E. Shulman, Esq.
14       650 Page Mill Road
15       Palo Alto, California 94304
16       650-493-9300 (fax 650-493-6811)
17       rshulman@wsgr.com
18
19   Videographer:
20       Michael Henry
21
22

1 (Pages 1 to 4)

7/13/2010 **Illumina Inc. v. Affymetrix Inc** John R. Stuelpnagel
**Attorneys' Eyes Only**

| Page 5 | Page 7 |
|---|---|
| 1   VIDEO DEPOSITION OF JOHN R. STUELPNAGEL, D.V.M., | 1   blame, but Dr. Stuelpnagel is a third-party witness. So |
| 2   taken at 3579 Valley Centre Drive, Suite 300, San Diego, | 2   if you could take that into account in your questioning |
| 3   California 92130, commencing on Tuesday, July 13, 2010, | 3   and try and be as efficient as possible so we can try to |
| 4   at 10:06 a.m., before Veronica Thompson, CSR 6056. | 4   make up for the time that we've lost as a result of the |
| 5        SAN DIEGO, CALIFORNIA, JULY 13, 2010, 10:06 A.M. | 5   mix-up, that would be great. |
| 6 | 6        MR. SHULMAN:  Okay. |
| 7        VIDEOGRAPHER:  Good morning.  We're on the | 7   BY MR. SHULMAN: |
| 8   record at 10:06 a.m. on July 13, 2010, for the videotaped | 8        Q.  Dr. Stuelpnagel, by whom are you currently |
| 9   deposition of John Stuelpnagel in the matter of Illumina | 9   employed? |
| 10   Incorporated versus Affymetrix Incorporated, Case | 10        A.  I'm self-employed. |
| 11   No. 09-cv-277, consolidated with case No. 09-cv-665. | 11        Q.  In what capacity? |
| 12        We're taking this deposition at 12 -- I'm | 12        A.  As an investor and a biotech entrepreneur. |
| 13   sorry -- at 3579 Valley Centre Drive, Third floor, in | 13        Q.  And how long have you been self-employed? |
| 14   San Diego, California. | 14        A.  Since April of 2009. |
| 15        My name is Michael Henry, videographer with | 15        Q.  And prior to that time, you were employed by |
| 16   Digital Evidence Group located at 1299 Pennsylvania | 16   Illumina? |
| 17   Avenue, Suite 1130-E, in Washington, D.C. | 17        A.  Yes. |
| 18        The court reporter is Veronica Thompson. | 18        Q.  Since approximately the summer of '98? |
| 19        Would counsel and all present please identify | 19        A.  That's correct. |
| 20   yourselves for the witness -- for the record beginning | 20        Q.  And you left Illumina in April of '09? |
| 21   with the witness. | 21        A.  That's right. |
| 22        THE WITNESS:  John Stuelpnagel. | 22        Q.  And why did you leave Illumina? |

| Page 6 | Page 8 |
|---|---|
| 1        MR. COSTAKOS:  Jeff Costakos with Foley & | 1        A.  I was transitioning out.  I had actually left |
| 2   Lardner for Illumina and the witness. | 2   my managerial responsibilities a year before that, April |
| 3        MR. SHULMAN:  And Ron Shulman from Wilson | 3   2008, and I left for a variety of reasons including the |
| 4   Sonsini representing Affymetrix. | 4   fact that I'd accomplished what I wanted to accomplish at |
| 5        VIDEOGRAPHER:  Thank you. | 5   Illumina. |
| 6        Would the court reporter please administer the | 6        Q.  And what were your goals of accomplishment at |
| 7   oath to the witness. | 7   Illumina that you believe you had achieved? |
| 8        JOHN R. STUELPNAGEL, D.V.M., | 8        A.  To build a company that had a successful |
| 9   having been administered an oath, testified as follows: | 9   business or businesses that was in still a growth phase, |
| 10 | 10   highly profitable, and valued by investors. |
| 11        EXAMINATION | 11        Q.  Okay. |
| 12   BY MR. SHULMAN: | 12        A.  As well as to create a lot of great jobs for a |
| 13        Q.  Would you please state your full name and | 13   lot of people. |
| 14   residence address. | 14        Q.  Now, back in 1996 and 1997, you were in |
| 15        A.  John R. Stuelpnagel, ███████████, | 15   business school.  Correct? |
| 16   ████████████ | 16        A.  I'm sorry.  Could you tell me the -- |
| 17        MR. COSTAKOS:  And before we begin, I just want | 17        Q.  '96 and '97. |
| 18   to reserve the right to read and sign and designate the | 18        A.  Actually, '95 through -- fall of '95 through |
| 19   transcript preliminarily under the protective order as | 19   the summer -- till the spring of '97. |
| 20   attorneys' eyes only. | 20        Q.  Okay.  And while in business school, at least |
| 21        Also note that we're starting here at 10:07. | 21   some portion of the time you were employed.  Correct? |
| 22   And I know these things happen.  I'm not casting any | 22        A.  I was.  So I was employed by a venture capital |

                                                                    2  (Pages 5 to 8)

Page 9

1  firm that had multiple name changes, but essentially
2  started out as Catalyst Partners and then became CW
3  Ventures. And my employment with that organization
4  started in the summer of 1996.
5     Q. Okay. And at one point it was called Avalon
6  Medical?
7     A. Yes. So Avalon Medical was the predecessor
8  fund to Catalyst Partners, and so they were really all
9  the same people involved.
10        And then what happened is CW Group, which is a
11  longstanding firm in New York, asked us to be part of
12  their firm when they were going to go out and raise a
13  ▮▮▮▮▮▮ fund. So the entire team said yes, and we
14  literally just changed the name of the --
15     Q. Okay.
16     A. -- of the organization.
17     Q. And you worked with Mr. Larry Bock while you
18  were at CW?
19     A. I did.
20     Q. Was it just the two of you in the San Diego
21  office?
22     A. There was an administrative assistant also.

Page 10

1     Q. And you were at CW until approximately when?
2     A. Summer of 1998.
3     Q. And at some point you left CW and joined
4  Illumina?
5     A. Yes. It was more of a transition. Officially
6  there's a start date with Illumina, but really started
7  to -- well, as you may know from reading documents, I was
8  instrumental in starting Illumina, and that process
9  started really in the fall of 1997. We incorporated in
10  May of '98, and I was the president and CEO at that time
11  and had an increasing amount -- percentage of my time
12  devoted to Illumina during that fall, winter, spring.
13  And by late spring, I was working all of my energy
14  towards Illumina. My official hire date didn't come till
15  later at Illumina.
16     Q. And when you say by late spring, you're talking
17  about the late spring of '98?
18     A. That's correct.
19     Q. Now, you know Dr. David Walt. Correct?
20     A. I do.
21     Q. And he's a professor at Tufts?
22     A. Yes.

Page 11

1     Q. Okay. And when did you first learn of him?
2     A. Well, it would have been the fall of 1997. I
3  had received some communication from a licensing group
4  that was representing Tufts with a licensing officer that
5  I had met previously when he was at Harvard, and he
6  brought to my attention some interesting technology.
7        My responsibilities at CW Group are similar to
8  my responsibilities at Catalyst and Avalon, and that was
9  to start new companies from -- primarily from university
10  technology. And so this was something that was very
11  interesting to me. And we ended up -- Larry and I ended
12  up going out to meet with the licensing officer as well
13  as Dr. Walt to learn more about his technology.
14     Q. And that was in the fall of '97?
15     A. That's right.
16     Q. Okay. And who was this licensing technology --
17  I mean, who was the licensing person?
18     A. Shameful. I can't -- Peter -- Peter -- Peter.
19  What's Peter's last name? I'm sorry. I'm drawing.
20     Q. Okay. And he was with MBRI?
21     A. Yes. And there's -- you might run across
22  documents that have MBRI and others that say MBI.

Page 12

1  They're the same organization. They changed their name
2  dropped an initial or something like that.
3     Q. And they were acting as a, for lack of a better
4  term, agent for Tufts?
5     A. Yes. I think they represented a number of
6  universities and maybe even hospitals in that
7  northeastern area and -- was essentially the technology
8  licensing arm.
9     Q. And you visited Dr. Walt's lab in the fall of
10  '97 with Mr. Bock?
11     A. That's correct.
12     Q. And was it your visit to Walt's lab in '97 the
13  event that gave you the idea about founding Illumina?
14     A. Yes. It wasn't a light switch. It was a
15  process, again, that happened through the fall and winter
16  until we really made the commitment in the spring to
17  start Illumina, but that was the initial meeting that got
18  me interested in what Walt was doing and got me working
19  on the project.
20     Q. Okay. And how long did the visit to Dr. Walt's
21  lab in the fall of '97 last?
22     A. I don't have perfect recollection of that. I

3  (Pages 9 to 12)

Page 13

1  think it was on the order of a half-a-day-type visit.
2      Q.  Okay.  And what did you see, or what were you
3  shown during this visit?
4      A.  He showed me some of his arrays that he was
5  making with fiberoptic bundles and beads and showed me
6  some of the data that they had generated with respect to
7  those arrays, and his general lab, and met some of his
8  grad students.
9      Q.  Okay.  And what, in general terms, did you
10  discuss with Dr. Walt and Peter whomever during this
11  visit?
12      A.  A number of things, obviously, concentrating
13  first on the technology and how it was differentiated
14  from other array technologies.  Talked to him about the
15  data and also talked to them about what their interests
16  were with respect to commercialization of this
17  technology, whether they were interested in trying to
18  found a company with us de novo or whether they wanted to
19  license it to a larger organization.
20      Q.  And what did you discuss about how this
21  technology of Dr. Walt's was different than other array
22  technology during this visit?

Page 14

1      A.  What struck me -- and I don't know if it was
2  exactly in David's words -- but the fact that this was
3  really an orthogonal way to approach making arrays.
4          There were a lot of array companies back in
5  '97.  It was a very hot field, very competitive.  A lot
6  of big players including Japanese and Korean players that
7  wanted to get in this field, and obviously Affymetrix was
8  at the time the industry leader, but everybody was trying
9  to do the same thing essentially.  They had different
10  ways of doing it, but what they were trying to do is put
11  chemistry in a very, very small area so that they could
12  have lots of unique features or sites for the chemistry
13  in -- in a small, small area.  And so that's the basic
14  nature of array.
15          And from my perspective, they all suffered the
16  same challenge, which is it's very hard to contain liquid
17  chemistry in a confined space to attach an oligo, purely
18  in that location.  And so they were all suffering from
19  manufacturing constraints and problems.
20          And as they tried to reduce their feature size,
21  the size in which they tried to confine the oligo to one
22  location, they kept getting into more difficult

Page 15

1  manufacturing problems.
2          So what struck me about David's technology is
3  it was different.  It was an assembled array.  You
4  actually did your chemistry offline on little beads in
5  huge batches.  And literally those batch sizes
6  represented hundreds of thousands of arrays' worth of
7  material.  And so all of the chemistry that was done once
8  upfront, and then you'd literally assemble the array, and
9  so making an array that has very small features was
10  trivial.  And from a manufacturing standpoint, it seemed
11  to me to be a much more robust way to solve the problem
12      Q.  So as you saw the Walt tech- -- can I refer to
13  this as the Walt technology?
14      A.  Sure.
15      Q.  As you saw the Walt technology in the fall of
16  '97, it included, among other things, a bundle of optical
17  fibers?
18      A.  Correct.
19      Q.  Okay.  And, collectively, those fibers in the
20  bundle formed an array?
21      A.  Yes.  In combination with the beads that had
22  unique chemistry on them.  So it was more of a system

Page 16

1  than that.
2      Q.  Okay.
3      A.  It was -- I mean, that was the whole point.  It
4  was -- it had components to it that you could assemble.
5      Q.  All right.  I'm going to --
6      A.  Yeah.
7      Q.  -- take it component by component.
8          But the fibers in this bundle formed at least
9  an array of fibers?
10      A.  That's correct.
11      Q.  And the end of each fiber in the array had a
12  small or perhaps tiny well etched into its surface?
13      A.  That's right.
14      Q.  And in each well, a small bead was or could be
15  placed?
16      A.  Yeah.  Emphasis on "could be" because there was
17  a lot of work to be done to develop it to maximum
18  efficiency.
19      Q.  Okay.  And to each bead, some form of bioactive
20  agent was or could be attached?
21      A.  Correct.
22      Q.  And then the bundle with -- of the fibers with

4 (Pages 13 to 16)

Page 17

1 the beads attached was dipped into some sort of solution?
2     A. Correct.
3     Q. Okay. And the solution contained some target
4 analyte of whatever type you're interested in?
5     A. Yup.
6     Q. Okay. And then after the dipping, the Walt
7 technology would detect whether the bioactive agent on
8 each bead bound with something in the target analyte.
9 Correct?
10     A. Yes. I mean, there are potential steps we're
11 skipping over, but essentially that's the -- that's the
12 progression.
13     Q. Okay. And as you saw the Walt technology in --
14 in the fall of '97, how did Dr. Walt perform the
15 detection step?
16     A. He had a CCD camera. It was -- well, it was
17 pretty immature technology, pretty basic technology,
18 where you just had a CCD camera that took a picture of
19 the opposite end of the fiberoptic bundle --
20     Q. Opposite of the beads?
21     A. Of the beads.
22     Q. And --

Page 18

1     A. So, if you will, I'll call it -- I don't know
2 whether you want to call it the proximal end because it's
3 closer to the camera or the proximal -- or the distal end
4 because it's farther away from the beads, but it's the
5 end that didn't have the beads in it. And it was just a
6 simple off-the-shelf assembly of components built around
7 a CCD camera.
8     Q. Okay. And what the camera would take a picture
9 of is some fluorescence on the bead side of the fibers?
10     A. That's right.
11     Q. So is it correct that from your perspective,
12 what was interesting about the Walt technology was that
13 you simply had a fiber optic surface with wells in it and
14 you poured the beads over the surface and they
15 self-assembled into those wells to create this array that
16 you've spoken about?
17     MR. COSTAKOS: Objection to form.
18     THE WITNESS: So that was -- that was one of
19 the big things that attracted to me -- me to the
20 technology.
21     There were other things, such as the fact that
22 one can use standard chemistry to attach the bioactive

Page 19

1 agent. And so moving from oligos to other molecules was
2 attractive.
3     There was even an element to the technology
4 that we called a nose or a sensing technology where we
5 could look at compounds through fluorescent shifts that
6 had nothing to do with bioactive agents. So there was a
7 lot of elements to the technology. And I don't want to
8 necessarily characterize my interest as just being in one
9 area.
10 BY MR. SHULMAN:
11     Q. Okay. And I take it that your business idea at
12 some point was to found Illumina to commercially exploit
13 Dr. Walt's bead and fiberoptic well technology?
14     A. Yes. That would be the foundation of the
15 company, but we weren't satisfied that that had all the
16 elements.
17     One of the ways in which I was mentored to
18 start companies is to not be so technology focused or
19 unique technology focused, and so we were really
20 interested in trying to build around that, but that would
21 be the base.
22     Q. Okay. And is it correct that --

Page 20

1     MR. SHULMAN: You okay?
2     There's an artificiality about depositions --
3     THE WITNESS: Sure.
4     MR. SHULMAN: -- when you speak to the
5 reporter.
6 BY MR. SHULMAN:
7     Q. As of 1997 when you visited the Walt lab, had
8 anyone else yet commercially exploited the bead and
9 fiberoptic well technology?
10     A. No, I don't believe so.
11     Q. And approximately how soon after your visit to
12 the Walt lab did you come up with this idea of forming a
13 company based on the Walt technology?
14     A. Well, that was our whole reason for being out
15 there was to evaluate whether we thought this would be
16 foundation for a new company. It was the only reason I
17 was there.
18     Q. Uh-huh.
19     A. And so I went there with the motivation of
20 evaluating the technology to be satisfactory for starting
21 a new company. And that process was, again, a continual
22 process.

5 (Pages 17 to 20)

Page 21

1    As I did some due diligence on the technology,
2    I tried to ask questions like you just asked me about
3    whether anybody else was trying to use beads and wells to
4    form arrays, what the competitive landscape was, you
5    know, and thinking about this from a startup standpoint.
6        So that -- that process, you know, at least a
7    couple of months trying to do some -- some ground work,
8    and then in that process, started to engage the licensing
9    officer to see whether we could license this on terms
10   that would be compatible to starting a company. So there
11   were lots of checkpoints on the way.
12       Q. So after you visited Dr. Walt's lab, I take it
13   that you did some due diligence on the technology?
14       A. Yes, yes.
15       Q. Did you speak with experts in the field?
16       A. Yes.
17       Q. Who did you speak with in the latter half of
18   '97?
19       A. It's gonna be really hard for me to remember
20   all of that because, again, that's 12 years.
21       Q. Best you can.
22       A. For instance, we talked to George Whitesides at

Page 22

1    MIT. I'll pick out some names that are recognized in the
2    communities, but George Whitesides is a very famous
3    person in biotechnology.
4        We spoke to Clark Still, who at the time was a
5    professor at Columbia in chemistry and also very famous.
6    We'd gone and started a company called Pharmacopeia with
7    him previously, and both of those professors knew David
8    Walt and his reputation; so they were good references for
9    us.
10       But I would say that I probably talked to close
11   to a hundred plus people in that due diligence process,
12   not just to two.
13       Q. Do you recall any other scientific people that
14   you spoke with apart from the two that you've identified?
15       A. Again, probably not right at this moment. I'll
16   try to think of some.
17       Q. Okay. And you mentioned that you tried to
18   license the technology of Dr. Walt's from or through
19   MBRI. Correct?
20       A. Yes.
21       Q. Okay.
22       MR. COSTAKOS: If you want to just stop for

Page 23

1    just one second she wants to, I think, arrange her little
2    head gear, yeah.
3        Okay.
4        MR. SHULMAN: Okay?
5    BY MR. SHULMAN:
6        Q. Actually, I have in my notes now -- I think it
7    was Peter Williams of MBI?
8        A. Peter Williams.
9        Q. Okay.
10       A. Beautiful. That's him.
11       Q. Do you know a Peter Tutulio?
12       A. Tutu- -- was it Peter Tutulio or Jeff Tutulio?
13   I think it was Jeff Tutulio, and he was sort of Peter's
14   right-hand man at MBRI, and I believe the first name is
15   Jeff.
16       Q. Okay. So those were the MBRI guys?
17       A. Yes.
18       Q. All right. And is it correct that your efforts
19   to license the Walt technology from Tufts was a fairly
20   lengthy process that took about six months?
21       A. Yes. So I think we sort of started it --
22   negotiations in the, I'm going to guess, November '97

Page 24

1    time frame. Could be December.
2        It was -- it was a tough negotiation, and I'm
3    guessing again that sometime in the late winter, we
4    reached terms. And then there was still another couple
5    of months after that in which we signed the license
6    agreement. I believe that was the first part of May of
7    1998. So call it six months.
8        MR. SHULMAN: Let me ask the reporter to mark
9    as Stuelpnagel Exhibit 1 a copy of what I believe is the
10   Tufts license agreement bearing production numbers
11   Illumina 3071328 through 45.
12       (Exhibit 1 was marked.)
13   BY MR. SHULMAN:
14       Q. I'm not going to condemn you to read the whole
15   thing, but could you identify this, if you can, as the
16   Tufts agreement that you were referring to?
17       A. Let me just look for my signature.
18       And it has it, so yes, this is the -- the Tufts
19   agreement --
20       Q. Okay.
21       A. -- for the Walt technology license.
22       Q. And this was executed in early May of 1998.

6  (Pages 21 to 24)

Page 25

1  Correct?
2      A.  Correct.
3      Q.  Okay.  Now, is it correct that during the time
4  you were negotiating this Tufts agreement, Exhibit 1,
5  MBRI was also negotiating a license to the Walt
6  technology with at least AstraZeneca and Beckman Coulter?
7      A.  Actually, I don't recollect that.
8          Now, they might not have told me who they were
9  negotiating with.  I don't have any recollection of
10  AstraZeneca being involved.
11         I do have a recollection that David Walt
12  presented to Beckman his technology, and also to a
13  company called Stratagene that at the time was here in
14  San Diego as possible alternatives to the licensing.
15         What I don't have any recollection or knowledge
16  of is whether they actually got into negotiations with
17  those organizations.
18         MR. SHULMAN:  Well, let me see if I can refresh
19  your recollection, if we can mark as Exhibit 2 a copy of
20  your trial testimony from the Affymetrix versus Illumina
21  case, the prior case from the district of Delaware.
22         (Exhibit 2 was marked.)

Page 26

1  BY MR. SHULMAN:
2      Q.  And the cover page is just the cover page for
3  the day on which you testified -- and you can turn to the
4  page after the blue page.  You'll see your testimony
5  begins at transcript page 1012.  You see that there at
6  the bottom?
7      A.  Yes.
8      Q.  Okay.  And turn to page 1025, if you would,
9  please, and let me read the following testimony to you.
10         "Question," beginning on line 10, "Do you know
11  if MBRI -- I'm sorry -- MBRI was negotiating with anyone
12  else at this time that you were negotiating with them on
13  the Tufts Walt technology?
14         "Answer:  Yes.  I knew they were discussing
15  this technology with AstraZeneca and Beckman Coulter, two
16  much larger, obviously, companies out in California."
17         Did you give that answer --
18      A.  Yeah --
19      Q.  -- to that question?
20      A.  -- but, you know, the best I can think today is
21  that I misspoke.  First, the part about negotiating, I
22  don't know if they were actually negotiating or in

Page 27

1  discussions and so negotiating implies terms.  So whether
2  that was the right response to the term "negotiation,"
3  you know, we could debate about whether a discussion is
4  negotiation.  It's that MBRI was a third party, and they
5  weren't telling me exactly what they were doing, and so
6  whether they were discussing or negotiating, we're sort
7  of splitting hairs, but I want you to know that today I
8  don't know whether they were in formal negotiations.
9      Q.  Okay.
10     A.  What I do know is that Beckman Coulter and
11  Stratagene had been presented the technology by Walt and
12  that Walt at least had some discussions with them about
13  licensing.  Where AstraZeneca came in here, maybe that
14  was a brain meltdown on my part or maybe I remembered
15  something different back then, but I don't actually think
16  it was AstraZeneca.  I think it was Stratagene.
17     Q.  Okay.  But you did give this testimony.
18  Correct, sir?
19     A.  That's correct.
20     Q.  Okay.  And you went on to say -- you were
21  asked, "Question:  Did this influence your strategy or,
22  in your mind, your position in these negotiations in any

Page 28

1  way?"
2          And your answer was, "Absolutely.  When you're
3  in a competitive negotiation position, you have to be
4  cognizant of the fact that you could lose a negotiation.
5  So you're much more compliant in terms of trying to meet
6  a compromise position with respect to the terms."
7          Did you give that testimony, sir?
8      A.  Appears I did.
9      Q.  Okay.  And how did your compliance manifest
10  itself in terms -- in terms that were ultimately agreed
11  to in the Tufts agreement?
12         MR. COSTAKOS:  Objection.  Form.
13         THE WITNESS:  Actually, I don't know in the
14  context of which I answered that question.  The bottom
15  line is that we were in a negotiation with MBRI and I did
16  the best I could in term to terms with -- with MBRI on
17  behalf of Illumina.
18  BY MR. SHULMAN:
19     Q.  Okay.
20     A.  So that's -- that's...
21     Q.  Now, under the Tufts agreement, Illumina is
22  required to pay royalties to Tufts.  Correct?

7  (Pages 25 to 28)

7/13/2010     **Illumina Inc. v. Affymetrix Inc**     John R. Stuelpnagel
**Attorneys' Eyes Only**



**Page 29**

1    A. That's right.

2    Q. Okay. And apart from the monetary royalties

3 that Illumina is required to pay Tufts under the

4 agreement, was Illumina obligated to provide Tufts with

5 any other consideration -- monetary consideration for the

6 licenses granted under the agreement?

7      MR. COSTAKOS: Objection. Form, foundation.

8      THE WITNESS: Try -- can I look at the license

9 agreement --

10 BY MR. SHULMAN:

11    Q. Of course. Absolutely.

12

**Page 30**

8      (Telephone rings.)

9 BY MR. SHULMAN:

10    Q. Okay. Now, is it correct that acquiring the

11 rights to the core Walt technology pursuant to this

12 license agreement is what enabled Illumina to go forward

13 as a company?

14      MR. COSTAKOS: I'm sorry. Wait. Can you read

15 that? I was distracted.

16      MR. SHULMAN: Sure.

17      MR. COSTAKOS: Is that your phone that's

18 ringing?

19      MR. SHULMAN: No.

20      MR. COSTAKOS: Trying to figure out whose

21 phone. Could you read that back?

22      MR. SHULMAN: I'll just repeat it.

**Page 31**

1      MR. COSTAKOS: Okay, sure.

2 BY MR. SHULMAN:

3    Q. Is it correct that acquiring the rights to the

4 Walt technology pursuant to this license agreement is

5 what enabled Illumina to go forward as a company?

6    A. I think that's true.

7    Q. Is it fair to say that had you been

8 unsuccessful in acquiring the rights to Dr. Walt's

9 technology, Illumina would not be in the business that it

10 is in today?

11      MR. COSTAKOS: Objection. Form.

12      THE WITNESS: I think that's true, too.

13 BY MR. SHULMAN:

14    Q. Now, is it correct that one of the most

15 important terms in the Tufts agreement is that the

16 license granted to Illumina for the Walt technology is

18      MR. COSTAKOS: Objection. Form.

19      THE WITNESS: I think that's very important,

20 too.

21 BY MR. SHULMAN:

22

4      MR. COSTAKOS: Objection. Form.

5

9 BY MR. SHULMAN:

10

15

7/13/2010                 **Illumina Inc. v. Affymetrix Inc**                 **John R. Stuelpnagel**
                          **Attorneys' Eyes Only**



Page 33

1

MR. COSTAKOS: Objection. Form.

8

16      MR. SHULMAN: Okay. Let me see if I can
17 refresh your recollection.
18      Would you please mark as Exhibit 3 a copy of a
19 deposition of Dr. Stuelpnagel from the Affymetrix versus
20 Illumina case.
21      (Exhibit 3 was marked.)
22 BY MR. SHULMAN:

Page 34

1      Q.  Would you please turn to the page that has
2 production No. 3072200 on the bottom right?
3      A.  I'm sorry.  What was the number?
4      Q.  3072200.
5      And beginning at page 270 of the transcript at
6 line 17, let me read question and answer.
7      A.  I'm sorry.  I'm having trouble finding it.
8      Q.  270, line -- I'll give you the line number.
9 Line 17.
10

21      Did you give that testimony, sir?
22      A.  Yes.

Page 35

1      MR. COSTAKOS: Objection. Form.
2      THE WITNESS:  And I actually think it's
3 consistent with our discussion today.
4 BY MR. SHULMAN:
5      Q.  The question was, did you give the testimony,
6 sir?
7

15      Q.  Right.
16      Now, during your tenure at Illumina, which
17 products sold by Illumina incorporated the Walt
18 technology?
19      A.  The arrays.
20      Q.  Okay.  There's a product known as the bead
21 array product?
22      A.  There's a technology known as the bead array

Page 36

1 technology.
2      Q.  Okay.  I'm sorry.
3      There's a product within the bead array
4 technology known as the Sentrix BeadChip?
5      A.  Yes.  So Sentrix was a name -- I don't know
6 if -- I think it was a -- my memory is not perfect.
7      Sentrix was a trademark that we used for a
8 little while, particularly around the array matrix.  And
9 I think it continued to be around the BeadChip, but we
10 eventually just dropped.  So I'm not quite sure when
11 we dropped the --
12      Q.  Okay.
13      A.  -- the use of that trademark.
14      Q.  But in the array area --
15      A.  In the array area, things labeled "Sentrix"
16 would include the Walt technology.
17      Q.  Okay.  And the particular formats within the
18 array Walt technology that were turned into products were
19 the BeadChip and the ArrayMatrix?
20      A.  Yes.
21      Q.  Okay.  And I read in the 10K for the fiscal
22 year that ended in January of this year that in late 2009

9  (Pages 33 to 36)

Page 37

1  Illumina announced that it would no longer be selling the
2  ArrayMatrix product. Are you aware of that announcement?
3     A. I am aware of that announcement.
4     Q. Okay. To your knowledge, why has Illumina
5  discontinued sales of its ArrayMatrix product?
6        MR. COSTAKOS: Objection. Foundation.
7        THE WITNESS: I think the BeadChip was a
8  superior evolution of the technology. The ArrayMatrix
9  was sort of the first generation, and as we developed the
10  BeadChip, there were cost as well as customer advantages
11  and, perhaps most importantly, there was competitive
12  advantages on how quickly we could build new products
13  around the BeadChip. The ArrayMatrix was less flexible
14  in terms of product evolution.
15  BY MR. SHULMAN:
16     Q. Okay. So after discontinuance of selling the
17  ArrayMatrix product, was the BeadChip the only remaining
18  bead array product that Illumina sells?
19        MR. COSTAKOS: Objection. Form.
20        THE WITNESS: Yes. BeadChip is a family -- you
21  said "product," and so now I know you're going to cut my
22  answers closely. It's actually a family of products, and

Page 38

1  there's lots of bead chips.
2  BY MR. SHULMAN:
3     Q. Okay. But the BeadChip format is the only bead
4  array product that Illumina sells after it discontinued
5  selling the ArrayMatrix?
6     A. So, again, I'm going to be very concise.
7        The BeadChip products are the only bead array
8  products that I know of that incorporate the array
9  technology today that are sold by Illumina.
10     Q. Okay. Now, you mentioned earlier that you
11  incorporated Illumina in either April or May of 1998?
12     A. Yeah. My recollection is late April, but
13  it's --
14     Q. Okay.
15     A. -- you know, in that time frame.
16     Q. Is it correct that there were no contracts or
17  agreements between Illumina and any other party before
18  the incorporation date?
19        MR. COSTAKOS: Objection. Form.
20        THE WITNESS: I believe that's correct.
21  BY MR. SHULMAN:
22     Q. Okay. Before incorporating Illumina in either

Page 39

1  April or early May of 1998, did you enter into any
2  written or oral agreements with any third parties
3  relating to what eventually became the business of
4  Illumina?
5        MR. COSTAKOS: Objection. Form. By "you" --
6        MR. SHULMAN: I mean you personally, yes.
7        THE WITNESS: Could you repeat the question?
8        MR. SHULMAN: Absolutely.
9  BY MR. SHULMAN:
10     Q. Before Illumina was actually incorporated,
11  whenever that occurred --
12     A. Yes.
13     Q. -- did you personally enter into any written or
14  oral agreements with any third parties that related to
15  what eventually became the business of Illumina?
16     A. I don't think I personally did.
17     Q. Okay. Did Mr. Bock?
18     A. I don't think that he did, but...
19     Q. I mean to your knowledge.
20     A. Not to my knowledge.
21     Q. Is it correct that the first time Illumina had
22  any assets or value to the business was when you signed

Page 40

1  the license with Tufts in May of '98?
2        MR. COSTAKOS: Objection. Form.
3        THE WITNESS: I think that's fair. Yeah, sure.
4  BY MR. SHULMAN:
5     Q. Okay. And after you signed the license with
6  Tufts, you got busy building the company by hiring folks
7  and raising money?
8     A. Correct.
9     Q. And when did you first contact Steve Auger,
10  A-u-g-e-r, about the possibility of joining Illumina?
11     A. I hope I pronounce his name correctly. I
12  pronounce it Steve Auger.
13     Q. Auger.
14     A. And --
15     Q. I stand corrected.
16     A. Yes. And the way we became associated -- he
17  eventually joined Illumina -- was that he was working for
18  a scientist named Mark Chee, who I had met through other
19  relationships prior to founding Illumina. And when it
20  looked like we were going to be starting Illumina,
21  meaning we were getting closer to satisfactory terms from
22  Tufts, I met Mark up in the Palo Alto area, and Mark had

Page 41

1   started a little -- I'll call it a virtual company. I
2   hope I'm not insulting anybody, but it was just him and
3   Steve Auger that were working in this company called
4   N Genetics.
5          When Mark heard about the Walt technology and
6   realized that I was looking for a founding team and he
7   was intrigued and thought there might be a possibility
8   that we could combine forces, he brought up that Steve
9   Auger was an employee of his. And I said, "Great," you
10  know, "let's add Steve to the Illumina team."
11     Q.  And when was that? In the May time frame?
12     A.  The discussions probably were -- were probably
13  in the winter of '98. In terms of my discussions with
14  Mark, Steve Auger didn't become an official employee of
15  Illumina until June of '98.
16     Q.  Okay.
17     A.  So there was some discussions, and eventually
18  that reached oral commitments, but, actually, employment
19  didn't start until the June time frame.
20     Q.  And what was Mr. Chee's or Dr. Chee's company's
21  name at the time?
22     A.  I believe it was called N Genetics.

Page 42

1   Q.  N as in "Nancy"?
2   A.  N as in "Nancy."
3   Q.  And it was located out in Palo Alto?
4   A.  Yes. I think Steve was actually based on the
5   east coast in the Massachusetts area, and so they were
6   bi-coastal, but there was only two of them, so -- hence
7   my description of it being primarily a virtual company.
8   Q.  Okay. And when did -- so Mr. Auger had to move
9   to the west coast once he decided to join Illumina?
10  A.  Yes.
11  Q.  Okay. And when did he actually move out to the
12  west coast?
13  A.  Sometime -- I don't know when he actually moved
14  out. I know he was here by June of '98. So I don't know
15  whether he moved out the end of May or the beginning of
16  June.
17  Q.  Okay. And before he moved out or physically
18  relocated to the -- to the west coast, did you ever have
19  any face-to-face meetings with him?
20  A.  I don't really recall whether I just talked to
21  him on the phone or whether I actually met him in person.
22  I just don't recall.

Page 43

1   Q.  Okay. Did you and Chee and Auger have a
2   face-to-face meeting prior to the time that Auger
3   migrated west?
4   A.  I had face-to-face meetings with Mark Chee. I
5   can't remember whether Steve was in those meetings or
6   not.
7

Page 44

1   Q.  Well, before we go down that road -- I mean,
2   this isn't all that important, but I'm just working from
3   your prior testimony --
4   A.  Yes.
5   Q.  -- so let me show it to you. If you'd look at
6   Exhibit 3, please. Exhibit 3.
7   A.  Oh, okay.
8   Q.  And turn to the page that has this production
9   number: 3072145.
10  A.  Two -- what were the last three digits?
11     MR. COSTAKOS:  145.
12     VIDEOGRAPHER:  Mr. Stuelpnagel, can I have you
13  raise your mic up a little bit.
14     THE WITNESS:  Yes. I'm sorry. Does that help?
15     VIDEOGRAPHER:  That helps. Thanks.
16     THE WITNESS:  Okay.
17     MR. SHULMAN:  145.
18  BY MR. SHULMAN:
19  Q.  And beginning at line 4 on page 53 of the
20  transcript, let me read the testimony into the record.
21

11  (Pages 41 to 44)



Page 45

Page 47

20  Q.  Okay.  And I noticed in looking online that
21  each year a proxy statement was put together for
22  Illumina, once it became public, listing share ownership

Page 46

Page 48

1   of significant managers within the company.  Are you
2   familiar with those documents?
3       A.  Yes.
4       Q.  Okay.  And those documents report on how many
5   shares you owned at any given point in time.  Correct?
6       A.  I believe that's right.
7       MR. SHULMAN:  Let me just mark as Exhibit 4 on
8   of these proxy statements.  This one is entitled Notice
9   of Annual Meeting of Stockholders to be held on June 28,
10  2005.
11      There you go.
12      THE WITNESS:  Thank you.
13      (Exhibit 4 was marked.)
14  BY MR. SHULMAN:
15      Q.  And if you turn, please, to the page numbered
16  18, and do you find there a list of directors and
17  officers as well as recitation of share ownership?
18      A.  Yes.
19      Q.  And if you could, could you explain to me, next
20  to your name, what the meaning is of the entry under the
21  first column that says "shares issuable pursuant to
22  options exercisable within 60 days of January 31, 2005."

17      Q.  Did you give that testimony, sir?
18      A.  Yes.
19      MR. COSTAKOS:  Objection.  Form.
20

Page 49

1    A. You know, that's an accounting term, and I'd
2  rather not define it. I think that you can probably find
3  somebody better than I that could define what that --
4  that qualification of what that meant.
5    Q. Okay. What was your understanding at the time?
6    A. It's -- the -- I think this is the number of
7  shares that were -- there's stock options that are
8  granted as incentives to employees.
9    Q. Correct.
10    A. I received some of those. They vest over time.
11  We use -- typically would have a five-year vest period,
12  and I think what this is probably referring to is the
13  number of shares that I -- of those options that I
14  received that were already vested that I could exercise
15  within that time frame.
16    Q. I see.
17    A. And, again, I'm not an accountant; so that's
18  my -- my best I can do.
19    Q. Okay. And then adjacent to that column,
20  there's a column entitled Beneficial Ownership. Do you
21  see that?
22    A. Yes.

Page 50

1    Q. Okay. And it says for you at that point, you
2  had 704,000 and change shares of which you are the
3  beneficial owner?
4    A. Yes.
5    Q. Does that -- was it your understanding at the
6  time that that meant that you owned 700,000 shares
7  outright?
8    A. I think the "outright" part is where it gets a
9  little fuzzy.
10    So this was the number of shares that I owned,
11  but some of those shares were probably still subject to a
12  repurchase right that the company could have should I
13  have left the company --
14    Q. Okay.
15    A. -- so --
16    Q. So there was some --
17    A. So taking that -- so "outright" is where I had
18  a little trouble with your question.
19    Q. Okay. And when you left the company,
20  approximately how many shares were you the beneficial
21  owner of?
22    A. Try to think.

Page 51

1    Q. Roughly.
2    A. I'm -- yeah, give me a minute.
3    Q. Sure.
4    A. I didn't really...
5    I don't know. I should, but I can't -- so in
6  April of 2009, I probably owned somewhere in the range of
7  150-, 200,000 shares.
8    Q. So you had sold a significant --
9    A. Yes.
10    Q. -- amount?
11    Okay. And since you left the company, do you
12  still own any shares of Illumina?
13    A. Yes. Down to like 50,000 shares.
14    Q. Okay. Now, in the spring or early summer of
15  '98, Mr. Walt -- or Dr. Walt also invested money in
16  Illumina. Correct?
17    A. Correct.
18    Q. And he received stock like you did. Correct?
19    A. (Nods head.)
20    Q. And did Mr. Chee and Mr. Auger also invest in
21  the company?
22    A. Not in the Series A financing.

Page 52

1    Q. Did they receive founder's stock?
2    A. Yes. As a condition of their employment. So
3  they purchase -- received -- they pushed at par value or
4  the fair market value their stock -- common stock when
5  they joined the company.
6    Q. Now, since 1998, Mr. Walt or Dr. Walt has been
7  the chairman of Illumina's scientific advisory board.
8  Correct?
9    A. I think that's correct.
10    Q. Okay. And he currently is a member also of the
11  board of directors of Illumina. Right?
12    A. (Nods head.)
13    Q. For about how long has he been a member of the
14  board of directors?
15    A. Well, since we organized the board of
16  directors, so --
17    Q. Going on 12 years?
18    A. Yes.
19    Q. Okay.
20    A. He was at the first meeting.
21    Q. Now, as of April 1998, there were no employees
22  of Illumina. Correct?

13  (Pages 49 to 52)

## Page 53

```
 1      A.  Correct.
 2      Q.  Okay.  And Illumina hired its first three
 3   employees in June of '98.  Correct?
 4      A.  That's correct.
 5      Q.  And those first three were Dr. Chee -- is it
 6   Dr. Auger?
 7      A.  It's -- he doesn't have a Ph.D.  It's Mister.
 8      Q.  Mr. Auger?
 9      A.  Yes.
10      Q.  And Dr. Czarnik?
11      A.  Correct.
12      Q.  Okay.  And when did Illumina hire its next
13   employees after this June time frame when the first three
14   came on board?
15      A.  Later that summer.  I think it might have been
16   August or September including the official hiring of me.
17      Q.  Using your official hiring as a milestone, was
18   anyone else hired by Illumina after these first three
19   before you were?
20      A.  I think so.  You know, we're talking about a
21   few days, two weeks.  I think Steve -- Steven --
22   Dr. Steven Barnard was hired before I was officially
```

## Page 54

```
 1   hired.
 2      Q.  Okay.  So as of the time that you were hired --
 3   effective September 1, was it, of '98?
 4      A.  Yeah, if you say so.
 5      Q.  Okay.  But roughly that time frame?
 6      A.  Roughly that time frame.
 7      Q.  Okay.  As of September 1 when you were hired,
 8   of '98, there was Chee, Auger, Czarnik, and Barnard, you
 9   said?
10      A.  Uh-huh.
11      Q.  Were there any other employees?
12      A.  I don't think so.
13      Q.  Okay.  Now, before incorporating Illumina in
14   April of '98, did you have any written or oral
15   communications with any third parties about the
16   possibilities of their joining Illumina after it was
17   founded?
18      A.  I'm sorry.  Could you repeat that question?
19      Q.  Before you incorporated Illumina --
20          Before you incorporated Illumina --
21      A.  Yes.
22      Q.  -- in late April or early May of '98 --
```

## Page 55

```
 1      A.  Yes.
 2      Q.  -- did you have any written or oral
 3   communications with any third parties about the
 4   possibility of their joining Illumina after it was
 5   founded?
 6      A.  Yes.
 7      Q.  Okay.  With whom?
 8      A.  Dr. Todd Dickinson.
 9      Q.  Anyone else?
10      A.  The time frame was before the incorporation of
11   Illumina.
12          I think it was -- we talked to a lot -- not a
13   lot -- a number of people about joining the company, but
14   of those that eventually joined, the only one that I can
15   think of is Todd.
16      Q.  I didn't limit it to those --
17      A.  Oh, okay.
18      Q.  -- who eventually joined.
19      A.  Sorry.  I misinterpreted the question.
20      Q.  Obviously you spoke to Mr. Chee or Dr. Chee?
21      A.  Yes.
22      Q.  And you spoke to Dr. Auger?
```

## Page 56

```
 1      A.  Yes.
 2      Q.  And you spoke to Dr. Czarnik?
 3      A.  Yes.
 4      Q.  And perhaps Barnard?
 5      A.  Yes.
 6      Q.  And now you've mentioned Dickinson?
 7      A.  Yes.
 8      Q.  And these are all people who eventually did
 9   join?
10      A.  Yes.
11      Q.  Okay.  Did you speak to any other people who
12   didn't join?
13      A.  Yes.
14      Q.  Who were they?
15      A.  I don't remember a full list, but one that I
16   know is Greg Kirk.  Dr. Greg Kirk.
17      Q.  Okay.  Anyone else?
18      A.  I can't remember anybody else.
19      Q.  Now, is it correct that Illumina's first
20   commercial bead array product was sold beginning in 2003?
21      A.  I believe that's correct.  We might have
22   offered it for sale in 2002, and we were selling
```

14 (Pages 53 to 56)

Page 57

1    services, not products, I think in 2002, also.
2        Q. Okay. And was the first bead array product the
3    BeadChip, the ArrayMatrix, or something else?
4        A. It was one -- the first bead array product was
5    the ArrayMatrix. There was other products that worked
6    with that product that were sold in concert, including an
7    instrument, for instance, and reagents.
8        Q. Okay. So the ArrayMatrix was first sold in
9    2003 in this bead array family. And later on the
10    BeadChip was sold?
11        A. Yes.
12        Q. Okay. And prior to the first sale of the
13    ArrayMatrix in 2003, did Illumina commercially use any
14    bead array products that included the Walt technology
15    even if they didn't sell it?
16        A. Yes.
17        MR. COSTAKOS: Objection. Form.
18        THE WITNESS: Yes. I think you asked
19    commercially --
20        MR. SHULMAN: Yes.
21        THE WITNESS: -- and that would have been the
22    commercial services that we offered for sale.

Page 58

1    BY MR. SHULMAN:
2        Q. Okay. And when did that begin, sir?
3        A. My best recollection was either right at -- I'm
4    trying to remember if it was 2001 or 2002. It was
5    certainly in 2002, and it might have also been in 2001.
6        Q. Okay. Now, I want to focus on the BeadChip
7    family of products.
8        A. Okay.
9        Q. Okay?
10        Is it correct that the BeadChip family of
11    products constitute a flat, planar surface with wells
12    etched out on the surface?
13        A. Yes. Wells for holding the beads.
14        Q. Correct.
15        And the flat, planar surface, is it akin to a
16    microscope slide, or can you describe it for us?
17        A. It's -- it's similar in shape to a microscope
18    slide. It's actually made out of silica, so it's not
19    just standard glass.
20        Q. Glass, right.
21        A. And planar is kind of a weird term because it
22    did have the wells, and so certainly the wells didn't

Page 59

1    make it absolutely flat.
2        Q. It was planar before you etched the wells?
3        A. I think that's right, yeah, yeah.
4        Q. And how many wells, approximately, are etched
5    onto the surface of the BeadChip?
6        A. Good question.
7        Q. Roughly.
8        A. In the first commercial iteration or now?
9        Q. Well, you can tell me about the evolution if
10    you want.
11        A. Okay. So -- and I'm going to do this math on
12    the fly so it could be really well off.
13        Somebody who's got it in front of them could do
14    a better job.
15        But to the best of my recollection, we had 12
16    stripes. Each of those stripes held about 20,000 to
17    25,000 to 30,000 -- let's call it 30,000 unique features.
18    And we, at the time, represented each unique feature
19    about 30-fold. So it would be 30 times 30,000 times 12,
20    approximately the number of wells on the first iteration
21    of the BeadChip.
22        Since then, oh, gosh, it's gone up a lot.

Page 60

1        Q. So the density has risen?
2        A. At least by well over 10-fold and maybe --
3    maybe closer to 50-fold from there.
4        Q. Okay. And what is the approximate dimension of
5    the BeadChip substrate itself?
6        A. It's a little bit different than a microscope
7    slide. It's a little bit longer, but approximately
8    1 inch by 3 inches. And then I could be off by a half an
9    inch or more in each direction.
10        Q. Okay. And so 30 times 30,000 times 12 is
11    roughly 10 million?
12        A. Okay. That actually sounds right.
13        Q. Okay. So at least in the first iteration,
14    approximately 10 million wells per BeadChip?
15        A. Yes.
16        Q. Okay. And beads were intended to be inserted
17    into each well. Correct?
18        A. Yes.
19        Q. Okay.
20        A. One bead per well.
21        Q. And when you began selling the BeadChip product
22    family, were the beads already inserted or attached to

15 (Pages 57 to 60)

Page 61

1  the wells when it goes out to the customer?
2      A.  Yes.
3      Q.  Okay.  And those beads already had attached to
4  them whatever bioactive agents were attached to them.
5  Correct?
6      A.  Yes.
7      Q.  Okay.  Now, with the BeadChip format, the
8  planar format with the wells and the beads in them, how
9  are the BeadChips containing these beads exposed to the
10 target analytes?
11     A.  Put on -- the last step of the manufacturing is
12 essentially a gasketing system, which separated -- I
13 mentioned that there were 12 stripes.  We could separate
14 them in different ways, so that in some cases, the
15 gasketing system would separate each stripe individually,
16 so there would be 12 isolated stripes from the gasketing
17 system.
18         Sometimes we would group two or more stripes
19 together, in which case there would be six locations for
20 samples.  There was an access hole and an exit hole in
21 which the sample could be put in.
22     Q.  I heard what you said --

Page 62

1      A.  Yeah, I know.
2      Q.  -- and I appreciate the explanation, but I'm
3  having difficulty picturing it.
4         So if you have the BeadChip with the wells and
5  the beads on it, you mentioned this gasket.  Is the
6  gasket some sort of physical device that's placed over
7  the BeadChip?
8      A.  Yes.  Think of it as a -- how can I describe
9  it? -- sticky side that had raised about a couple of
10 millimeters of distance with another clear plastic over
11 the top of it.  And so we would stick the sticky side
12 down --
13     Q.  Uh-huh.
14     A.  -- and so in that process we would create
15 compartments in which one could contain liquid.
16     Q.  Okay.
17     A.  And so the liquid would be the things that
18 contained the target analyte, and we would introduce the
19 liquid through that plastic sheath over the top filling,
20 essentially, that vessel that we've created by the bottom
21 being the BeadChip and the top being this clear plastic
22 and the sides being kind of a spongy, foamy material.

Page 63

1      Q.  How did you place the gasket on top of the chip
2  with such precision that you wouldn't knock off the
3  beads?
4      A.  First of all, the -- there was clearance
5  between -- so the beads didn't -- the wells and the bead
6  weren't covering the entire chip.  We actually had
7  discrete sections on the chip where the beads were
8  located -- the beads and the wells.
9         And so the gasket itself was designed to be
10 outside of that discrete area that housed the beads.
11     Q.  So when you mentioned the stripes before,
12 that's like lanes of traffic and the beads are in the
13 middle of the lanes?
14     A.  Sure, yes.
15     Q.  Okay.  And then you placed this gasket over it,
16 and it forms compartments around either an entire stripe
17 or section of --
18     A.  --
19         (Interruption by reporter.)
20 BY MR. SHULMAN:
21     Q.  Either around an entire stripe or multiple
22 stripes.  Correct?

Page 64

1      A.  Yes.
2      Q.  Okay.  And then, not to be too colloquial, but
3  you squirt the target analyte into these compartments?
4      A.  Yes.
5      Q.  Okay.  And then you allow a reaction time, and
6  hopefully some binding goes on?
7      A.  That's right.
8      Q.  Okay.  And how do you read or decode the
9  BeadChips?
10         MR. COSTAKOS:  Objection.  Form.
11         THE WITNESS:  We do that at time of
12 manufacturing.  Reading is different than decoding, so
13 I'm going to just focus on decoding.
14 BY MR. SHULMAN:
15     Q.  Forget about the decoding.
16     A.  Oh.
17     Q.  I'm not interested.
18         How do you read the results?
19     A.  Oh, okay.
20         So we had a proprietary instrument in which you
21 placed the BeadChip after you stripped the gasket back
22 off and you rinse it a lot of times, et cetera.  And then

16  (Pages 61 to 64)

Page 65

1   you put it into the instrument, and the instrument would
2   scan this with a confocal laser and essentially detect
3   the fluorescence from that.
4       Q.  Approximately how long after the Sentrix
5   ArrayMatrix product was introduced did you introduce the
6   BeadChip format, roughly?
7       A.  Yeah, and I could be wrong on my dates, but I'm
8   pretty sure it was 2004.
9       Q.  So about a year later?
10      A.  Yes.
11      Q.  Okay. So they've both been on the market, at
12  the same time at least, since 2004?
13      A.  Yes.
14      Q.  And which of the two formats, the ArrayMatrix
15  or the BeadChip format, has been the more successful?
16          MR. COSTAKOS: Objection. Form.
17          THE WITNESS: Depends on time. So initially
18  the bead -- the ArrayMatrix was much more successful.
19  That was the bulk of our sales in 2003, obviously, 2004,
20  and into the first half of 2005. It was in the 2000- --
21  middle of 2005 when we launched our first Infinium
22  products. Those are the whole-genome genotyping family

Page 66

1   of products where there was a pretty large shift in our
2   customer base from using the ArrayMatrix to using the
3   BeadChip.
4   BY MR. SHULMAN:
5       Q.  Okay. So the first year or so that they were
6   both on the market, the ArrayMatrix was selling much
7   better than the BeadChip?
8       A.  Yes. And that was because they addressed --
9   they were different products. The -- the BeadChip, as it
10  was first introduced, was for whole-genome expression --
11      Q.  Right.
12      A.  -- whereas the ArrayMatrix was primarily for
13  genotyping, and genotyping was a bigger part of our
14  business than expression.
15      Q.  Okay. And beginning in mid-2005, sales of the
16  BeadChip eclipsed the sales of the ArrayMatrix product?
17      A.  Sometime -- not in the beginning of 2005
18  because --
19      Q.  I think I said mid-2005.
20      A.  Yeah, okay. I'm sorry. I'm trying to listen
21  too carefully.
22          The -- yes, sometime in the later part of 2005,

Page 67

1   there was much more sales from a revenue standpoint from
2   BeadChips than there were from the ArrayMatrix.
3       Q.  And that continued through the time when
4   Illumina announced in late 2009 that the ArrayMatrix is
5   no longer going to be offered?
6       A.  Yes.
7       Q.  Okay. Let me just ask you some questions about
8   the ArrayMatrix, and then we'll take a short break.
9           The ArrayMatrix product was a bundle or had
10  several bundles of fiberoptic strands bundled together.
11  Correct?
12      A.  Yes.
13      Q.  And in the configuration as sold, were the
14  number of bundles 96 in number, 384 in number, 1536 in
15  number, or some other number?
16      A.  96.
17      Q.  Okay. And approximately how many fiberoptic
18  strands per bundle were included in the ArrayMatrix
19  product?
20      A.  To the best of my recollection, it was like
21  50,000 in each of the bundles.
22      Q.  Okay. And did that number grow over time, or

Page 68

1   was that the number from the beginning?
2       A.  No. That was the number from the beginning.
3   It points to the inflexibility of that format.
4       Q.  Okay. And so each bundle in the ArrayMatrix
5   bundle of bundles contains an array of strands. Correct?
6       A.  Each contains an array of strands, yes. Well,
7   no. Or -- I'm just -- I'm stumbling over the word
8   "array" because I use "array" for the bundle. I guess
9   you could say a collection of strands would make me feel
10  more comfortable.
11      Q.  Well, if you just look at the bundle itself --
12      A.  Yes.
13      Q.  -- and forget about all the other bundles in
14  the product --
15      A.  Yeah, yeah.
16      Q.  -- within a single bundle, there's an array of
17  strands. Correct?
18      A.  Yeah. I'm just, again, stumbling over what
19  you -- what I would call an array.
20          I would call an array, maybe too narrowly, but,
21  in the context of Illumina, something that has
22  bioactive -- multi-bioactive agents on it. And I realize

**Page 69**

1  "array" could have a more colloquial meaning to mean a
2  collection of strands. And so if you mean by "array" a
3  collection of stands, then I'm comfortable with what
4  you're --
5  Q. That's exactly what I meant.
6  A. Yeah.
7  Q. Okay. So each bundle contains an array of
8  strands in the sense of being a collection of strands.
9  Correct?
10  A. Yes.
11  Q. All right. And the combined bundles, the 96 in
12  the product, contain an array of arrays. Correct?
13  A. Yes. The -- the whole ArrayMatrix, we would
14  call an array of arrays.
15  Q. Okay. And a well is etched into the distal end
16  of each strand in each of the bundles?
17  A. Yes.
18  Q. Okay. And one well per strand. Correct?
19  A. Yes.
20  Q. And a bead in each well. Correct?
21  A. Ideally.
22  Q. Ideally.

**Page 70**

1  A. But we didn't -- we never got 100 percent fill.
2  Q. But that's the goal?
3  A. That's the goal.
4  Q. Okay. And as sold by Illumina, the beads were
5  already attached to the fiberoptic strands. Correct?
6  A. Yes.
7  Q. And the beads already had attached to them
8  whatever bioactive agent you chose to attach. Correct?
9  A. Correct. I'm sorry.
10  Q. And the ArrayMatrix system at Illumina also
11  used a microtiter plate containing -- containing sample
12  solution wells or assay wells. Correct?
13  A. Whoever did the experiment would format it in a
14  microtiter plate. The ArrayMatrix was designed to mate
15  to that microtiter plate.
16  Q. Okay. And in the Sentrix or the ArrayMatrix
17  system, the number of wells in the microtiter plate, as
18  well as their spacing and configuration, matches the
19  number, spacing, and configuration of the fiberoptic
20  bundles containing the beads. Correct?
21  A. Could you repeat that, please.
22  Q. Yeah.

**Page 71**

1  You had a -- a 90- -- 96 bundles in your
2  Sentrix ArrayMatrix.
3  A. Yes.
4  Q. -- product. Right?
5  A. Yes.
6  Q. And the bundles were arranged in a spacing and
7  a configuration so they would fit into individual wells
8  of a 96-well --
9  A. Yes.
10  Q. -- microtiter plate. Correct?
11  A. Yes.
12  Q. Okay. That was what I was trying to ask
13  inartfully before.
14  A. Sorry.
15  Q. And in this ArrayMatrix system, each of the
16  fiberoptic bundles in this collection of 96 is inserted
17  simultaneously into its own sample well in the well
18  plate. Right?
19  A. Yes.
20  Q. Okay. And royalties are paid to Tufts on the
21  ArrayMatrix product when you were selling it. Correct
22  A. Yes.

**Page 72**



10  BY MR. SHULMAN:
11  Q. Okay. Are there any products sold by Illumina
12  that use beads other than the BeadChip family and the
13  ArrayMatrix family?
14  A. Yes.
15  Q. And what are they?
16  A. We acquired a company called CyVera. Gosh, the
17  dates are escaping me. I think it was 2006. And CyVera
18  had a different bead system. Doesn't use the Walt
19  technology. And so -- we still sell it. It's called
20  BeadXpress technology.
21  MR. SHULMAN: Okay. Why don't we take a
22  10-minute break. We'll try and keep it short since we

18 (Pages 69 to 72)

Page 73

1   got started late.
2           THE WITNESS: Okay.
3           VIDEOGRAPHER: Off the record at 11:15.
4   (Recess.)
5           VIDEOGRAPHER: We're on the record at
6   11:24 a.m.
7   BY MR. SHULMAN:
8       Q.  Dr. Stuelpnagel, in -- back in 1998, did
9   Illumina ever have or use office space in Cardiff,
10  California?
11      A.  Yes.
12      Q.  And during what period of time?
13      A.  From approximately time of incorporation
14  through the fall -- I'm guessing October or maybe
15  November of '98 -- we were housed in Cardiff --
16      Q.  Okay.
17      A.  -- in the CW offices.
18      Q.  Okay.
19      A.  It was rent-free. CW provided those offices to
20  us.
21      Q.  And do you remember the address?
22      A.  No. I should. No, I don't. Sorry.

Page 74

1       Q.  Okay. And Cardiff is somewhere in the
2   San Diego area?
3       A.  Yeah. It's a little beach community about
4   10 miles north of here.
5       Q.  Okay. And what was the next office space after
6   using the Cardiff space of CW?
7       A.  We moved down here to the UTC area in San Diego
8   on --
9       Q.  I'm sorry?
10      A.  University Town Center. It's abbreviated UTC.
11          And that -- I believe the address was -- I
12  don't know what the address was. It was just down the
13  street from where -- where Illumina -- 9885, I think,
14  Towne Centre Drive. I could be wrong, but that's my best
15  recollection.
16      Q.  And did you begin occupying that space after
17  you closed the Series B financing?
18      A.  We actually began occupying it slightly before
19  we closed the Series B financing, to the best of my
20  recollection.
21      Q.  Okay. And I saw in the Illumina Web site that
22  the Series B financing was closed on or about November 1

Page 75

1   of 1998. Is that --
2       A.  November is my recollection.
3       Q.  So the Cardiff space was occupied until roughly
4   October sometime?
5       A.  October. Could have been late September. In
6   that area.
7       Q.  Now, before this lawsuit was filed by Illumina
8   in 2009, the one that brings us together today, there was
9   an earlier lawsuit between Affymetrix and Illumina.
10  Correct?
11      A.  Correct.
12      Q.  And that earlier lawsuit was filed by
13  Affymetrix against Illumina back in Delaware. Correct?
14      A.  Yes, I believe that's right.
15      Q.  Okay. And you testified as a witness for
16  Illumina in the trial of that Delaware case. Right?
17      A.  Correct.
18      Q.  And before testifying in court in Delaware, you
19  took an oath to tell the truth. Correct?
20      A.  Yes.
21      Q.  And I assume you complied with the oath when
22  you were testifying?

Page 76

1       A.  To the best of my ability.
2       Q.  Okay. And if you'd look again at Exhibit 2,
3   which is a copy of your trial testimony from the Delaware
4   case -- and please turn to page 1012 of the transcript.
5   It's the third page in.
6           And do you see there that at about line 10 or
7   11, Mr. Pals called you as Illumina's first witness?
8       A.  Yes. That's what it says here.
9       Q.  Okay. And Mr. Pals was Illumina's lawyer or
10  one of them. Correct?
11      A.  Yes.
12      Q.  And at the time you gave this testimony, you
13  were the chief operating officer and senior vice
14  president of the array business for Illumina?
15      A.  Correct.
16      Q.  And Mr. Pals was -- strike that.
17          Let's go to page 1035 of the transcript. And
18  beginning at line 9, do you see that Mr. Pals asked you
19  to explain what Exhibit 2054 is?
20      A.  Yes.
21      Q.  Okay. And in response to that question, you
22  stated that Exhibit 2054 is Illumina's Sentrix

Page 77

1  ArrayMatrix. Do you see that?
2     A. I see that.
3     Q. Okay. And the next question that Mr. Pals
4  asked you is on lines 15 to 16 where he said, quote, "And
5  can you describe how the ArrayMatrix format was arrived
6  at?" Do you see that?
7     A. Yes.
8     Q. And your answer to that question begins at
9  page 1035, line 17, and continues through line 1 of
10  page 1037. Is that correct?
11    A. 1037...
12    Q. It ends on line 1 of page 1037. Correct?
13    A. Yeah. I'm -- we're trying to read to make sure
14  that I understand what -- yes. That seems like the
15  extent of the description.
16    Q. Okay. So let me read into the record Mr. Pals'
17  questions and your answers beginning at 1035, line 10,
18  and ending at 1037, line 1.
19    "Question: Okay. Dr. Stuelpnagel, the exhibit
20  you're holding is Exhibit 2054. Can you explain what
21  Exhibit 2054 is?
22    "Answer: Yes. This is our Sentrix

Page 78

1  ArrayMatrix.
2     "Question: Can you describe how the
3  ArrayMatrix format was arrived at?
4     "Answer: Yes. In the summer of 1998, I
5  mentioned that we were trying to think about ways in
6  which we could format these bead arrays into products
7  that would be useful to customers.
8     "And I was actually out for a run thinking and
9  maybe obsessing a little bit about the Illumina
10  technology and started to realize that this array was
11  fundamentally different in its physical form from
12  everybody else's arrays, too.
13    "So in addition to being different in how we
14  manufactured it, they were different in form. And what
15  was unique about these arrays is that you could take this
16  fiber bundle and put it into a sample.
17    "Everybody else took a sample and poured it
18  onto the array. So I started thinking about that and
19  what you could do that would be different from what
20  everybody else was doing.
21    "I came back and started talking. My
22  colleagues -- we were brainstorming. And after that

Page 79

1  brainstorming session, we realized that what we could do
2  is use this array and insert it into a microtiter plate.
3     "I believe you saw one of those. It's a common
4  format where wells are in a 96 arrangement. And people
5  commonly use those for experimentation in the lab.
6     "What we could do with this ArrayMatrix is
7  literally just insert it right into the microtiter plate,
8  and you could do experiments on a sample basis than higher
9  inputs than anybody considered at the time."
10    Did I read that correctly, sir?
11    A. Yes.
12    Q. And were you asked those questions, and did you
13  provide those answers that I just read into the record?
14    A. To the best of my recollection.
15    Q. Now, in the testimony that we just read from
16  the Delaware case, you referred to a run that you took in
17  the summer of '98 that was followed by a brainstorming
18  session.
19    When in the summer of '98 did you take this run
20  that led to the brainstorming session?
21    A. To the best of my recollection, it would have
22  probably been on the weekend. And I lived in Cardiff

Page 80

1  the time, and there was a nice 6- or 8-mile loop that I
2  used to do. And so that's why I think it was on the
3  weekend because I would only run that distance on the
4  weekend. And I remember coming back and just thinking
5  about how these arrays could be used differently.
6     And so early summer of 1998, June -- late June,
7  early July time frame.
8     Q. Okay. Is there any document we can point to or
9  that I could show you to refresh your recollection as to
10  what the date was of this run?
11    A. The only document that I know that would lock
12  it into a narrower time frame would be an invention
13  disclosure that we wrote after the brainstorming session.
14    Q. And what time of day did you take this run?
15    A. It would have likely been morning because I
16  took all my long runs in the morning.
17    Q. When it was cool?
18    A. Yeah.
19    Q. And where did you take this run?
20    A. In Cardiff. A little lap that actually went
21  into Del Mar -- went into Solana Beach and then came back
22  into Cardiff.

Page 81

1    Q. Okay. Not to embarrass you, but how long did
2  this run last?
3    A. A lot shorter than it would last today. You
4  know, I was probably running seven-,
5  seven-and-a-half-minute miles. So I think it was about a
6  6-mile run. So it was close to, you know, a little less
7  than an hour or something like that.
8    Q. Okay. And who were the colleagues that
9  participated in this brainstorming session after your run
10  in the summer of '98?
11    A. So it would have been a day or two later when
12  we all assembled back at work. So that would have been a
13  normal workday, a Monday through Friday. And it was Mark
14  Chee and Steve Auger.
15    Q. Was Dr. Czarnik there?
16    A. No.
17    Q. How long did this brainstorming session last?
18    A. Probably a couple of hours. Again, I don't
19  have perfect recollection of all of that.
20    Q. And was it during the brainstorming session
21  that you and your colleagues arrived at the idea of
22  formulating an array of fiberoptic bundles and inserting

Page 82

1  each bundle simultaneously into a separate well in the
2  microtiter well plate?
3    A. Yeah, there was a lot more to it than what you
4  said. I think a real key component was how to format
5  that and put that into a block structure with a plate and
6  how that would interface and the customer would use that.
7  But all of that is what we considered to be part of the
8  ArrayMatrix products that we eventually developed.
9    Q. Okay. But in terms of the idea that you
10  described in your testimony at pages 1035 through 1037,
11  that idea was developed during this brainstorming
12  session?
13    A. Yeah, that plate that held the 96 fiber
14  bundles.
15    Q. Okay. Can you show me where in your testimony
16  there's reference to a plate?
17    A. The Sentrix ArrayMatrix was a plate. It was a
18  plate that held the 96 fiber bundles. It was a device.
19    Q. In your testimony beginning at line 15 of
20  page 1035 and ending at line 1 of 1037, can you point to
21  me where you mentioned a plate?
22    MR. COSTAKOS: Objection. Form.

Page 83

1    THE WITNESS: I think I --
2    MR. COSTAKOS: Asked and answered.
3    THE WITNESS: -- answered that on -- referring
4  you back to line 13 of page 1035. I said yes, this is
5  our Sentrix ArrayMatrix, which is the 96 bundles and the
6  plate that holds those bundles together.
7  BY MR. SHULMAN:
8    Q. Sorry. I didn't ask you about line 13.
9    A. I'm sorry.
10    Q. I asked about your testimony beginning at
11  line 15 going through line 1 of 1037, in that section.
12    A. Yes.
13    Q. Can you point out to me where you referred to a
14  plate?
15    MR. COSTAKOS: Objection. Form, argumentative.
16    THE WITNESS: I was responding to Dr. -- or
17  Mr. Pals' question about the ArrayMatrix format, which is
18  this plate, which is Exhibit 2054.
19    So all of that, which then is derived from his
20  question on line 15, was referring exactly to this plate,
21  this ArrayMatrix format thing that we're talking about
22  right now.

Page 84

1  BY MR. SHULMAN:
2    Q. Can you point to me, please, any passage,
3  beginning at line 15 of page 1035 and ending at line 1 of
4  1037, where you mentioned a plate?
5    A. I --
6    MR. COSTAKOS: Objection. Form. I think that
7  that question is inappropriate.
8    You can answer the question in context. I
9  don't think you need to limit yourself the way he said.
10    THE WITNESS: So looking at line 21 through 22,
11  the ArrayMatrix is a plate. So if we're stumbling over
12  the term "plate," fine. We can call it an ArrayMatrix.
13  BY MR. SHULMAN:
14    Q. Okay. Did you mention the word "plate"
15  beginning at line 15 of page 1035 through line 1 of
16  page 1037 when referring to the ArrayMatrix?
17    MR. COSTAKOS: Objection. Form, argumentative,
18  incomplete.
19    THE WITNESS: So I think I -- I've answered it
20  as best I can. I don't see --
21  BY MR. SHULMAN:
22    Q. The answer is either yes or no or you don't see

Page 85

1   it.
2        MR. COSTAKOS: I think he can answer it --
3        THE WITNESS: I appreciate your help.
4        MR. COSTAKOS: -- however he wants to answer
5   it.
6        THE WITNESS: I appreciate your help in the
7   des- -- my testimony, but, as I mentioned, lines -- the
8   lines that you're talking about is around the ArrayMatrix
9   format.
10       If you're asking me did I call the ArrayMatrix
11  format the plate in this testimony, the answer is no.
12  BY MR. SHULMAN:
13       Q. Okay. Now, the idea that you described
14  beginning at line 15 of page 1035 and ending at line 1 of
15  page 1037 was one that came up during this brainstorming
16  session. Correct?
17       A. Yes.
18       Q. Okay. And is it correct that the brainstorming
19  session with Chee and Auger took place at a boardroom?
20       A. We called it a boardroom. It was our
21  conference room at CW Group's offices.
22       Q. In Cardiff?

Page 86

1        A. In Cardiff.
2        Q. Okay. Was the brainstorming session in the
3   morning or in the afternoon?
4        A. I don't have -- I don't remember.
5        Q. And you regarded the brainstorming session as a
6   significant meeting. Correct?
7        A. I do, yes.
8        Q. Now, did you regard the brainstorm that came
9   out of the brainstorming session as described at
10  page 1035 through 1037 of your testimony as an important
11  idea at the time that you came up with it in the summer
12  of '98?
13       A. When you say "you," meaning the collection of
14  the three of us, yes, I did.
15       Q. Okay.
16       A. Because ultimately that became the first
17  product that Illumina offered for sale in the BeadArray
18  family.
19       Q. So you personally regarded it as an important
20  idea at the time, and you say that your fellow inventors
21  did as well?
22       A. I don't want to speak for them, but I do, yes.

Page 87

1        Q. Okay. And at the time that you came up with
2   this brainstorm in the summer of 1998, did you regard
3   that brainstorm as an invention?
4        A. Yes.
5        Q. Okay. And, in fact, you regarded this
6   brainstorm as a fundamental invention. Correct?
7        A. I don't know what you mean by "fundamental." I
8   think it was an important innovation in the company. And
9   I don't want to trip over the word "invention" because
10  ultimately that's a legal term that the patent office
11  decides. But I thought it was an important invention. I
12  thought it was -- was really important for the company.
13       Q. Fundamental?
14       A. Whether you want to call it important, the same
15  thing as fundamental, and whether I did on a previous
16  date, that's fine.
17       Q. Well, I'm asking you for your testimony today,
18  if you regard -- did you regard it at the time as a
19  fundamental invention for Illumina?
20       A. Sure. I don't have a problem with that.
21       Q. Okay. With respect to this brainstorm that you
22  regarded as a fundamental invention, did you or Dr. Chee

Page 88

1   or Mr. Auger reduce it to writing at or about the time
2   that you say you came up with it in the summer of '98?
3        A. Yes.
4        Q. And who wrote down this idea?
5        MR. COSTAKOS: Objection. Form.
6        THE WITNESS: I think I was probably the
7   primary author of the invention disclosure --
8        MR. SHULMAN: Uh-huh.
9        THE WITNESS: -- although there were
10  contributions from the other inventors, too.
11  BY MR. SHULMAN:
12       Q. Okay. And when, relative to the brainstorming
13  session, did you prepare this -- I assume it's a
14  document?
15       A. I don't have perfect recollection of when.
16       Q. Right.
17       A. It would have been in my habit to have done it
18  within a small number of days post-session because I was
19  trying to be very diligent about writing and documenting
20  these things up.
21       Q. And where was this document filed after you
22  prepared it?

Page 89

1    A. It was filed with Illumina.
2    Q. In whose files was this documents kept?
3    A. Originally it was in mine, and I transferred it
4    to our IP attorney who was outside counsel, Ms. Robin
5    Silva.
6    Q. I'm sorry?
7    A. Ms. Robin Silva.
8    Q. S-i-l-v-a?
9    A. S-i-l-v-a.
10   Q. And where was she at the time?
11   A. She's changed firms a couple of times. I think
12   she was with Townsend & Townsend at the time.
13   Q. Okay.
14   A. That's my best recollection.
15   Q. And when -- when did you provide --
16   A. Oh, no, it wasn't Townsend & Townsend. It was
17   in San Francisco, and she -- oh, gosh. The firm no
18   longer exists. It was merged. I'm not going to come up
19   with the name, but it was not Townsend & Townsend.
20   Q. Limbock Limbock & Sutton?
21   A. No.
22   Q. Was it an IP firm?

Page 90

1    A. It was an IP firm. Small IP firm in
2    San Francisco city. Nice view of the Golden Gate Bridge,
3    if that helps, and the Embarcadero Center.
4    Q. Where is Ms. Silva today, if you know?
5    A. Again, she's changed firms or the firms have
6    merged. That's probably more of an accurate description.
7    The firms have merged a couple of times, and so I don't
8    quite -- I don't know the firm -- I can't think of the
9    firm right now that she's in.
10   Q. Okay. Can you recall any other firm that she
11   was associated with beyond the original firm whose name
12   you can't recall?
13   A. I'm not doing well with law firms.
14   Gosh. Is there a law firm called Deschert,
15   D-e-s-c-h-e-r-t? That's --
16   Q. Dechert, D-e-c-h-e-r-t, yes.
17   A. You know what, I better not be taking guesses.
18   Q. That's fine.
19   When did you provide Ms. Silva with a copy of
20   this invention disclosure form?
21   A. I don't remember whether it was days or weeks,
22   but it was probably in that relationship.

Page 91

1    Q. And in -- did you provide her with the original
2    or just a copy of the form?
3    A. My guess is I probably provided her with a copy
4    so that we would keep the originals at Illumina, but even
5    that I don't know for sure.
6    Q. And were the originals of invention disclosure
7    forms, such as the one you prepared in the summer of '98,
8    maintained at Illumina as part of their business record?
9    A. I believe they are.
10   Q. And they're still there today?
11   A. I believe so.
12   Q. And who is the custodian of the invention
13   disclosure forms at Illumina?
14   A. Well, it's the legal department under Chris
15   Cabou. I don't know who in his organization is actually
16   responsible for keeping those things under.
17   Q. And who is Chris Cabou?
18   A. Chris Cabou is the general counsel at Illumina.
19   Q. How do you spell his last name.
20   A. C-a-b-o-u.
21   Q. Like "caribou"?
22   A. Like "caribou."

Page 92

1    Q. Okay. Now, let's go back to the Walt
2    technology that Dr. Walt developed and which you licensed
3    from Tufts.
4    In the Walt technology, Dr. Walt had inserted a
5    single bundle of fiberoptic fibers containing beads into
6    a sample solution. Correct?
7    A. Correct.
8    Q. And he did so in some form of a small test tube
9    or an Eppendorf tube?
10   A. That sounds right. I don't want to limit what
11   he's done with it, but I do -- at some point he was
12   inserting them into Eppendorf tubes.
13   Q. Okay. But as far as you and Dr. Chee and
14   Mr. Auger knew in the summer of '98, Dr. Walt had not
15   inserted his single bundle into a microtiter well plate.
16   Correct?
17   A. You know, he'd be the right one to ask, not me.
18   I didn't -- I don't -- I did not see him do that.
19   Q. Okay. So as far as you knew, he had --
20   A. Sure.
21   (Interruption by reporter.)
22   BY MR. SHULMAN:

Page 93

1    Q. As far as you knew, he had not done that --
2    A. And I said sure.
3    Q. -- before?
4    A. Sorry.
5    Q. Did you get the question?
6       I'll repeat it.
7       As far as you knew in the summer of 1998,
8    Dr. Walt had not inserted his bead-containing fiberoptic
9    bundle into a microtiter well plate. Correct?
10   A. Correct.
11   Q. And, in your mind, in the summer of '98,
12   concerning the bead-containing fiberoptic bundle into a
13   microtiter well plate was something new and different
14   from what Dr. Walt had done.
15      MR. COSTAKOS: Objection. Form.
16   BY MR. SHULMAN:
17   Q. Correct?
18   A. No. Well, I think what you're saying is that
19   the invention -- and I don't actually think that was the
20   invention -- that was the thought that got us thinking
21   about how to format 96 arrays together into an
22   ArrayMatrix.

Page 94

1    BY MR. SHULMAN:
2    Q. Okay.
3    A. So --
4    Q. But is it correct that as far as you knew,
5    inserting a fiberoptic bundle into a microtiter well
6    plate was something different than what you understood
7    Dr. Walt to have done?
8    A. I didn't have any understanding whether he had
9    or had not. It stimulated me to think about how we might
10   want to build a product.
11   Q. Okay. Now, in the Walt technology that
12   Dr. Walt had developed and which you licensed, Dr. Walt
13   had a single fiberoptic bundle consisting of several
14   fiberoptic strands. Correct?
15      MR. COSTAKOS: Objection. Form.
16      THE WITNESS: Correct.
17   BY MR. SHULMAN:
18   Q. And when you came up with the idea of bundling
19   together several bundles of fiberoptic strands in this
20   array of arrays format in the summer of '98, I take it
21   that as far as you and Chee and Auger knew, Dr. Walt had
22   not previously come up with this array of arrays format?

Page 95

1       MR. COSTAKOS: Objection. Form, foundation.
2       THE WITNESS: I think that's correct.
3    BY MR. SHULMAN:
4    Q. And in your mind in the summer of '98,
5    inserting the multiple bundles of fiberoptic strands,
6    this array of arrays, simultaneously into separate wells
7    of the well plate was an idea that originated with you,
8    Chee, and Auger during this brainstorming session.
9    Correct?
10   A. That was my assumption at the time.
11   Q. Okay. Now, the microtiter well plate that you,
12   Chee, and Auger contemplated using in the summer of '98
13   that plate is typically made out of some substrate like
14   plastic or metal. Is that correct?
15   A. Plastic typically.
16   Q. And the microtiter well plate that you
17   contemplated using in the summer of '98 can have 96 or
18   384 or as many as 1536 wells in it. Correct?
19   A. Correct.
20   Q. And each of the wells is designed to contain a
21   sample solution having a different target analyte.
22   Correct?

Page 96

1    A. Correct.
2    Q. Now, let's return to the bead in well
3    fiberoptic bundle that Walt developed and which you
4    licensed. And I'm just going to refer to that as the
5    Walt bundle.
6    A. Okay.
7    Q. Okay. And in the Walt bundle, each bead was
8    designed to have some bioactive agent attached to it.
9    Correct?
10   A. Yes.
11   Q. Okay. And in the Walt technology, the Walt
12   bundle containing the beads with these bioactive agent
13   was inserted into some test tube or Eppendorf tube
14   containing a sample solution of the target analyte.
15   Correct?
16   A. Yes.
17   Q. Okay. And according to the Walt technology,
18   the presence or absence of the target analytes on the
19   beads was thereafter detected in some manner that you
20   described earlier?
21   A. Yes.
22   Q. Now, in a prior lawsuit between Illumina and

24 (Pages 93 to 96)

Page 97

1  Dr. Czarnik -- am pronouncing his name correctly?
2  **A. Czarnik, yes.**
3  Q. Czarnik, okay.
4  You testified that in the summer of '98, you
5  and Dr. Chee were the primary authors of a business plan
6  for Illumina. Do you recall that?
7  **A. Primary authors, correct.**
8  Q. Right. He -- Dr. Czarnik contributed some, but
9  not very much?
10  **A. And Steve Auger contributed some, too.**
11  MR. SHULMAN: Okay. Let me -- let me ask the
12  reporter to mark as exhibit next in order, whatever it
13  is, Exhibit 5, a document bearing production Nos. ILL
14  3032700 through 2750.
15  (Exhibit 5 was marked.)
16  BY MR. SHULMAN:
17  Q. I'm not going to condemn you to read this whole
18  thing because I don't have that many questions about it,
19  but could you glance through it and tell me if this is a
20  draft of the Illumina business plan that you prepared in
21  the summer of '98. And I can help you date this by
22  things that I know where they appear in here if you want

Page 98

1  that information.
2  **A. It appears to be a draft of the Illumina**
3  **business plan, and I -- the summer and fall sounds like a**
4  **consistent time. Whether it was September or another**
5  **date, that's probably pretty close.**
6  Q. Let me -- let me help you there --
7  **A. Okay.**
8  Q. -- just so there are no surprises.
9  If you look at the fourth page in, it has the
10  number ending 703 in the corner. Down at the bottom it
11  says▮
▮
13  **A. Uh-huh.**
14  Q. And I think earlier we established the Series B
15  financing closed around the November --
16  **A. November.**
17  Q. -- time frame, and the Series A was in June.
18  **A. Yes.**
19  Q. So that dates this document somewhere in
20  between. Correct?
21  **A. That's a good assumption.**
22  Q. Okay. What was the purpose of writing the

Page 99

1  business plan?
2  **A. Two-fold. One is to really organize our**
3  **thoughts on how we wanted to propose commercialization**
4  **resource utilization, things like that for the company.**
5  **So, really, what were we going to try to do?**
6  Q. Uh-huh.
7  **A. And the other is as a supplement to financing**
8  **due diligence by private investors, venture capitalists.**
9  Q. So you're -- you're writing the document to,
10  for lack of a better term, gel your own thinking about
11  what the future business was going to be of Illumina?
12  **A. Yes.**
13  Q. That was one purpose.
14  **A. Yes.**
15  Q. Correct?
16  And the second purpose was to have a document
17  that you could give to your potential investors in
18  connection with the Series B financing?
19  **A. Yes.**
20  Q. Okay. And was the business plan finalized at
21  some point?
22  **A. Was the business plan financed? I don't know**

Page 100

1  **if any business plan is ever finalized because you're**
2  **always constantly adjusting your plans, your strategy**
3  **from the company's perspective, but it -- it reached a**
4  **point where we finished the Series B financing. And**
5  **thereafter, I don't think we updated it formally in --**
6  Q. Let me ask you --
7  **A. -- the context of a Word document.**
8  Q. Let me ask the question in a slightly different
9  way.
10  **A. Yeah.**
11  Q. Did the business plan that you were working on
12  in the summer of '98 get to a point where you finished
13  working on it in a format that you handed out to
14  investors?
15  **A. Yes.**
16  Q. Okay. I'll refer to that as the final business
17  plan.
18  **A. Okay.**
19  Q. Okay?
20  Once you started handing out to investors, you
21  weren't changing it. Correct?
22  **A. That's correct.**

25 (Pages 97 to 100)

7/13/2010                  **Illumina Inc. v. Affymetrix Inc**                  John R. Stuelpnagel
                                   **Attorneys' Eyes Only**

| Page 101 |
| --- |

1    Q.  And could anybody be an investor in the
2  Series B financing?
3    A.  No.  We --
4    Q.  You had to qualify in some way?
5    A.  A couple things.  One is we wanted the best --
6  we wanted value-added investors, and so that was
7  important for us.  So we were looking for high quality
8  venture firms that wanted to participate with us in the
9  growth of this company.
10    Q.  Okay.  To whom did you hand out the business
11  plan?
12    A.  It was a select number of people, a handful of
13  people.  And I think primarily venture capitalists.
14    Q.  Were they required to sign any NDA or anything
15  like that with respect to a business plan?
16    A.  To the best of my recollection, they did.
17    Q.  Okay.  Which obligated them not to disclose the
18  information to others?
19    A.  Yes.
20         And I also think that we had a non-confidential
21  version also for those that didn't sign -- if somebody
22  wanted to look at it, I think at some point we developed

| Page 102 |
| --- |

1  a non-confidential version, but I don't recollect that
2  version -- I think the confidential version was the one
3  that went to the venture capitalists.  And I can't even
4  remember if there's anybody that we distributed the
5  non-confidential version to.
6    Q.  Okay.  And does the -- what we've called the
7  final business plan still exist at Illumina?
8    A.  I have no idea.  So the only place it existed
9  might have been in my hard drive and maybe in other
10  people's, but I don't have -- I don't have a copy, a hard
11  copy.  I don't have a clue whether the venture guys have
12  a copy, and I don't have a clue whether Illumina has a
13  copy.
14    Q.  Okay.
15    A.  Other than the one you've been able to produce
16    Q.  Is it correct that as you envisioned the
17  ArrayMatrix format in the mid-1998 time frame --
18    A.  Okay.
19    Q.  -- mid being --
20    A.  June and later.
21    Q.  In the June and November time frame.
22    A.  Okay.

| Page 103 |
| --- |

1    Q.  Is it true that as you envisioned the
2  ArrayMatrix format in the June through November 1998 time
3  frame, that format permitted many millions of assays to
4  be carried out in parallel on a single well plate?
5    A.  I think that's an accurate statement.
6    Q.  Okay.
7    A.  96 times 1536 times -- well, 96 times 40,000
8  would get you many millions.
9    Q.  Okay.  And in the same time frame of June to
10  November of 1998, you understood that with the
11  ArrayMatrix format -- there's a fly.
12    A.  That's bizarre.
13    Q.  I'll start over.
14         In the June through November 1998 time frame,
15  did you understand that with the ArrayMatrix format, that
16  detection methods could be massively parallelled?
17         MR. COSTAKOS:  Objection.  Form.
18         THE WITNESS:  No, I didn't.
19         Just to make sure that we're on the same page,
20  the detection method I'm thinking about is the
21  instrument.  Are you thinking about something --
22         MR. SHULMAN:  No.  I meant -- I meant the --

| Page 104 |
| --- |

1  the -- performing the assay tests.
2         THE WITNESS:  Massively parallel meaning --
3         MR. COSTAKOS:  Objection.
4         THE WITNESS:  -- you could do, for instance,
5  96 samples in parallel?
6  BY MR. SHULMAN:
7    Q.  And, as you said, 10 million tests?
8    A.  And -- yeah, okay.  Yeah, sure.
9    Q.  Okay.  And in the summer of '98 toward the June
10  and November time frame of '98, you envisioned that as
11  many as 1536 fiber bundles with thousands of tests per
12  bundle could be simultaneously dipped or inserted into
13  the separate wells of a 1536 well microtiter plate.
14  Correct?
15    A.  That was one idea we had.  It turned out to not
16  be something that we could -- we could reduce to actually
17  reduce to a product.
18    Q.  Okay.  And in this June to November 1998 time
19  frame, you understood that the readout of target analytes
20  that bind to the beads in each strand of the bundles
21  could be performed by a single CCD camera.  Correct?
22         MR. COSTAKOS:  Objection.  Form.

                                        26  (Pages 101 to 104)

Page 105

1  THE WITNESS: Yes and no. So let me -- let me
2  make sure I answer this a little bit more carefully.
3  A single CCD camera couldn't take one image of
4  the entire plate and produce that kind of data, but what
5  you could do is serially take pictures on each of the
6  bundles. And so the -- the readout -- the
7  instrumentation wasn't parallelized or wasn't taking one
8  image. It was taking 96 images in the case of a
9  96-bundle ArrayMatrix.
10 BY MR. SHULMAN:
11 Q. Okay. How many bundles could you image on a
12 CCD camera at once?
13 A. One.
14 Q. That's what you envisioned back then?
15 A. Yes.
16 Q. Okay. Now, you mentioned that you know a man
17 by the name of Dr. Kirk. Right?
18 A. Yes.
19 Q. Okay. And how did you come to know Dr. Kirk?
20 A. He used to work with somebody at Caliper
21 Technologies. Caliper was a company that was founded by
22 Larry Bock and others. And they -- part of the

Page 106

1  management team was a person named Wally Parse, and it
2  was already founded when I joined Larry.
3  I helped Caliper with a lot of its business
4  development and corporate strategy and things like
5  licensing and things like that. So I got to know the
6  management team.
7  And as we were thinking about building a team
8  for Illumina, I went to Wally and Larry and asked them,
9  you know, for their list of people that I should talk to.
10 They provided me with Greg Kirk's name.
11 Q. Okay.
12 A. Greg had worked with Wally at Molecular
13 Devices. And Greg had gone on to be part of
14 Pharmacopeia.
15 Q. Okay. And is it correct that during the first
16 five months of 1998, you were seeking out qualified
17 scientists and other individuals to join Illumina after
18 it was formed? First four months, I guess.
19 A. Yes.
20 MR. COSTAKOS: Objection. Form.
21 THE WITNESS: So, you know, gradually -- these
22 things are all transition. So first I was concentrating

Page 107

1  on, was the technology worthwhile, then is the technology
2  licensable, and then as I started to get some visibility
3  that we'd get a license done with Tufts, I was starting
4  to think about the team.
5  And so -- but -- but recruiting didn't end in
6  the first four months or begin in the first four months
7  and end in the four months. Recruiting was a non-stop
8  process --
9  MR. SHULMAN: I understand.
10 THE WITNESS: -- that went beyond that time
11 point.
12 BY MR. SHULMAN:
13 Q. But certainly during those first four months of
14 '98, recruiting was one of the efforts that you were
15 engaged in?
16 A. Soft recruiting in the first part because I
17 don't think we had reached terms in the early part of
18 January with -- with Tufts, and so -- or MBRI, which was
19 representing Tufts. And so it was kind of a
20 hypothetical, If we start this company, would you have
21 any interest? And so it wasn't a serious recruiting or
22 trying to hire somebody. It was always conditional on

Page 108

1  the company going forward.
2  Q. And as you got into the March and April time
3  frame, the recruiting efforts became more focused and
4  more serious?
5  A. Yes. Because at that point there was better
6  visibility that we'd actually license the technology and
7  form a company around it.
8  Q. And as part of that effort to -- of recruiting
9  people, you had some communications with Dr. Kirk.
10 Correct?
11 A. Yes.
12 Q. Okay.
13 A. We tried to recruit him.
14 Q. Right.
15 Why did you try and recruit him?
16 A. Based upon the recommendations of Wally Parse,
17 who I mentioned. And also I believe Larry Bock had
18 continuing interactions with Greg because when Greg --
19 Larry helped found Pharmacopeia and was on the board
20 still at Pharmacopeia, and Greg had transitioned over to
21 Pharmacopeia. So Greg knew him from Pharmacopeia, too.
22 Q. Okay.

27 (Pages 105 to 108)

Page 109

1   A. Larry knew Greg from Pharmacopeia, so it was
2   based upon the recommendations of those two people
3   primarily.
4        MR. SHULMAN: Okay. Let me ask the reporter to
5   please mark as Exhibit 6 a document bearing production
6   Nos. AFMX 1808310 through 8314.
7        (Exhibit 6 was marked.)
8   BY MR. SHULMAN:
9    Q. Do you recognize this as an email from Dr. Kirk
10  to yourself dated January 7, 1998?
11   A. I'm reading it right now. It's certainly
12  likely to be -- I don't have any specific recollection of
13  this email outside of the fact that I'm looking at it,
14  but I have no doubt that Greg sent it to me and we were
15  talking about these kinds of subjects.
16   Q. Okay. And do you have any doubt that --
17   A. I don't know if that makes sense.
18   Q. -- you read it on or about the date it bears?
19   A. I assume I read it within a day or so of
20  receiving it.
21   Q. Was it your practice to read emails that
22  arrived in your inbox?

Page 110

1   A. Yes. That's why I assume that I read this one.
2    Q. And I was thinking about this the other day.
3        When you were at CW, what email software did
4   you use? Was it Microsoft Office-based or Microsoft
5   Outlook?
6    A. No. We were using Macs.
7    Q. Okay.
8    A. And I can't even remember what software we
9   used. I know before CW, we just -- we used Yahoo. And
10  then after CW Group, I'm not quite sure what -- I'm not
11  quite sure.
12   Q. Okay. But when you opened up your inbox, it
13  would list the emails --
14   A. Sure.
15   Q. -- that you had received and the subject matter
16  if there happened to be a subject matter in the header
17  field?
18   A. Yes.
19   Q. So by this email, Dr. Kirk was sending you his
20  CV. Correct?
21   A. Correct.
22   Q. And this followed a discussion that you and

Page 111

1   I -- you and he had at Newark airport. Right?
2    A. Let me read this.
3    Q. EWR is the abbreviation for Newark airport.
4        MR. COSTAKOS: Really?
5        THE WITNESS: Okay. I do remember, not great,
6   but do I remember that Greg and I met at the Newark
7   airport.
8   BY MR. SHULMAN:
9    Q. Okay. And why were you meeting with him at
10  this point?
11   A. For recruiting purposes.
12   Q. And what did you discuss at the Newark airport?
13   A. I barely remember the meeting, but I'm pretty
14  sure we discussed the Walt technology and some of our
15  plans for trying to turn that into a new company.
16   Q. And what did -- what specifically did you
17  discuss about the Walt technology during this meeting.
18   A. I don't remember anything specific about what
19  discussed.
20   Q. Nothing at all?
21   A. I can just barely remember that we had the
22  meeting.

Page 112

1    Q. And your reference to going to -- or his
2   reference, rather, to going to -- going to Boston and
3   wishing you good luck, was that on the negotiation with
4   Tufts?
5    A. Again, probably, but I don't really remember.
6    Q. Okay. Was this meeting in the Newark airport
7   the first time you had met Dr. Kirk?
8    A. I think it was.
9    Q. And what impression did he create in your mind
10  about his abilities in the prospective area that you were
11  looking into?
12   A. He seemed like a candidate that we wanted to
13  keep on the list and that, you know, I was excited that
14  he'd consider joining us.
15       MR. SHULMAN: Okay. Let me mark as Exhibit 7
16  an email from Dr. Stuelpnagel to Greg Kirk bearing
17  production No. AFMX 1808309.
18       (Exhibit 7 was marked.)
19  BY MR. SHULMAN:
20   Q. Are you the John Stuelpnagel that's indicated
21  as the signator on this email?
22   A. Be a really good guess.

28  (Pages 109 to 112)

Page 113

1    Q. Okay. And you appear to have sent it from
2  Larry Bock's inbox. Do you see that? Or Larry Bock's
3  email address?
4    A. That's weird. It may be an artifact of -- I'm
5  assuming you received these from Greg Kirk, and it may
6  have been how he introduced my name into his Outlook.
7    Q. Right.
8    A. I know this not because I was working in
9  Outlook in 1998, but in subsequent relationships with
10  email at Illumina, I know that depending on how you put
11  your contact in, it will automatically put a name in.
12    Q. Ah.
13    A. So my guess is that I sent it from my inbox
14  because I didn't have access to Larry's inbox, and that
15  someone -- Greg -- put me under Larry's name, and so it
16  showed up as Larry.
17    Q. Okay.
18    A. So I'd be pretty -- I'd be pretty surprised if
19  this was sent from Larry's email box. I think it was
20  probably sent from mine and miscategorized by Greg's
21  email system.
22    Q. Okay.

Page 114

1    A. Program.
2    Q. And you were responding to his email of
3  January 7, Exhibit 6?
4    A. Oh, I -- they have the same subject; so I would
5  say that's a pretty good guess, but I don't have any
6  recollection of how they were related today.
7    Q. And you thanked him for the introduction to
8  Nancy Gray, which is one of the subjects of his email?
9    A. Again, all consistent. I just don't -- don't
10  remember personally, but it's all consistent, so I don't
11  want to argue the point.
12    Q. Okay. And you told him that you would be in
13  touch and you had made some progress in Boston. Correct?
14    A. Yes.
15    Q. And did you stay in touch with him?
16    A. I believe we did have further communication
17  after that.
18    Q. Okay. Do you have any of these emails in your
19  possession?
20    A. No, I don't.
21    Q. How did you learn about these emails?
22    A. I learned -- I didn't learn about these at all.

Page 115

1  I think I've learned about the one that's going to be
2  shown to you by Illumina's counsel. They showed it to me
3  about three weeks ago, two, three weeks ago.
4    Q. What email is that?
5    A. One from Greg in which he has already gone to
6  the Walt lab and expressed some ideas that he had after
7  going to the Walt lab.
8    Q. Okay. When did you first see that email?
9    A. About three weeks ago.
10    Q. Never saw it before?
11    A. I'm sure I saw it before. I have no
12  recollection of that email prior to -- to -- or
13  particularly the subject in that email prior to seeing it
14  again three weeks ago.
15    MR. SHULMAN: Okay. Let me mark as Exhibit 8 a
16  January 9, 1998, email from Dr. Kirk to Dr. Stuelpnagel.
17    And we need to take a break because we're out
18  of tape.
19    (Exhibit 8 was marked.)
20    VIDEOGRAPHER: This is the end of disk no. 1 of
21  Volume I. We're off the record at 12:10 p.m.
22    (Recess.)

Page 116

1    VIDEOGRAPHER: This is the beginning of disk
2  No. 2 of Volume I. We're on the record at 12:19 p.m.
3  BY MR. SHULMAN:
4    Q. Would you look, please, at Exhibit 8. And you
5  see at the bottom of this email chain, there is
6  Dr. Kirk's response to you?
7    A. Yes.
8    Q. And you received this on or about the date that
9  it bears?
10    A. Probably, yes.
11    Q. Okay. You don't have any doubt that you read
12  it at the time?
13    A. I assume I did.
14    Q. Okay. And he refers -- and he's -- he refers
15  to the fact that he's still thinking about
16  encoding-decoding strategies, both from a collaboration,
17  existing IP viewpoint, and with respect to brand new
18  ideas. Were you and he discussing ideas about the Walt
19  technology in this time frame?
20    A. The only recollection I have is that there --
21  obviously there was some emails going back and forth.
22  don't really remember having a lot of telephone

Page 117

1  conversations. I remember the one meeting at Newark, and
2  beyond that, I don't remember if there was any other --
3  just a long time ago.
4      Q.  Okay.  But seeing this reference to thinking of
5  new strategies and ideas, does this refresh your
6  recollection that you and he were engaged in discussions,
7  perhaps not very extensive, but discussions about how
8  this Walt technology might be implemented?
9      A.  Well, and not limited to him.  I was talking to
10  lots of people about what I saw as the limitation to the
11  Walt technology, which was around encoding-decoding.
12      Q.  Okay.
13      A.  So it was probable -- in fact, this supports
14  that guess -- that I also talked to Kirk, but I don't
15  have a list of all the people I talked to about encoding
16  and decoding strategies.
17      Q.  But you were talking to him and others about
18  that?
19      A.  To my best recollection, I was talking to lots
20  of people, and this email supports the fact that I talked
21  to him about it.
22      MR. COSTAKOS:  Okay.  Let's mark as Exhibit 9 a

Page 118

1  January 12, 1998, letter from Dr. Kirk to
2  Dr. Stuelpnagel.
3      (Exhibit 9 was marked.)
4  BY MR. SHULMAN:
5      Q.  Did you receive this letter on or about the
6  date that it bears?
7      A.  Yeah, I have no recollection of receiving this.
8  I assume that I did receive it.  I don't know whether I
9  received it by mail or as attachment to an email.  I just
10  don't know.
11      Q.  Okay.
12      A.  I have no recollection.
13      Q.  But you have no doubt that you received it and
14  reviewed it at or about the time that it was written?
15      A.  I guess because I didn't -- don't have any
16  recollection that I received it, I just don't know, but I
17  don't have any reason to assume that I didn't receive it.
18      Q.  Okay.  Fair enough.
19      A.  You know, I struggle over
20  no-doubt-that-I-read-it language that was implied in your
21  question, and I just don't know that.
22      Q.  Okay.  You don't have any reason to doubt that

Page 119

1  you received it?
2      MR. COSTAKOS:  Objection.  Form.
3      THE WITNESS:  I think I answered that.  I have
4  no idea whether I -- I assume I received it, but there is
5  a small probability that I didn't receive it.
6  BY MR. SHULMAN:
7      Q.  I understand that.  I'm saying, are you
8  presently aware of any reason why you doubt that you did
9  receive this document?
10      A.  No.
11      Q.  Okay.
12      A.  I answered that one, correct.
13      Q.  Okay.  And are you presently aware of any
14  reason that would cause you to doubt that you read the
15  document at the time?
16      A.  If I had received it, which I think I did, I
17  just am not going to say absolutely that I received it.
18  And so if I struggle and appear argumentative, I'm not
19  trying to.  I'm trying to be --
20      Q.  I understand.
21      A.  -- correct in how I answer the questions.
22      Q.  So is it correct that you don't have any

Page 120

1  present reason to doubt that you read this document?
2      A.  I can answer yes to that one.
3      MR. SHULMAN:  Okay.  Let's mark as Exhibit 10
4  another email, this one from Dr. Stuelpnagel to Greg Kirk
5  dated January 20 of 1998.
6      (Exhibit 10 was marked.)
7  BY MR. SHULMAN:
8      Q.  Did you send this email to Dr. Kirk on or about
9  the date that it bears?
10      A.  I'm reading it to --
11      Q.  Sure.
12      A.  So -- excuse me.  I'm just trying to see what's
13  in this email.
14      So it appears that I sent it.  I don't have any
15  reason to not believe I sent it, and I think I probably
16  did send it.
17      Q.  Okay.  And it appears to be responding to the
18  letter of January 12, Exhibit 9, where he enclosed his
19  IBC talk for which you thanked him in Exhibit 10.
20  Correct?
21      A.  Appears so, yes.
22      Q.  Okay.  Now, in the first paragraph of

Page 121

1    Exhibit 10, last sentence, you referred to the fact that
2    when the negotiations with Tufts are complete, you would
3    like to get Dr. Kirk together with Dr. Walt. Do you see
4    that?
5        A. I see that.
6        Q. Why did you want to get them together?
7        A. As part of Greg's due diligence about whether
8    he wanted to join the company and our due diligence
9    whether he was the right person, it seemed like a meeting
10   between David Walt and Greg Kirk would have been
11   something I would have recommended.
12       Q. Okay. And were you trying to interest him in
13   the technology?
14       A. Yes. Because we were trying to recruit him.
15       Q. Okay. And you were asking him for his thoughts
16   at least about the optical coding --
17       A. Yes.
18       Q. -- issue. Correct?
19       A. Appears so.
20       Q. Okay. And you also asked him for
21   recommendations for potential scientific advisory board
22   members. Correct?

Page 122

1        A. Yes.
2        Q. Okay. Was it important for you to have him
3    meet Dr. Walt and see what was in his lab?
4        MR. COSTAKOS: Objection. Form.
5        THE WITNESS: If he was going to proceed as a
6    potential candidate for joining the company, I think it
7    was very important.
8    BY MR. SHULMAN:
9        Q. Okay. And at this point he was expressing
10   interest in at least exploring that possibility. Right?
11       A. To the best of my recollection and supported by
12   the emails that you've given to me.
13       Q. Okay. And did you -- were you looking for
14   feedback on the technology from these various candidates
15   that you were enticing, for lack of a better term, to
16   join Illumina?
17       A. I don't know if -- you know, "enticing" is a
18   little -- I don't know what that means. But in terms of
19   the people that I were -- I was talking to about
20   potential jobs at Illumina and joining me as a
21   co-founder, I often ask them about technology solutions
22   to, again, what I testified before was, I think, the

Page 123

1    Achilles heel of the Walt technology.
2        Q. Okay. And so were you looking from these
3    people that you were, you know, trying to interest in
4    joining Illumina for their feedback on what they thought
5    about the Walt technology?
6        A. Yeah, but not exclusively them.
7        Q. I'm not suggesting that.
8        A. Also -- yeah, yeah. So I was talking -- like I
9    mentioned before, I've talked to lots of experts around
10   the world trying to find out if there's other
11   technologies we could bring in.
12       Q. So you were interested in what Dr. Czarnik had
13   to say about the Walt technology as well as Dr. Chee and
14   Mr. Auger and Dr. Kirk and others?
15       A. Dr. Still and Dr. Whitesides. So what I want
16   to do is not try to leave the impressions that I was only
17   talking to these things about people we were recruiting
18       Q. Right. And I take it that in addition to being
19   interested in getting Dr. Kirk's feedback on the Walt
20   technology, you were interested in having him move to the
21   west coast and join Illumina should Illumina be formed?
22       A. At some point we decided to put Illumina on the

Page 124

1    west coast, but I don't know if that decision had been
2    made in the time frame in which these emails are being
3    transferred.
4        Q. Okay. Let me rephrase the question.
5        A. Yeah.
6        Q. In addition to being interested in getting
7    Dr. Kirk's as well as these other folks' feedback on the
8    technology, were you also interested in having Dr. Kirk
9    join Illumina after it was formed?
10       A. Yes.
11       Q. Okay. And there came a point in time when
12   Dr. Kirk made the decision to remain on the east coast
13   and not join Illumina. Correct?
14       A. Yes.
15       Q. And by early May of 1998, he had informed you
16   of that decision, and you were disappointed. Correct?
17       A. I can't remember the exact timeline, but I
18   remember thinking that that was disappointing.
19       MR. SHULMAN: Let me show you what we'll mark
20   as Exhibit 11, an email from you to Dr. Kirk dated May 4,
21   1998, bearing production No. AFMX 1808301.
22       (Exhibit 11 was marked.)

31  (Pages 121 to 124)

Page 125

BY MR. SHULMAN:
1   Q.  Do you recognize this as an email you sent to
2   Dr. Kirk on or about May 4, 1998?
3       A.  All of that is consistent.  I don't have any
4   clear recollection of sending the email, but I have no
5   reason to doubt that I did.
6       Q.  Okay.  And this happens to have an address for
7   you.  Is this the Cardiff office?
8       A.  It would be.
9       Q.  At 2187 Newcastle Avenue?
10      A.  Yes.
11      Q.  Okay.  Why were you disappointed in Dr. Kirk's
12  decision to remain on the east coast?
13      A.  Because I think he would have been a good
14  addition to Illumina.
15      Q.  And why did you believe he would have been a
16  good contributor to the Illumina team?
17      A.  He came highly recommended.  My -- as best I
18  can remember, my interactions with him were all positive
19  he seemed like a good team player and had a good track
20  record.
21      Q.  And was your belief based, in part, on any

Page 126

1   feedback you had received from him about ideas for
2   Illumina?
3       A.  I can't remember whether that would have
4   influenced my decision.  I think I was already interested
5   in him based upon his reputation.
6       Q.  Okay.  Let's look again at Exhibit 10, the end
7   of the first paragraph where you stated that you wanted
8   to get Kirk and Walt together.  Do you see that?
9       A.  Yes, I do see that.
10      Q.  Did you ever arrange to get them together?
11      A.  To the best of my recollection, they did meet.
12      Q.  Okay.  And did you arrange for that to happen?
13      A.  I probably helped facilitate it in some way,
14  but they did their own scheduling --
15      Q.  Okay.
16      A.  -- I suspect.  I don't know.
17      Q.  And did you ever get Dr. Kirk's feedback on the
18  Walt technology?
19      A.  I had no remembrance of that until I recently
20  saw an email that I'm sure you'll show me, too, but in
21  that email, it appears that I did get his feedback.
22          MR. SHULMAN:  Okay.  Let's look at that email.

Page 127

1   Let me mark for identification as Exhibit 12 a
2   two-and-a-half-page, single-spaced email from Dr. Kirk to
3   Dr. Stuelpnagel dated March 9, 1998, and bearing
4   production Nos. AFMX 1808304 through 8306.
5          (Exhibit 12 was marked.)
6   BY MR. SHULMAN:
7       Q.  You've seen this email before.  Correct?
8       A.  I saw this about three weeks ago, and I had --
9   you know, I'm not going to deny that I probably saw it
10  somewhere around the time it was sent to me, too.
11      Q.  Okay.  So --
12      A.  I just don't remember.
13      Q.  -- you don't have any reason to doubt, as you
14  sit here today, that you did receive this email on or
15  about March 9?
16      A.  That's correct.
17      Q.  And you don't have any reason to doubt, as you
18  sit here today, that you read the email on or about the
19  time that you received it?
20      A.  I assume I did, yes.
21          MR. COSTAKOS:  Form.
22  BY MR. SHULMAN:

Page 128

1       Q.  Okay.  And you see that the subject of the
2   email is "Feedback from Thursday meeting at Tufts."
3   Right?
4       A.  Yes.
5       Q.  And Tufts was where Dr. Walt worked.  Right?
6       A.  Correct.
7       Q.  Now, let's look at the substance of Dr. Kirk's
8   email.  According to the header of the email, March 9,
9   1998, was a Monday.  Do you see that?
10      A.  Yes, I do.
11      Q.  And the subject matter addressed in the email
12  is Dr. Kirk's feedback from his meeting at Tufts in
13  Dr. Walt's lab that was held on Thursday.  Do you see
14  that?
15      A.  I do.
16      Q.  Okay.  And did you arrange for this meeting in
17  the manner that you described earlier?
18      A.  This would have been the meeting that I think I
19  arranged.
20      Q.  Okay.
21      A.  Or at least facilitated.
22      Q.  And why did you arrange or facilitate this

Page 129

1   meeting?

2   A.  As we discussed before, it was primarily a due

3   diligence on both sides.  One is to have Greg become more

4   familiar with the technology.  The other is to have David

5   Walt assess Greg's technical competence.

6   Q.  Okay.  And do you know who accompanied Dr. Kirk

7   on his visit to the Walt lab in March of '98?

8   A.  I have no idea.

9   Q.  I take it you did not?

10  A.  To the best of my memory, I did not.

11  Q.  Okay.  And Mr. Bock did not, as far as you

12  know?

13  A.  As far as I know.

14  Q.  Okay.  And this email was directed to Mr. Bock

15  as well.  Correct?

16  A.  Correct.

17  Q.  Okay.  And you and he shared an office in

18  Cardiff.  Right?

19  A.  Correct.

20  Q.  Now, apart from what's reported in this email,

21  do you have any information about what transpired during

22  Dr. Kirk's visit to the Walt lab in March of '98 or what

Page 130

1   he thought about what he saw during that visit?

2   A.  No.

3   Q.  Okay.  Now, if you look at page 1 of this

4   email, if you count down eight paragraphs, begins --

5   MR. COSTAKOS:  The one that begins with the

6   word "first"?

7   MR. SHULMAN:  Correct.

8   BY MR. SHULMAN:

9   Q.  There Dr. Kirk stated that he wanted to share

10  with you some of his brainstorming ideas about the Walt

11  technology that he had discussed with a scientific

12  colleague over the weekend between the lab visit and the

13  date of the email.  Do you see that?

14  A.  Yes.

15  Q.  So Kirk's visit to Walt's lab must have been on

16  the Thursday before this Monday, March 9.  Correct?

17  A.  Yes.

18  Q.  Okay.  Now, let's look at some of Dr. Kirk's

19  ideas that he described and disclosed to you in this

20  March 9 email.

21  If you look at the first page of the email, the

22  paragraph that has the number three in front of it about

Page 131

1   halfway down?

2   A.  Yes.

3   Q.  Okay.  There he told you in the first sentence

4   that with this Walt technology, the detection methods can

5   be massively parallel.  Do you see that?

6   A.  Yes.

7   Q.  And in the second sentence, Dr. Kirk then

8   explained to you what he meant by massively parallel --

9   A.  Yes.

10  Q.  -- when he stated, for instance, 15 -- and I'm

11  quoting, "For instance, 1536 fiber bundles with up to

12  6,000 tests can be fixtured to perform simultaneous

13  testing of all wells in our new 1536 microliter meter

14  well plates," exclamation point.  Do you see that?

15  A.  Yes.

16  Q.  And in the sentence that I just read, Dr. Kirk

17  emphasized that the testing can be done simultaneously in

18  all wells by typing the word "all" in capital letters and

19  using an exclamation point at the end of the sentence.

20  Do you see that?

21  MR. COSTAKOS:  Objection.  Form.

22  THE WITNESS:  Yes.

Page 132

1   BY MR. SHULMAN:

2   Q.  Okay.  And after Dr. Kirk informed you of his

3   emphasized idea in March of 1998, you claimed to have

4   originated the same idea months later after taking a run

5   in San Diego.  Correct?

6   MR. COSTAKOS:  Objection.  Form.

7   THE WITNESS:  I would not agree to that, no.

8   BY MR. SHULMAN:

9   Q.  Okay.  How is Dr. Kirk's emphasized idea that

10  he communicated to you in March of 1998 any different

11  than the testimony that appears at page 1035 beginning at

12  line 15 through 1037, line 1, of your trial testimony?

13  A.  Yes.

14  MR. COSTAKOS:  Objection.  Form.

15  THE WITNESS:  So the trial testimony was around

16  a particular exhibit, if I recall our review of it today.

17  It was around the specific product that would become the

18  product -- Illumina's first product.  And that's what --

19  that was part of the brainstorming session.  I don't

20  think it's clear that the same product that we developed

21  is that which he's describing here.

22  BY MR. SHULMAN:

Page 133

1     Q.  You didn't have a product in the summer of '98,
2   did you?
3     A.  We had a product idea, a product concept
4   in summer of '98.
5     Q.  You had an idea.  Right?
6     A.  Yes.
7     Q.  Okay.  You didn't have a product?
8         MR. SHULMAN:  Objection.  Form.
9         THE WITNESS:  That's right.
10  BY MR. SHULMAN:
11    Q.  Okay.  And so how is the idea that you
12  described at page 1035 through 1037 -- how is that idea
13  any different than the idea that Dr. Kirk informed you of
14  months earlier?
15        MR. COSTAKOS:  Objection.  Form.
16        THE WITNESS:  So I'm not going to argue that
17  they're similar -- they're not similar because they are,
18  but here it's not clear to me how you would fixture all
19  of those.  And then when I read on, the idea of 1536 is
20  not a practical one, and that the readout on one high
21  resolution CCD chip would never work.  Furthermore, the
22  1536 fiber bundles with 6,000 tests depends on what he

Page 134

1   means by tests because you have to have redundancy.  You
2   would never be able to design a 1536 bundle with 6,000.
3   If he means unique tests, I just don't know what he means
4   there in a fiber bundle that's small enough to fit into a
5   1536 microtiter well plate.  And so there's a lot of
6   differences between what became our product and the
7   description that Greg has here.
8   BY MR. SHULMAN:
9     Q.  Okay.  But I didn't ask you about your product.
10  I asked you about the differences between your
11  description that appears on page 1035 through 1037 and
12  the words that appear in this email.  So let's put the
13  product out -- out of our minds for a moment and just
14  look at your testimony at page 1035, line 15, through
15  1037, line 1.
16        MR. COSTAKOS:  Well, hold on.  Hold on.
17        MR. SHULMAN:  Excuse me.
18  BY MR. SHULMAN:
19    Q.  What are the difference between -- in your
20  mind, between the words you chose to describe how you
21  arrived at the format and what Dr. Kirk said in this
22  email?

Page 135

1     A.  So I'm --
2         MR. COSTAKOS:  Wait.  Hold on.  I'm going to
3   object --
4         THE WITNESS:  Yeah.
5         MR. COSTAKOS:  -- because we've been through
6   this before and the unfairness of taking that testimony
7   out of context, and we spent a great deal of time about
8   that specific issue before.  So I think the question is
9   improper.
10        You can go ahead and answer how you see fit.
11        THE WITNESS:  Well, I'm really confused because
12  what I testified to was a product, and how we came up
13  with the product, and it's a specific context.  And now
14  you're asking me not to describe it in context of the
15  product, that line 15 was about a specific exhibit which
16  was our Sentrix ArrayMatrix.
17  BY MR. SHULMAN:
18    Q.  Sir, let's start at line --
19    A.  So when you asked me to do -- say what's
20  different and I say the product's different what Greg
21  describes here, and then you tell me not to use that as a
22  frame of reference, I'm totally confused by what you're

Page 136

1   trying to accomplish.
2     Q.  Okay.  Why don't you look at page 1035 of your
3   testimony --
4     A.  Okay.
5     Q.  This is Exhibit 2.
6         MR. COSTAKOS:  Which exhibit was it again?
7         MR. SHULMAN:  Exhibit 2.
8         THE WITNESS:  Exhibit 2.
9   BY MR. SHULMAN:
10    Q.  Okay.  Page 1035, at line 10, your lawyer said,
11  "Can you explain what Exhibit 2054 is?"  I'm sorry.
12  Line 11.  Do you see that?
13    A.  Yes.
14    Q.  Okay.  And your response was, "Yes, this is our
15  Sentrix ArrayMatrix."  Right?
16    A.  Yes.
17    Q.  Okay.  And the Sentrix ArrayMatrix is a
18  product.  Correct?
19    A.  Yes.
20    Q.  Okay.  And then he asked you, "Can you describe
21  how the ArrayMatrix format was arrived at."  Right?
22    A.  Yes.

34  (Pages 133 to 136)

Page 137

1    Q.  He's asking you about the format.  Right?
2    A.  I don't know what he means by format.  I
3    assumed he meant, you know, how did you come up with the
4    product idea.
5    Q.  He asked you about the format, and he didn't
6    even mention Sentrix in the question that appears at
7    line 15.  Correct?
8    A.  So maybe you can help define what format means
9    in that question because all I can say is in the context
10    in which I answered it several years ago.
11    Q.  Okay.  And you didn't use the word "Sentrix" in
12    your answer either, did you?
13    A.  I think I used ArrayMatrix, and I think we all
14    knew what we were talking about.  When I said
15    ArrayMatrix, we were talking about Exhibit 2054.  I'm
16    really confused by your line of questioning because
17    I'm -- I just -- I'm trying to be helpful here.  I just
18    don't know how to answer the question accurately with the
19    way that you're taking it out of context.
20    Q.  Okay.  Did your ArrayMatrix product that you
21    eventually came out with many years later, did it have
22    fiber bundles fixtured to perform simultaneous testing of

Page 138

1    all wells in the well plate?
2    A.  Yes.
3    Q.  Okay.  And that idea was communicated to you by
4    Dr. Kirk in his email.  Correct?
5    MR. COSTAKOS:  Objection.  Form.
6    THE WITNESS:  But it's -- it's -- it's how
7    they're fixtured and how they're put together that makes
8    that a product.  The same words are consistent with --
9    BY MR. SHULMAN:
10    Q.  Okay.
11    A.  -- with -- with our product.
12    Q.  So that idea was communicated to you by
13    Dr. Kirk --
14    MR. COSTAKOS:  Objection.
15    BY MR. SHULMAN:
16    Q.  -- in March of '98.  Correct?
17    MR. COSTAKOS:  Objection.  Form.
18    THE WITNESS:  The idea that is listed here in
19    the one sentence from Dr. Kirk was communicated to me, by
20    all probability, somewhere around March of '90- -- 1998.
21    BY MR. SHULMAN:
22    Q.  Okay.

Page 139

1    A.  This one sentence.
2    Q.  And you would agree that that is very similar
3    in concept to what you came up or claim to have come up
4    with in the summer of '98?
5    MR. COSTAKOS:  Objection.  Form.
6    THE WITNESS:  I think it is.
7    BY MR. SHULMAN:
8    Q.  Okay.  Now, according to Dr. Kirk's emphasized
9    idea in this paragraph 3 of his email, each of the 1536
10    fiber bundles that he envisioned would contain up to
11    6,000 fiberoptic strands.  Correct?
12    A.  That's not clear to me, so -- and I might -- if
13    I can -- if you can give me some liberty to -- to talk
14    about what I regard as a test, a test would be --
15    Q.  Well, let me help you out there --
16    A.  Okay.
17    Q.  -- before you go out a limb.
18    If you look at page 2 of his email --
19    A.  Uh-huh.
20    Q.  -- halfway down there's a section Roman numeral
21    II.  Do you see that?
22    A.  Yes.

Page 140

1    Q.  And then there's paragraph A?
2    A.  Yes.
3    Q.  And he says, in paragraph A, "I was excited to
4    see how small and convenient each 6,000 member fiber
5    bundle is."
6    A.  So it appears that -- you know, and I don't
7    have any recollection of this email other than having
8    seen it today and once before three weeks ago, but it
9    seems to me that he defines test as a fiber bundle.  And
10    that's fine.  There's -- there's different ways of
11    defining tests; so I'll accept that definition.
12    Q.  It has a fiber in a fiber bundle?
13    A.  A fiber -- yes, 6,000 fibers in a fiber bundle.
14    Q.  So a test -- 6,000 tests is --
15    A.  6,000 fibers --
16    Q.  -- fibers per bundle?
17    A.  -- is the way he is using the term.  I'm not
18    trying to quibble.  I'm just saying people use those
19    terms differently.
20    Q.  And collectively --
21    A.  I use those terms differently.
22    Q.  And collectively, the 6,000 strands in each

35  (Pages 137 to 140)

Page 141

1   bundle of the 1536 that he envisioned here was an array
2   of thousands of fiberoptic strands. Correct?
3     A. Say that again.
4     Q. Yes.
5     Collectively --
6     A. Yes.
7     Q. -- the 6,000 fiberoptic strands in each bundle
8   that he envisioned was an array of thousands of
9   fiberoptic strands. Correct?
10      MR. COSTAKOS: Objection. Form.
11      THE WITNESS: If I'm following the question
12   correctly, yes.
13   BY MR. SHULMAN:
14     Q. Okay. And as described in Dr. Kirk's email,
15   the fiberoptic strands in each bundle could have a bead
16   loaded under their projecting end, and each bead could
17   have a different bioactive test agent. Correct?
18     A. Correct.
19     Q. And as described --
20     **A. So I -- wait. Let me -- I said "correct" too**
21   **quickly because I actually don't think that -- it's not a**
22   **correct implementation of the technology, and so unless**

Page 142

1   **he said that, which he might have, he would have been**
2   **wrong, but -- so, you know, again, I'm trying to adapt to**
3   **his nomenclature in an email that I haven't reviewed**
4   **today, so --**
5     Q. Look at paragraph 2 on page 1.
6     A. Okay.
7     Q. He says, "Test reagents can be loaded into
8   fibers as beads or as a chemical coding step."
9     A. Yes.
10     Q. Correct? Yes?
11     A. Yes.
12     Q. And he also told you that tests can be
13   performed by a simple dipping step. Right?
14     A. Yes.
15     Q. Okay.
16     **A. But how did that answer the question that --**
17   **where I created some -- you created some confusion in my**
18   **mind.**
19     Q. I'm not worried about that. I got --
20     A. Oh, okay.
21     Q. And as described in Dr. Kirk's email, all 1536
22   arrays of fiberoptic bundles could be combined into a

Page 143

1   single fixture. Correct?
2      MR. COSTAKOS: Objection. Form.
3      THE WITNESS: Actually, it doesn't say that.
4   It says that somehow they can be fastened together. You
5   inserted the word "single," and I wouldn't necessarily
6   say that I can infer that from his sentence here.
7   BY MR. SHULMAN:
8     Q. He said they could be combined into a fixture.
9   Right?
10     **A. No, he doesn't. He says that they could be**
11   **fixtured to perform simultaneous testing. It's only one**
12   **sentence. We can't -- I mean, we can quibble about the**
13   **words, but let's just read it accurately and we then mov**
14   **on. It's one sentence, paragraph 3, "1536 fiber bundles**
15   **with up to 6,000 tests can be fixtured to perform**
16   **simultaneous testing of all wells in our new 1536**
17   **microtiter plate."**
18     Q. Okay. Now look at page 2.
19     A. Okay.
20     Q. Halfway down the page you see Roman numeral II,
21   the section that begins Roman numeral II?
22     A. Yes.

Page 144

1     Q. Okay. And then you see the subparagraph
2   labeled A?
3     A. Okay. Yes.
4     Q. Okay. And if you go down to the first, second,
5   third, fourth, fifth line down, last word, I'll read it
6   into the record.
7     A. Okay.
8     Q. "For instance, a low-cost fixture can be
9   fabricated that would arrange 1536 fiber bundles to line
10   up with the wells of one of the new Costar plates." Do
11   you see that?
12     A. Yes, I do.
13     Q. So as described in Dr. Kirk's email, all 1536
14   arrays of a fiberoptic bundle -- or fiberoptic bundles
15   could be combined into a single fixture. Correct?
16     A. Appears so.
17     Q. Okay. And when you combine all 1536 arrays
18   into a single fixture, what you end up with is an array
19   of 1536 arrays. Correct?
20      MR. COSTAKOS: Objection. Form.
21      THE WITNESS: You have an array of 1536 fiber
22   bundles.

36 (Pages 141 to 144)

Page 145

1   BY MR. SHULMAN:
2      Q.  Right.  And each of those fiber bundles is, in
3   and of itself, an array of fiberoptic fibers.  Right?
4      A.  Yes.
5      Q.  Okay.  Now, let's look again at the email,
6   page 1, paragraph 3.
7      A.  Page 1, paragraph 3.
8      Q.  After telling you his idea that all 1536
9   bundles can be tested simultaneously in all 1536 wells of
10  his new 1536 well plate, he told you in the third
11  sentence that the readout from these millions of
12  simultaneous tests only required one high-resolution CCD
13  chip.  Do you see that?
14         MR. COSTAKOS:  Objection -- objection.  Form.
15         THE WITNESS:  I do see that.
16  BY MR. SHULMAN:
17     Q.  Okay.  And in the camera that you contemplated
18  using in the summer of '98, there would be one CCD chip
19  that would be used to read out each of the bundles
20  separately.  Correct?
21     A.  Yes.  So I want to make sure that I don't -- I
22  read this sentence that he's got one CCD chip that images

Page 146

1   all the bundles simultaneously, and that's not what we
2   developed, but I'm just trying to, you know, read into
3   what -- that's my interpretation of those two sentences
4   He may have a different interpretation of those two
5   sentences.
6      Q.  And that's how you interpret it today?
7      A.  That's correct.
8      Q.  And you don't remember how you interpreted it
9   back in March of '98?
10     A.  I have no recollection of remembering --
11     Q.  Okay.
12     A.  -- seeing this in '98.
13     Q.  Okay.  Let's look at page 2 of the email.
14  About halfway down the page, there's a paragraph labeled
15  A, the one we were looking at before, where he says, "I
16  was excited to see how small and convenient each
17  6,000-member bundle is."  Do you see that?
18     A.  Yes, I do.
19     Q.  And in the third sentence of that paragraph, he
20  told you -- Dr. Kirk told you that, quote, "We have been
21  working hard on these technologies at PCOP."  Do you see
22  that?

Page 147

1      A.  I do see that.
2         MR. COSTAKOS:  Objection.  Form, context.
3   BY MR. SHULMAN:
4      Q.  Okay.  And PCOP is an acronym for
5   Pharmacopeia Inc.  Correct?
6      A.  I believe so, yes.
7      Q.  And that's where Dr. Kirk worked at the time as
8   vice president of engineering.  Right?
9      A.  I have a faint recollection that that's his
10  title, but I don't remember sitting here today that that
11  was his title.
12     Q.  Okay.  And then in the fourth sentence of
13  paragraph A on page 2, he told you that "coupling to the
14  fiber bundle method seems like a big winner."  Do you see
15  that?
16     A.  Yes.
17     Q.  I'm sorry?
18     A.  I do see that sentence.
19     Q.  And in the very next sentence, he explained
20  what he meant when he stated that, "for instance, a
21  low-cost fixture can be fabricated that would arrange
22  1536 fiber bundles to line up with the wells on one of

Page 148

1   the new Costar plates."  Do you see that?
2      A.  I do.
3      Q.  And he explained to you on page 3 of his email
4   that the new Costar plate was a 1536 microliter well
5   plate that Pharmacopeia had co-developed with Corning
6   Costar.  Do you see that?
7      A.  I'm sorry.  I'm still trying to catch up.
8   Could you show me where on page 3 --
9      Q.  Yeah.
10     A.  -- that disclosure is.
11     Q.  The first paragraph, about an inch down.
12  "PCOP is currently inviting companies to join a
13  consortium to develop a 1536-well microliter scale
14  screening system based on a plate co-developed with
15  Corning Costar."
16     A.  I see that.
17     Q.  Okay.  And how is this idea of Dr. Kirk's of
18  dipping simultaneously an array of array bundles of
19  fiberoptic fibers into separate wells of a microtiter
20  plate any different than the concept you came up with o
21  claim to have come up with in the summer of '98?
22     A.  So there's -- certainly those -- they share

37  (Pages 145 to 148)

Page 149

1    those similarities of multiple fibers dipping into a
2    microtiter plate.
3        I think what we came up with was this idea of
4    a -- of a product and how these things would be combined
5    and how they would mate to a microtiter plate.
6        Q. Now, you mentioned earlier to me that you
7    thought 1536 was impractical. Right?
8        A. We didn't know it at the time, but I -- here
9    today, I think it is impractical.
10       Q. When did you learn that it was impractical?
11       A. When we tried to make a model of 1536 and
12   having seen how that -- how difficult it is to align
13   those fibers into the wells of the microtiter plate.
14       Q. Okay. And approximately when in point of time
15   did you discover the difficulties that you just testified
16   to?
17       A. I think it was a continuous evolution of
18   thought from somewhere in probably the July time frame to
19   the December time frame of 1998.
20       Q. So by the end of 1998, you knew that 1536 was
21   not going to work?
22       A. I -- you know, I -- I just don't remember. I

Page 150

1    just remember that we came at some point to the
2    conclusion that 1536 would never be practical.
3        Q. Was that in the decade of the '90s that that
4    decision was made or that conclusion was reached?
5        A. I -- I think so, but I don't even know.
6        Q. Okay. Do you know that in your patent you
7    claimed 1536 well plates?
8        A. Yeah. Because when we filed the patent, we
9    probably still thought it was okay.
10       Q. Do you know that you didn't file those claims
11   with 1536 well plates until well into 2004 or 2005?
12       A. I have no idea about the patent prosecution.
13   My guess is that it was a continuation of an earlier
14   filing.
15       Q. Okay.
16       A. And so the sub- -- the specification probably
17   wasn't altered, but you -- you have the documentation, so
18   if I'm wrong, please correct me.
19       MR. SHULMAN: Okay. Five more minutes, then
20   we'll take a lunch break. Is that okay with everyone?
21   BY MR. SHULMAN:
22       Q. Let's talk about this 1536 well plate --

Page 151

1        A. Okay.
2        Q. -- that Dr. Kirk disclosed in his email.
3        According to his description, each assay well
4    is designed to hold a volume of liquid that, as he
5    described it, is measured in microliters. Correct?
6        A. Uh-huh.
7        Q. And according to paragraph 4 on page 1, the
8    test samples or test liquids for the assays can be
9    prepared in separate wells of the well plate until the
10   fibers are ready to be dipped into the wells. Do you see
11   that?
12       A. I'm catching up, so I'm just -- we're flipping
13   back and forth, and I just --
14       Q. Sure.
15       A. -- want to read this.
16       So you're saying paragraph 4 does -- says --
17   discloses what?
18       Q. Let me -- let me repeat the question.
19       A. Okay.
20       Q. According to paragraph 4 on page 1, the test
21   samples or test liquids for the assays can be prepared in
22   separate wells of the well plate until the fibers are

Page 152

1    ready to be dipped into the wells. Correct?
2        A. Correct.
3        Q. And that was another --
4        MR. COSTAKOS: And you can, of course, read any
5    part of the email that you feel appropriate to read.
6        MR. SHULMAN: And make sure that you follow
7    counsel's instructions, particularly when they're
8    inappropriate.
9        MR. COSTAKOS: That's not inappropriate. What
10   I'm saying is when you're flipping back and forth, he can
11   read whatever he wants to read. That's my only point.
12   BY MR. SHULMAN:
13       Q. Okay. And when each of the separate 1536
14   bundles are dipped into a separate one of each of the
15   1536 wells as described in Dr. Kirk's email, each of the
16   6,000 bead-containing fibers in the fiber bundles are
17   processed in parallel. Correct?
18       MR. COSTAKOS: Objection. Form.
19       Can you read that one back?
20       MR. SHULMAN: Sure. I wrote it down because it
21   was a mouthful. Let me --
22       MR. COSTAKOS: Yeah, I know. I noticed that.

38 (Pages 149 to 152)

7/13/2010          **Illumina Inc. v. Affymetrix Inc**          John R. Stuelpnagel
**Attorneys' Eyes Only**

---

Page 153

1      MR. SHULMAN: Let me repeat it for you slowly
2   BY MR. SHULMAN:
3      Q. Is it correct that when each of the separate
4   1536 bundles are dipped into a separate one of the 1536
5   wells as described in this email, each of the 6,000
6   bead-containing fibers in each bundle are processed in
7   parallel?
8      MR. COSTAKOS: Objection. Form.
9      THE WITNESS: I'm stumbling over "processed"
10  because if you're saying that you can insert this in --
11  at least theoretically into separate wells, that's all
12  done in parallel. But what can't be done parallel or
13  simultaneous is a single readout. So the readout would
14  actually be serial with each bundle being --
15  BY MR. SHULMAN:
16     Q. Yeah, I'm not talking about the readout.
17     A. So I just --
18     Q. Right. So you would agree that the process
19  step of inserting the 6,000 fibers that are present in
20  each of the 1536 bundles into separate wells of 1536 well
21  microtiter plate is done in parallel?
22     A. Yes. Disregarding the technical limitation --

---

Page 154

1   technical difficulties of doing that.
2      Q. Okay. And 6,000 fibers per bundle times 1536
3   bundles comes out to roughly 9 million or 10 million.
4   Correct?
5      A. Yeah, that sounds about right.
6      Q. Now, let's look at the last page of the email,
7   the second-to-last paragraph.
8      And there Dr. Kirk told you that he would
9   welcome the opportunity to further discuss his ideas with
10  you. Correct?
11     A. Yes, he says that.
12     Q. And did you take Dr. Kirk up on that
13  opportunity to discuss all of these ideas with him?
14     A. I have no recollection of that.
15     Q. Okay. You have no recollection of ever
16  discussing any of these ideas with Dr. Kirk?
17     A. No. And until three weeks ago, I had no
18  recollection of having received this email either.
19     MR. SHULMAN: Why don't we take a lunch break.
20     VIDEOGRAPHER: Off the record at 12:59.
21     (The lunch recess was taken at 12:59 p.m.
22  Proceedings scheduled to resume at 1:50 p.m.)

---

Page 155

1               * * *
2           LUNCH RECESS
3               * * *
4
5      (The deposition resumed at 1:50 p.m.)
6      VIDEOGRAPHER: We're on the record at 1:50 p m.
7   BY MR. SHULMAN:
8      Q. Dr. Stuelpnagel, you mentioned earlier today
9   that back in '98 it was your practice to open and read
10  the emails that appear in your email box. Correct?
11     A. Yes. I -- let's just leave it at yes.
12     Q. And do you have any reason that you departed
13  from that practice with respect to the March 9, 1998,
14  email that has been marked as Exhibit 12?
15     A. No, I have no reason to assume that.
16     Q. Okay. Do you believe that you did read the
17  email at the time?
18     A. Just based upon what I normally did, I would
19  think that I would have read the email.
20     Q. Okay. Now, can you look at Exhibit 3, please.
21  It's your deposition testimony from the earlier
22  Illumina-Affymetrix case.

---

Page 156

1      MR. COSTAKOS: Which one are we on? Exhibit 3
2      MR. SHULMAN: Yeah.
3   BY MR. SHULMAN:
4      Q. And if you turn to the page that has the funny
5   numbers in the right-hand corner that ends with 171...
6      MR. COSTAKOS: One second.
7      MR. SHULMAN: You get it?
8      MR. COSTAKOS: Uh-huh.
9   BY MR. SHULMAN:
10     Q. Okay. And do you see there in the bottom left
11  quadrant, there's page 155 of the transcript?
12     A. Yes.
13     Q. Okay. About halfway down that page, you were
14  asked some questions about what patents you're on. Do
15  you see that?
16     A. Yes.
17     Q. And your response, you stated, "I don't even
18  know which ones are patents and which ones are
19  applications, but there are some that are assay
20  applications and patents and some that are decoding and
21  some that are format-related." Do you see that?
22     A. Yes.

---

39  (Pages 153 to 156)

Page 157

1   Q.  You did give that testimony.  Correct?
2   A.  Yes.
3   Q.  Okay.  And then you were asked a question.
4   "When you say format-related, you mean -- so
5   do you know how many issued patents there are in your
6   name?
7       "Answer:  No.
8       "Question:  More or less than five?
9       "Answer:  Probably around that number.
10      "Question:  Around that number?
11      "Answer:  Uh-huh.
12      "Question:  Do you think about four?
13      "Answer:  Okay.
14      "Question:  I'm asking if you think that's
15  correct.
16      "Answer:  I don't know.
17      "Question:  You have no idea?
18      "Answer:  Huh-uh.
19      "Question:  When you say format-related, what
20  are you talking about?
21      "Answer:  Oh, for instance, their ArrayMatrix
22  was a big part of an invention that I contributed to in a

Page 158

1   large way.
2       "Question:  You contributed in a large way to
3   the invention of the Sentrix ArrayMatrix?
4       "Answer:  I believe so.
5       "Question:  What was your contribution to that?
6       "Answer:  Well, the invention happened in the
7   boardroom with Tony Czarnik -- not Tony Czarnik.  I'm
8   sorry -- Mark Chee and Steve Auger and myself.  And I had
9   been running that weekend and was thinking about these
10  probe arrays and how they're different than everybody
11  else's arrays -- this is the fiberoptic, because that's
12  the only format we had at the time -- and how you could
13  actually put that into a well and bring the array to the
14  solution as opposed to bringing the solution to the
15  array.  And so I was thinking about what are the
16  implications of that, what can you do, and I started to
17  think about how you could match those to wells in
18  microtiter plates.  So we started brainstorming around
19  this, and I think it was the next day -- it might have
20  been a couple of days later -- and we, the three of us,
21  came up with this idea of putting 96 arrays together to
22  match the wells in the microtiter plates, and that's the

Page 159

1   ArrayMatrix."
2       Did you give that testimony, sir?
3   A.  Yes, I did.
4   Q.  Okay.  And is the subject matter that appears
5   here and the answer that bridges paragraphs 156 and 157
6   the same subject matter to which you were testifying at
7   trial at pages 1035 through 1037?
8       MR. COSTAKOS:  Objection.  Form.
9       THE WITNESS:  No.  And I don't mean to split
10  hairs, but I think I have to.
11  BY MR. SHULMAN:
12  Q.  Okay.
13  A.  Here I'm talking about patents and the
14  ArrayMatrix.  In the testimony in court, I was talking
15  about the specific exhibit that was shown to me.
16  Q.  Okay.  Is the run that's referred to on
17  pages 156 to 157 of your deposition, as well as the
18  brainstorming session leading up to this 96 arrays
19  together, is that the same run and brainstorming session
20  to which you referred in your trial testimony at
21  pages 1035 to 1037?
22  A.  Yes, that's true.

Page 160

1   Q.  Okay.  And so here on pages 156 and 157 -- I
2   apologize.  I don't want to mischaracterize what you just
3   told me.
4   A.  Yeah.
5   Q.  I just forgot.
6   A.  Okay.
7   Q.  But you said your trial testimony concerned the
8   Sentrix ArrayMatrix product.  Correct?
9   A.  Yes.
10  Q.  And this testimony at pages 156 and 157
11  concerns what, sir?
12  A.  There's elements that are talking about the
13  patent as well as the actual product.  And so there's
14  both of those intermixed in this question and answer, as
15  I read it.
16  Q.  Okay.  In this answer that spans pages 156 and
17  157, do you see any reference to a plate?
18  A.  No.  But I use -- like I said before, the plate
19  that I would be talking about is the Sentrix ArrayMatrix
20  which is referred here.  And so I use those terms
21  interchangeably.  I'm not quite so sure why it's
22  important for you not to let me use those

Page 161

1    interchangeably, but that's how I use them.
2        Q.   I'm happy to have you do whatever you want.
3        A.   Okay.
4        Q.   I'm just asking questions, sir.
5        A.   Okay.
6        Q.   We saw, in the March 1998 email, Dr. Kirk
7    disclosed to you this idea of creating an array of
8    fiberoptic arrays in a bundle and dipping each of the
9    arrays in that array of arrays into its own separate well
10   on the microtiter plate. Do you recall that?
11       A.   Yes.
12           MR. COSTAKOS: Objection. Form, compound.
13   BY MR. SHULMAN:
14       Q.   Okay. Do you have any explanation for the fact
15   that four months after Kirk disclosed that idea to you,
16   you claimed to have thought of what you characterized
17   earlier as substantially the same idea in the summer of
18   '98?
19           MR. COSTAKOS: Objection. Form.
20           THE WITNESS: So I'm not sure that I would
21   agree with your assessment that what we developed in the
22   summer of 1998 is substantially the same. I think it's

Page 162

1    much more and broader than the three lines that are in
2    Dr. Kirk's email.
3        Second, you asked me about whether I had any
4    explanation why I received this email and why we had a
5    brainstorming session around this. I don't have any
6    connection between the two whatsoever. I honestly did
7    not remember this email until it was shown to me. I had
8    no idea about Greg's description here of 1536 fiber
9    bundles in a 1536 microtiter plate.
10   BY MR. SHULMAN:
11       Q.   Okay.
12       A.   I just didn't remember those things --
13       Q.   Okay.
14       A.   -- so I don't think I used this information at
15   all in coming up with what eventually became the
16   ArrayMatrix. And I think that's supported with all of my
17   previous testimony, and I think it's also supported with
18   the enthusiasm that we felt after the brainstorming
19   session that we thought we'd figured out what Illumina's
20   first product's going to be.
21       Q.   And when you say you don't recall the email,
22   you're talking about today. Correct?

Page 163

1        A.   No. I don't think I -- I have no -- I don't
2    think there's any way I recalled the email when we had
3    the brainstorming session or when I went for the run,
4    because if I had, I certainly wouldn't have characterized
5    my contribution in the way that I've characterized my
6    contribution.
7        Q.   Or maybe you're taking credit for Dr. Kirk's --
8           MR. COSTAKOS: Wait. Hold you. Hold on. You
9    interrupted his answer.
10          MR. SHULMAN: I'm just --
11          MR. COSTAKOS: No, no, no, no. You're not
12   allowed to interrupt.
13   BY MR. SHULMAN:
14       Q.   Go ahead, go ahead. Finish up if you have
15   something else to say.
16       A.   Go -- go ahead.
17          MR. COSTAKOS: But please don't interrupt
18   again.
19          MR. SHULMAN: I apologize.
20   BY MR. SHULMAN:
21       Q.   One explanation is that you forgot what you
22   read in the email. Right?

Page 164

1        A.   Uh-huh. Yes.
2        Q.   Correct?
3        Another explanation is you took credit for
4    yourself for what was in the email. Right?
5        A.   That's your hypothesis. I have no -- I
6    absolutely do not believe that's the case.
7        Q.   Okay. And that's your present day belief.
8    Right?
9        A.   That's correct.
10       Q.   But you don't remember what happened back in
11   1998 because you don't even remember receiving the email.
12   Right?
13          MR. COSTAKOS: Objection. Form.
14          THE WITNESS: Correct.
15   BY MR. SHULMAN:
16       Q.   So you don't know whether you derived it from
17   Dr. Kirk or whether you thought it of independently
18   because you just don't remember?
19       A.   Well, I can say that if it were such an
20   important part of us coming up with the product that we
21   eventually came up with, I think I would remember that.
22   So I'm sorry. I get literally hundreds of thousands of

41 (Pages 161 to 164)

7/13/2010      **Illumina Inc. v. Affymetrix Inc**      **John R. Stuelpnagel**
**Attorneys' Eyes Only**

Page 165

1   emails through my career at Illumina, and I don't
2   remember every one. I just don't.
3      I do remember when we developed the first
4   product at Illumina and how interesting and exciting that
5   was. And I remember, because it was such an important
6   event, how the ideas evolved to me, which included the
7   idea of -- of obsessing of the fact that these arrays are
8   different. The fact that other people had recognized
9   they were different, great, but that's not how I came up
10   with my contributions to this -- this product.
11     Q. In fact, you thought the March 9, 1998, email
12   was a very important email, didn't you, back at that
13   time?
14      MR. COSTAKOS: Objection. Form.
15      THE WITNESS: I have absolutely -- I think that
16   actually mischaracterizes my testimony, and I, having the
17   fact that I don't even remember this email, wouldn't
18   characterize it as something that was important enough
19   for me to remember.
20   BY MR. SHULMAN:
21     Q. Okay. Isn't it true that in March and April of
22   '98, you and Kirk had further discussions about his idea

Page 166

1   set forth in the email?
2     A. I have recollection of that, as I've testified
3   before.
4     Q. So you're not denying it happened?
5     A. I have no idea.
6     Q. Okay. And you don't recall having taken Kirk's
7   ideas and claimed it as your own?
8     A. That's right.
9     Q. Okay. You're not saying it didn't happen?
10     A. No. I think if that had happened, I would have
11   a different recollection of how the ArrayMatrix came to
12   be. And so all the consistent testimonies, at all times
13   that I've remembered how this invention came to be did
14   not include thinking about this email that Greg had sent
15   me.
16     Q. What can you point to other than your say-so
17   that Kirk's email had no influence on what you claimed to
18   have been your conception in the summer of '98?
19     A. Again, all I can point is the documents that
20   you're putting in front of me that I think are consistent
21   with my explanation today, and that's it.
22     Q. Now, let me show you -- the documents that I'm

Page 167

1   putting forward before you today to which you just
2   referred are your prior testimony. Correct?
3     A. That's correct.
4     Q. Okay. And that's just your say-so. Right?
5     A. That's my say- --
6      MR. COSTAKOS: Objection. Form.
7      THE WITNESS: It's what people have asked me
8   about historically about how this came to be.
9   BY MR. SHULMAN:
10     Q. Right. And all you can point is your say-so.
11   Right?
12      MR. COSTAKOS: Objection. Form.
13      THE WITNESS: Yes. And it's been consistent
14   over the years.
15   ///
16   BY MR. SHULMAN:
17     Q. I grant you that, but that wasn't my question.
18   All you can point to is your say-so. Right?
19     A. That's --
20      MR. COSTAKOS: Objection. Form.
21      THE WITNESS: I've answered that question, and
22   the answer is yes.

Page 168

1   BY MR. SHULMAN:
2     Q. Okay. Can you point to any other evidence to
3   demonstrate that you didn't derive the invention from the
4   explication that Dr. Kirk provided in his email,
5   Exhibit 12?
6     A. No, I cannot.
7      MR. SHULMAN: Okay. Let me mark as Exhibit 1
8   another email from Dr. Kirk to Dr. Walt dated March 11,
9   1998, bearing production Nos. AFMX 1808315 through 1
10      (Exhibit 13 was marked.)
11   BY MR. SHULMAN:
12     Q. If you'd look first at the first page of this
13   email, I have no reason to believe you've seen this
14   before, so I'm not going to suggest that you have.
15     A. Okay.
16     Q. But I'd like you to just read the first page.
17     A. Okay.
18     Q. And you see the first page. It's an email from
19   Dr. Kirk to Dr. Walt from March 11 of '98?
20     A. I see that.
21     Q. And do you see that the attachment is "Feedback
22   from Thursday meeting at Tufts"?

42 (Pages 165 to 168)

Page 169

1    A. The subject is titled that, yes.
2    Q. And then the feedback is actually attached
3  there as a little icon?
4    A. Yes.
5    Q. And then that attachment is included as part of
6  this exhibit. Correct?
7    A. Appears to be, yes.
8    Q. Okay. And in the email that Kirk wrote to
9  Walt, he stated that, quote, "I was so excited after the
10  visit to your lab and our discussion that I sent Larry
11  and John a, quote, stream of consciousness, unquote,
12  email with some ideas and business strategy thoughts.
13  They suggested I send them on to you. Some are probably
14  not worth much discussion. Let me know your thoughts."
15    Do you see that?
16    A. I do.
17    Q. And you're the Larry and John -- you're the
18  "John," and Larry Bock is the Larry in this email.
19  Correct?
20    A. I'm assuming so.
21    Q. Okay. Why did you suggest to Dr. Kirk that he
22  send his March 9 email to Dr. Walt?

Page 170

1    A. Well, from today's discussion, I think you sent
2  me an email from -- you showed me an email from Greg
3  where, in the body of the email, he asked whether he
4  should forward those to David Walt.
5    I'm assuming I responded to that email and said
6  sure, but I have no recollection of doing that. I'm just
7  trying to piece together the -- the documents that you've
8  put forth before me today.
9    Q. Okay. Well, I don't want you to speculate.
10  I'm asking you, why did you suggest to Dr. Kirk that he
11  sent -- that he send, rather, his March 9, 1998, email to
12  Dr. Walt?
13    A. Well, since I have no recollection of sending
14  that email that actually told him to do that, I have
15  absolutely no recollection of knowing why I would say
16  that.
17    Q. Okay.
18    A. I think both of those are compatible.
19    Q. So you don't -- you don't deny having done so;
20  you just don't remember why you did it?
21    MR. COSTAKOS: Objection. Form.
22    THE WITNESS: Well, I -- I -- I don't. Maybe

Page 171

1  you should ask me the question again because I got lost.
2    ///
3    BY MR. SHULMAN:
4    Q. You don't deny having made the suggestion to
5  Dr. Kirk, but you don't recall why you did so. Is that
6  fair?
7    A. I --
8    MR. COSTAKOS: Objection. Form.
9    THE WITNESS: I have no recollection of whether
10  I made the suggestion that he send this to David Walt,
11  nor any idea why or what my purpose was for suggesting
12  that, if, in fact, I did.
13    The only thing that I can piece together is the
14  emails that you sent. And certainly one could infer from
15  those emails that I might have said that. Could have
16  been Larry said it, to send it to Dr. Walt. I have no
17  idea. I have no remembrance of that.
18    BY MR. SHULMAN:
19    Q. Okay. Do you have any reason to doubt that you
20  made this suggestion to Dr. Kirk that he send his March 9
21  email to Dr. Walt?
22    MR. COSTAKOS: Objection. Form, calls for

Page 172

1  speculation.
2    THE WITNESS: I have no reason to doubt it, and
3  I think it's a reasonable inference based upon the
4  documents you've put in front of me.
5    ///
6    BY MR. SHULMAN:
7    Q. Okay. And would you have made that suggestion
8  without first reading Dr. Kirk's March 9 email?
9    A. I've -- as I've testified before, I'm assuming
10  I did read the email, but I have no remembrance of
11  reading the email.
12    Q. Are you able to testify on your oath that in
13  the time frame from March through July of 1998 you
14  completely forgot about the March 9, 1998, email?
15    A. I have no recollection of the March 1998 email
16  and no understanding how I would have remembered it
17  between March and June. It's, to the best of my
18  recollection, under oath that I did not use that in the
19  brainstorming sessions that we had later in June or July.
20    Q. That wasn't my question, sir.
21    I asked you, can you testify on your oath
22  positively that after receiving the email on March 9 and

43 (Pages 169 to 172)

Page 173

1  before the brainstorming session in the summer of '98 you
2  completely forgot about everything that was in Kirk's
3  email?
4      MR. COSTAKOS: Objection. Asked and answered,
5  form.
6      THE WITNESS: I'm trying -- trying to
7  understand how I didn't answer that before because I
8  think I did.
9      I don't think I remember that email between
10 March and June, because, otherwise, I would have had a
11 different recollection of how the ArrayMatrix product
12 came to be.
13 BY MR. SHULMAN:
14     Q.  That assumes that the recollection set forth in
15 your prior testimony is truthful. Right?
16     A.  I appreciate your interest in trying to degrade
17 me and make me feel -- or make -- give the impression
18 that I'm not trying to be truthful in all of my
19 testimonies.
20     I can tell you here today that I've been
21 truthful to the best of my ability in every damn
22 testimony I've ever given, including this one, sir.

Page 174

1      Q.  Okay. Now, after Dr. Kirk sent his March 1998
2  email to Dr. Walt, you again communicated with Dr. Kirk
3  about his email and told him that Dr. Walt was very
4  impressed with him. Correct?
5      A.  I have no -- did -- was that one of the
6  documents that we've seen? Because I -- I don't -- I
7  don't actually remember that either.
8      MR. SHULMAN: Okay. Well, let's see if we can
9  jog a memory here.
10     Could we mark, please, as Exhibit 14 a one-page
11 document bearing production Nos. AFMX 1808319, which is
12 an email from Dr. Stuelpnagel to Dr. Kirk dated Thursday,
13 March 19, 1998.
14     (Exhibit 14 was marked.)
15 BY MR. SHULMAN:
16     Q.  Have you had a chance to review the email?
17     A.  I've read it, yes.
18     Q.  Okay. And is this an email that you wrote to
19 Dr. Kirk on or about March 19, 1998?
20     A.  It appears so.
21     MR. COSTAKOS: Objection. Foundation.
22 BY MR. SHULMAN:

Page 175

1      Q.  And you wrote to him, "David was impressed with
2  your email." Do you see that?
3      A.  Yes.
4      Q.  How did you know that Dr. Walt was impressed
5  with Dr. Greg's -- I'm sorry -- Dr. Kirk's March 9, 1998,
6  email?
7      A.  I don't remember. I'm inferring from this
8  email that David and I talked about the email.
9      Q.  Okay. What did you talk to Dr. Walt about
10 concerning Dr. Kirk's March 9 email?
11     A.  Since I don't even remember having that
12 conversation, I'm only inferring from this email. I have
13 no idea --
14     Q.  Okay.
15     A.  -- what the context or subject of that email
16 was or that discussion with David was.
17     Q.  And you went on to say in Exhibit 14 that "we
18 both appreciated your enthusiasm." Do you see that?
19     A.  I do.
20     Q.  And the "we" there is Dr. Walt and yourself.
21 Correct?
22     A.  Yes.

Page 176

1      Q.  Okay. And how would you know that Dr. Kirk was
2  enthusiastic if you hadn't read his email?
3      A.  I'm assuming I did read the email.
4      Q.  And then you forgot about it?
5      A.  Obviously.
6      Q.  Who's Wally?
7      A.  Wally is Wally Parse, the person who worked
8  with Greg at Molecular Devices. We talked about that
9  earlier in the day.
10     Q.  Okay. Now, Dr. Walt is the so-called father of
11 the Walt technology. Correct?
12     A.  Yes. He and others. I think there's other
13 people on the patent.
14     Q.  Would it be fair to say that in March of 1998,
15 Dr. Walt was one of the people who knew more about the
16 Walt technology than anybody else in the world?
17     MR. COSTAKOS: Objection. Form.
18     THE WITNESS: He was -- sure. Sure. He was
19 one of the people. I think everybody in his lab would
20 qualify, too.
21 BY MR. SHULMAN:
22     Q.  Okay. And according to you, Dr. Walt was

Page 177

1  impressed by Dr. Kirk's email where Kirk described his
2  own ideas about that technology. Correct?
3       MR. COSTAKOS: Objection. Form.
4       THE WITNESS: It appears so, yes.
5  BY MR. SHULMAN:
6    Q. What was it about Kirk's email that was
7  impressive to Dr. Walt?
8       MR. COSTAKOS: Objection. Asked and answered,
9  foundation.
10      THE WITNESS: Since I have no recollection of
11 the conversation that David and I might have had with
12 respect to Greg's email, I have no idea what he might
13 have been impressed with. I have no recollection of what
14 he might have been impressed with.
15 BY MR. SHULMAN:
16   Q. Have you ever heard of a man by the name of
17 Rhett, R-h-e-t-t, Affleck, A-double-f-l-e-c-k?
18   A. I have a vague memory that he was a colleague
19 of Greg Kirk's, and those were the two people that were
20 thinking about joining Illumina.
21   Q. Did you ever meet with Mr. Affleck?
22   A. I might have. It's really hard for me to

Page 178

1  remember all of the things that happened. I sort of
2  faintly remember that Greg turned us down for the job.
3       Did we meet with Rhett? I can't remember.
4    Q. So we've seen several emails now that refer
5  to -- or at least state that you suggested to Kirk that
6  he send his March 9 email to Walt and that Walt was
7  impressed with the March 9 email and both of you
8  appreciated Kirk's enthusiasm.
9       Do these emails that we've now looked at,
10 Exhibits 12, 13, and 14, refresh your recollection at all
11 about discussions that you had with Kirk about any of the
12 ideas set forth in his email?
13   A. No, they don't.
14   Q. Now, didn't Dr. Kirk remind you in May of '98
15 that he had worked with Rhett Affleck in coming up with
16 some of the ideas in his March 9 email?
17   A. I don't recall.
18   Q. Let's look at that. I believe we've already
19 marked it.
20      Look at Exhibit 11, please -- strike that.
21      We have marked it. That's the wrong exhibit.
22      Do you have Exhibit 3?

Page 179

1       MR. COSTAKOS: It's this.
2       MR. SHULMAN: It's the deposition.
3       I apologize.
4       Now, let me mark for identification as
5  Exhibit 15 a copy of the 020 patent-in-suit.
6       (Exhibit 15 was marked.)
7  BY MR. SHULMAN:
8    Q. If you would turn, please, to the claims. And
9  if you'd also place before you the March 9, 1998, email,
10 Exhibit 12.
11      Could you read Claim 1 to yourself, please.
12      Do you understand Claim 1?
13   A. I believe I do, although I'm not here to
14 represent the legal definition of a claim because I
15 understand that that's developed during prosecution, and
16 I don't want to --
17   Q. I'm not going to ask you for definitions.
18   A. Okay, okay.
19   Q. So Element A is "a first substrate with a
20 surface comprising a plurality of assay wells comprising
21 samples." Do you see that?
22   A. I do.

Page 180

1    Q. Okay. And do you understand that that would
2  cover a microtiter plate?
3       MR. COSTAKOS: I'm going to object to the form
4  of the question to the extent it calls for a legal
5  conclusion and also competence and foundation.
6       THE WITNESS: I could see where that would
7  cover microtiter plate.
8  BY MR. SHULMAN:
9    Q. Okay. Including a 1536-well microtiter plate.
10 Right?
11      MR. COSTAKOS: Same objections.
12      THE WITNESS: Yes. I don't see any difference.
13 BY MR. SHULMAN:
14   Q. Then paragraph (b) begins by calling for "a
15 second substrate comprising a plurality of projections,
16 each projection comprising an array location."
17      I'm just going to break it down into pieces
18 because there's so many words there.
19   A. Okay.
20   Q. Okay?
21      Would you agree that a fixture that has 1536
22 different fiberoptic bundles would be a substrate

Page 181

1 comprising a plurality of projections, each projection
2 comprising an array location?
3        MR. COSTAKOS: Same objection. Legal
4 conclusion, competence, foundation, form.
5        THE WITNESS: And I'm not prepared today to say
6 that those things are similar enough. You know, a
7 substrate versus his description of a fixture or
8 fixtures, I have no idea what Greg meant by that.
9        I do have an idea of what we meant by a second
10 substrate, and I think it's adequately described in the
11 patent application.
12 BY MR. SHULMAN:
13    Q. Let me begin by asking you, what did you --
14 what's your idea of what you meant by a second substrate?
15    A. The plate. The plate that holds the arrays.
16    Q. Okay.
17    A. A monolithic block that has the arrays in it as
18 projections.
19    Q. Okay. If a second substrate simply means a
20 support -- just means a support, let's assume that --
21 then would you agree that a fixture that has 1536 bundles
22 of fiberoptic arrays would be a second substrate

Page 182

1 comprising a plurality of projections, each protection
2 comprising an array location?
3        MR. COSTAKOS: Same objections. Legal
4 conclusion, competence, foundation, form.
5        THE WITNESS: I am not prepared to answer a
6 question that's based on an assumption, so unless --
7 BY MR. SHULMAN:
8    Q. Okay.
9    A. -- you know better -- unless you have a way of
10 describing what was meant in the email, I'm not prepared
11 to assume I know it. And I'm not prepared to assume
12 what, through prosecution, the definition of the second
13 substrate has evolved to.
14    Q. That's very well.
15        Can you tell me in your own mind what the
16 differences are between the idea that Kirk disclosed in
17 his email of taking an array of 1536 fiber bundle arrays
18 and dipping them simultaneously into individual wells of
19 a microtiter plate and that which is set forth in Claim 1
20 of the 020?
21    A. To me --
22        MR. COSTAKOS: Same objections.

Page 183

1 BY MR. SHULMAN:
2    Q. Yes, to you.
3    A. To me, the key difference -- or what I think is
4 the difference is the second substrate. It's not clear
5 that Kirk had identified a substrate as -- as we have
6 described it in this application based upon this email
7 that you've been reviewing with me today.
8    Q. Anything else, sir?
9    A. No.
10    Q. Okay. And the difference in terms of the
11 substrate is the substrate you guys contemplated was this
12 plate that you've referred to. Correct?
13    A. Yeah. The monolithic block-type thing with the
14 array projections firmly adhered or attached or developed
15 from.
16    Q. Okay. And all Kirk says is have a fixture with
17 bundles of fibers sticking out of it?
18    A. That's right.
19    Q. Okay. He doesn't tell you more about what that
20 fixture is?
21    A. That's right.
22    Q. Okay. Anything else?

Page 184

1        MR. COSTAKOS: Same objections.
2        THE WITNESS: I was back reading the claim.
3 I'm not quite sure what the question on record is, but I
4 don't think I have any other things to add about my
5 understanding of Claim 1, which should not be construed
6 as a legal understanding.
7 BY MR. SHULMAN:
8    Q. Okay. Now, during prosecution of the
9 applications for the 841 and the 020 patents, which are
10 the two patents-in-suit here, did you ever tell the
11 examiner that in the summer of '98 you arrived at the
12 idea of simultaneously inserting an array of fiberoptic
13 arrays into individual wells of a well plate?
14    A. Did I tell the examiner that?
15    Q. Correct.
16    A. I don't remember telling the examiner that.
17    Q. Why not? Not why don't you remember, but why
18 didn't you tell him that?
19    A. Well, first, I don't remember --
20        MR. COSTAKOS: Objection. Form.
21        THE WITNESS: -- which is slightly different
22 than your question, which is why I didn't tell him that

46 (Pages 181 to 184)

7/13/2010                  **Illumina Inc. v. Affymetrix Inc**              John R. Stuelpnagel
                           **Attorneys' Eyes Only**

Page 185

1    because I don't remember. I may or may not have.
2        Second is I'm not sure it would be relevant to
3    the examiner, and I'd leave that up to the legal team
4    that's prosecuting the patents to decide whether that
5    information should be administered -- or delivered
6    during -- during patent prosecution.
7    BY MR. SHULMAN:
8        Q. Did you ever communicate with the examiner at
9    all concerning the applications that led to your 841 and
10   020 patents? You personally, not through a
11   representative.
12       A. I'm trying to remember because there have been
13   times when I have communicated with the patent office
14   either by participating in a telephone call or an
15   examiner visit or -- or through a declaration, but I
16   don't have any specific recollection of interacting with
17   an examiner on these two patents.
18       Q. Okay. During prosecution of the applications
19   for the 841 and the 020, did you ever consider telling
20   the examiner that in the summer of '98 you arrived at the
21   idea of simultaneously inserting an array of fiberoptic
22   arrays into individual wells of a well plate?

Page 186

1        MR. COSTAKOS: Objection. Form.
2        THE WITNESS: Again, I don't have any
3    recollection that I've communicated with the examiner
4    directly other than the patent application.
5    BY MR. SHULMAN:
6        Q. My question was, during the prosecution of the
7    applications for the two patents-in-suit, did you ever
8    consider telling the examiner that in the summer of '98
9    you arrived at this idea of simultaneously inserting an
10   array of fiberoptic arrays into individual wells of a
11   well plate?
12       A. I don't think I participated at all -- well, I
13   shouldn't say that.
14       I don't recollect participating directly with
15   the examiner on the patent prosecution for these two
16   patents, and so I don't think I would have considered
17   providing additional information unless it was requested
18   by those that were communicating directly with the patent
19   office.
20       Q. Okay. Which attorney or attorneys or patent
21   agents do you associate with having handled your patent
22   applications that led to the issuance of the two

Page 187

1    patents-in-suit?
2        A. I believe that the patent family, of course,
3    was -- with the original application was written by Robi
4    Silva.
5        I know that internal Illumina legal team worked
6    with -- I don't -- I don't know if they worked with
7    outside counsel or not, but to answer your question, I
8    believe John Murphy was involved in the prosecution of
9    these patents, these two patents that you've drawn to my
10   attention.
11       Q. And he was an internal Illumina guy. Right?
12       A. Yes.
13       Q. Okay. Without getting into the substance, but
14   I'd like to know with whom on the legal team you
15   interacted in connection with preparing and prosecuting
16   the applications that led to the 841 and the 020.
17       A. So may I provide a little background?
18       Q. However you need to answer it.
19       A. So from 1998 to the time the current general
20   counsel arrived at Illumina, I supervised the legal
21   department at Illumina.
22       During some of that period of time, Nicky

Page 188

1    Espinosa, who is a patent attorney, reported to me and
2    directly supervised the legal team.
3        I believe she left and there was an 18-month or
4    maybe even a two-year gap in which I, once again, assume
5    direct reporting relationships with all of the legal team
6    at Illumina. So everybody that was on the legal -- it
7    was quite small. But everybody that was on the legal
8    team for a while reported back directly to me until we
9    hired Chris Cabou.
10       I believe that the prosecution of these two
11   patents overlapped that period of time in which I was in
12   charge of the legal team. And I believe that I
13   interfaced with John Murphy in at least the beginning of
14   the patent prosecution around this, but the details of
15   the prosecution were not something that I was involved
16   with after Chris came in and certainly not even while
17   John was prosecuting.
18       Q. Who's Chris?
19       A. Chris Cabou. I'm sorry. The general counsel
20   at Illumina.
21       Q. Okay. Let me see if I can summarize.
22       A. Okay.

47 (Pages 185 to 188)

Page 189

1    Q.  You've given me a lot of information there.
2        The original application for these patents was
3    prepared by Robin Silva?
4    A.  Correct.
5    Q.  And you dealt with her?
6    A.  Yes.
7    Q.  Okay.
8    A.  And I was the person interfacing directly with
9    her because the intellectual property fell to my
10   responsibilities during that time period.
11   Q.  Okay.  And the original application, I believe,
12   was filed in December of '98?
13   A.  Okay.
14   Q.  For how long did Robin Silva remain involved in
15   the applications that led to the patents-in-suit?
16   A.  Quite a few years.  We started to divide up our
17   portfolio after Nicky Espinosa joined Illumina.  And she
18   allocated certain applications to different outside
19   firms.
20       To the best of my knowledge, Robin Silva
21   maintained prosecution over the -- what we call the Tufts
22   portfolio or those that have David Walt as inventor --

Page 190

1    inventor and Tufts as assignee.
2        I believe the internal Illumina general
3    applications were transferred to other outside firms, but
4    I don't have a specific recollection of when that
5    occurred and who the firms would have been.
6    Q.  Okay.  Let me ask it specifically.
7        Robin Silva was one lawyer with whom you
8    interfaced on the applications that led to the
9    patents-in-suit.  Correct?
10   A.  Yes.
11   Q.  John Murphy was another?
12   A.  Yes.  But to clarify, John Murphy's a
13   paralegal, not a patent attorney.
14   Q.  And I believe he's a patent agent.  Correct?
15   A.  I believe so.
16   Q.  Okay.
17   A.  In fact, I know so.
18   Q.  Nicky Espinosa -- did you interface with her
19   over the prosecution of the patent -- of the applications
20   for the patents-in-suit?
21   A.  These -- I interfaced with her during her
22   tenure at Illumina.  I believe that these patents-in-suit

Page 191

1    were, I think, filed after Nicky left.  The continuation.
2        So I think Nicky transitioned out of Illumina,
3    I'm going to guess, 2006, maybe 2007.  I don't have a
4    clear recollection.  And then we hired Chris, I think, in
5    2008.
6    Q.  My question was, did you have any interactions
7    with Nicky Espinosa about prosecuting any of the
8    applications that led to the patents-in-suit?
9    A.  And I'm sorry if, again, I'm being
10   argumentative, but I don't know exactly when the
11   patents-in-suit were filed, but I think --
12   Q.  Nine --
13   A.  -- it was the gap period from when Nicky left
14   and before Chris came.  And so the answer is, for the
15   patents-in-suit, I do not believe I interfaced with
16   Nicky, but I'm not positive because I don't know when the
17   patent-in-suit was filed.  I can take a moment --
18   Q.  Let me explain.
19   A.  Yes.
20   Q.  There were a series of applications --
21   A.  Yes.
22   Q.  -- the first of which was filed in '98.

Page 192

1        All of my questions have been with respect to
2    any of the applications leading to the patents-in-suit,
3    so --
4    A.  Okay.
5    Q.  -- let me back up and start over.
6    A.  I'm sorry.  I misunderstood.
7    Q.  Is it correct that beginning with the 1998
8    application, you had dealings with Miss Silva concerning
9    the prosecution of one or more of the applications that
10   led to the patents-in-suit?
11   A.  Yes.
12   Q.  And the same is true with Mr. Murphy?
13   A.  Yes.
14   Q.  Is the same also true with Nicky Espinosa?
15   A.  Yes.
16   Q.  Were there any other attorneys or patent agents
17   with whom you dealt concerning the applications or any of
18   the applications that led to the patents-in-suit?
19   A.  Not that I can recollect, because I think any
20   external counsel, besides Robin, would have interfaced
21   directly either with John Murphy or Nicky Espinosa.
22   Q.  Have you ever heard of a man by the name of

48  (Pages 189 to 192)

Page 193

1  Hefner? I don't know his first name.
2      A. I have heard of that name.
3      Q. He's an attorney at Knobbe Martens, I believe?
4      A. Sounds reasonable. I know we have used them
5  for prosecution.
6      Q. Have you -- did you have any dealings with
7  Mr. Hefner concerning any of the applications that led to
8  the patents-in-suit?
9      A. I don't believe I did.
10     Q. Okay.
11     A. I think I had some communications around the
12  decoding family, but I don't think we had anything around
13  the ArrayMatrix family.
14     Q. During the preparation or prosecution of any of
15  the applications for the 841 and 020 patents, did you
16  ever discuss with either Mr. Chee or Mr. Auger whether
17  you should tell the examiner that in the summer of 1998
18  you arrived at the idea of simultaneously inserting an
19  array of fiberoptic arrays into individual wells of a
20  well plate?
21         MR. COSTAKOS: Objection. Form. It's asked
22  and answered.

Page 194

1         THE WITNESS: No. Again, I don't think I had
2  any contemplation of ever telling the examiner anything,
3  and so I have no recollection of telling Mark or Steve
4  that, too.
5  BY MR. SHULMAN:
6      Q. Okay. During preparation or prosecution of the
7  applications for the 841 and 020 patents, did you ever
8  discuss with any of the attorneys responsible for those
9  applications whether you should tell the examiner that in
10  the summer of 1998 you arrived at the idea of
11  simultaneously inserting an array of fiberoptic arrays
12  into individual wells of the well plate?
13         MR. COSTAKOS: Objection. Form.
14         THE WITNESS: No. And I think it's -- no.
15  BY MR. SHULMAN:
16     Q. Okay. During prosecution of the applications
17  for the 841 and 020 or any of those applications, did you
18  ever tell the examiner that in March of 1998 Dr. Kirk
19  disclosed to you his idea of simultaneously inserting an
20  array of fiberoptic arrays into individual assay wells of
21  a microtiter well plate?
22         MR. COSTAKOS: Objection. Form.

Page 195

1         THE WITNESS: No.
2  BY MR. SHULMAN:
3      Q. Why not?
4      A. Because I didn't even remember the email.
5      Q. During prosecution of the applications for the
6  841 and 020 patents, did you ever consider telling the
7  examiner that in March 1998 Dr. Kirk disclosed to you his
8  idea of simultaneously inserting an array of fiberoptic
9  arrays into individual assay wells of a well plate?
10         MR. COSTAKOS: Objection. Form.
11         THE WITNESS: No.
12  BY MR. SHULMAN:
13     Q. During preparation or prosecution of the
14  applications for the 841 and 020 patents, did you ever
15  disclose to or discuss with either Mr. Auger or Dr. Chee
16  that in March of '98 Dr. Kirk had disclosed to you his
17  idea of simultaneously inserting an array of fiberoptic
18  arrays into individual wells of a well plate?
19         MR. COSTAKOS: Objection. Form.
20         THE WITNESS: No. Again, because I didn't
21  remember the email.
22  BY MR. SHULMAN:

Page 196

1      Q. During preparation and prosecution of the
2  applications for the patents-in-suit, did you ever
3  disclose to or discuss with any of the attorneys
4  responsible for those applications that in March of '98
5  Dr. Kirk had disclosed to you his idea of simultaneously
6  inserting an array of fiberoptic arrays into individual
7  wells of a well plate?
8      A. No.
9      Q. During prosecution of the applications for the
10  841 and 020 patents, did you ever disclose to the
11  examiner Dr. Kirk's March 1998 email?
12     A. No.
13     Q. Or its content?
14     A. No.
15     Q. During prosecution of the applications for the
16  841 and 020 patents, did you ever consider disclosing to
17  the examiner Dr. Kirk's March 1998 email or its contents?
18         MR. COSTAKOS: Objection. Form.
19         THE WITNESS: No.
20  BY MR. SHULMAN:
21     Q. During prosecution of the applications for the
22  841 and 020, did you ever discuss or disclose to either

49 (Pages 193 to 196)

Page 197

1  of your co-inventors Dr. Kirk's March 1998 email or its
2  content?
3      A. No.
4          MR. COSTAKOS: Objection. Form.
5  ///
6  BY MR. SHULMAN:
7      Q. You're sure about that?
8      A. Yes.
9      Q. During preparation or prosecution of the
10  applications for the 841 and 020 patents, did you ever
11  discuss or disclose to either of your co-inventors
12  Dr. Kirk's March 1998 email or its content?
13      A. I don't believe so.
14      Q. And you're sure about that?
15      A. As best I can recollect.
16      Q. During preparation or prosecution of the
17  applications for the 841 and 020 patents, did you ever
18  discuss or disclose to any of the attorneys responsible
19  for those applications Dr. Kirk's March 1998 email or its
20  content?
21          MR. COSTAKOS: Objection. Form.
22          THE WITNESS: No.

Page 198

1  BY MR. SHULMAN:
2      Q. Once again, that's because --
3      A. I didn't remember the email.
4      Q. -- you don't remember -- you don't remember it
5  today?
6      A. And as I've testified, I didn't remember it
7  when we made the invention and -- I didn't remember it.
8      Q. Is it your testimony that today you remember
9  not remembering it in '98?
10      A. No. It was my testimony that it was
11  inconsistent with how I felt about the activities around
12  the brainstorming session and how we reached those
13  activities to suggest that I didn't remember it then
14  either.
15      Q. Okay. But I'm asking you, is it your memory
16  today that you can recall not having any recollection of
17  the email back in 1998?
18      A. No.
19          MR. COSTAKOS: Objection. Form.
20          THE WITNESS: That would be impossible.
21  BY MR. SHULMAN:
22      Q. Okay. So what you're saying is you're

Page 199

1  surmising you didn't know about it because of your
2  invention story to which you've testified?
3      A. Yes.
4          MR. COSTAKOS: Objection. Form.
5  BY MR. SHULMAN:
6      Q. Now, back in 2007, as we saw earlier, there was
7  a lawsuit pending between Affymetrix and Illumina.
8  Correct?
9      A. Correct.
10      Q. And during the trial of that case, you gave the
11  sworn testimony that we looked at earlier. Correct?
12      A. Correct.
13      Q. And at the time that you gave that testimony,
14  you were the chief operating officer of Illumina.
15  Correct?
16      A. Correct.
17      Q. And in 2007 when you gave that testimony,
18  there's no doubt that you had read Dr. Kirk's March 1998
19  email where he disclosed to you his idea of
20  simultaneously inserting an array of fiberoptic arrays
21  into individual wells of a well plate?
22          MR. COSTAKOS: Objection. Form.

Page 200

1  BY MR. SHULMAN:
2      Q. Correct?
3          MR. COSTAKOS: Foundation.
4          THE WITNESS: At the time that I testified a
5  the Affymetrix trial, I had no recollection of the Kir
6  email.
7  BY MR. SHULMAN:
8      Q. But there's no doubt that you had read it as o
9  that time. Correct?
10          MR. COSTAKOS: Same objections.
11          THE WITNESS: I have -- "no doubt" is your
12  words. I have inferred from a series of emails that
13  the -- is a strong suggestion that I did read the email
14          MR. SHULMAN: I ask you one more time.
15  BY MR. SHULMAN:
16      Q. Is there any doubt that you had read it?
17          MR. COSTAKOS: Same objections.
18          THE WITNESS: Any doubt that I had read it
19  Other than the fact that I can't remember, no.
20  BY MR. SHULMAN:
21      Q. Okay. Well, let's see if, in fact, you had
22  read it.

Page 201

1    Prior to today, you've had some experience with
2    inventorship issues on patents that named you as an
3    inventor. Correct?
4    **A. Correct.**
5    Q. For example, in 2005, about five years ago,
6    Mr. Czarnik, a former employee of Illumina, brought suit
7    against Illumina. Correct?
8    **A. Correct.**
9    Q. And in that lawsuit, Mr. Czarnik claimed that
10   he should have been named as an inventor on several
11   Illumina patents where you had been named as the
12   inventor. Correct?
13   **A. On -- there were two patent families. One**
14   **patent family I was a -- one of the named inventors. On**
15   **the other patent family, I was not.**
16   Q. Okay. But there were certainly patents naming
17   you as an inventor where he claimed that you wrongfully
18   excluded him as an inventor. Correct?
19   MR. COSTAKOS: Objection. Form.
20   THE WITNESS: I don't know about the plural
21   "patents" at the time of the lawsuit. I don't know
22   whether there was two issued patents out of this patent

Page 202

1    family. If you can -- I'm sure you have that
2    information.
3    If there are, then I have no objection to your
4    question.
5    If by some chance there was no issued patents
6    or one issued patent from this patent family, then your
7    question wouldn't be correct. So I just don't know how
8    many patents were issued. I know there were several
9    patent applications.
10   BY MR. SHULMAN:
11   Q. And he was claiming, in addition to the patent
12   or patents that had issued that named you as an inventor,
13   he should also be named on the patent applications that
14   named you as an inventor. Correct?
15   (Interruption by reporter.)
16   BY MR. SHULMAN:
17   Q. Is it correct that in Dr. Czarnik's lawsuit
18   against Illumina, he was claiming that he should be named
19   as an inventor on one or more patents that named you as
20   an inventor, as well as on one or more applications on
21   which you were named as an inventor?
22   **A. Yes.**

Page 203

1    MR. COSTAKOS: Objection. Form. Sorry.
2    THE WITNESS: Yes. With the caveat that I just
3    don't know what was issued at the time of 2005.
4    BY MR. SHULMAN:
5    Q. I understand.
6    **A. Yeah, I know.**
7    Q. That's why I said one or more.
8    **A. Well, it could be none or more if there was**
9    **none that were issued. I just don't know what was**
10   **issued.**
11   Q. All right. We'll get to that in a moment.
12   And that lawsuit where he was claiming
13   inventorship was eventually settled in 2008. Correct?
14   **A. Correct.**
15   MR. SHULMAN: Let me mark as Exhibit 16 the
16   release and settlement agreement between Dr. Czarnik
17   which is C-z-a-r-n-i-k, and Illumina.
18   (Exhibit 16 was marked.)
19   BY MR. SHULMAN:
20   Q. You see Mr. Flatley's signature on page 7 of
21   the agreement?
22   **A. Just a moment. I'm just trying to refresh my**

Page 204

1    memory about this agreement.
2    **Yes, I do see Mr. Flatley's signature on**
3    **page 7.**
4    Q. And do you recognize Mr. Czarnik's signature?
5    **A. Yes, I do.**
6    Q. Have you seen this settlement agreement before?
7    **A. I have a recollection that I at some point read**
8    **this.**
9    Q. Okay. And if you look at paragraph 2.1, which
10   begins at the bottom of page 1 --
11   **A. Okay.**
12

18   Q. Okay. And, consequently, inventorship was
19   corrected on those patents. Correct?
20   **A. I believe that's so.**
21   Q. Now, Mr. Czarnik was not the only person who
22   ever raised with you whether the inventorship was correct

51 (Pages 201 to 204)

Page 205

1  on Illumina patents that named you as an inventor.
2  Correct?
3          MR. COSTAKOS: Objection. Form.
4          THE WITNESS: I'm sorry. I -- I know that -- I
5  apologize. I'm trying to think, and I'm -- I don't
6  recall anybody -- oh, I think I know where the question
7  is coming from.
8          So I think that's probably yes.
9  BY MR. SHULMAN:
10     Q.  Do you know what question you were answering?
11  You just said yes. I'm not sure --
12     A.  I think I was --
13     Q.  I'll ask it again.
14     A.  -- answering a question in which somebody had
15  objected to inventorship surrounding patent
16  applications to which I'm a named inventor.
17     Q.  Correct. So Mr. Czarnik was not the only
18  person who ever raised with you whether the inventorship
19  was correct on Illumina patents that named you as an
20  inventor. Correct?
21          MR. COSTAKOS: Objection. Form.
22          THE WITNESS: Correct.

Page 206

1  BY MR. SHULMAN:
2     Q.  Okay. Who were the other persons who raised
3  such an issue with you?
4     A.  The only one that I can recall is Greg Kirk
5  thinking that he had made a contribution to our decoding
6  patent application family.
7     Q.  Okay. And Dr. Kirk raised that issue with you
8  in 2001. Correct?
9     A.  I think that's correct.
10    Q.  Okay. And do you know someone by the name of
11  Bryan Roberts who used to work at a venture firm by the
12  name of Benrock Associates?
13    A.  Yes. And to be correct, he still works there.
14    Q.  Good.
15          And do you recall that in late February of
16  2001, Mr. Roberts, on behalf of Dr. Kirk, inquired about
17  whether you had used any of Dr. Kirk's oligo decoding
18  ideas set forth in Dr. Kirk's March 9, 1998, email in
19  connection with an Illumina patent application that named
20  you and Mr. Chee and Mr. Czarnik as inventors?
21    A.  Yes. That email was sent -- was shown to me by
22  Illumina's counsel three weeks ago.

Page 207

1          MR. SHULMAN: Let me mark as Exhibit 17 a email
2  dated February 24, 2001, from Dr. Kirk to Bryan
3  Benrock -- I'm sorry -- Bryan Roberts at Benrock
4  Associates. It bears production Nos. AFMX 1808332
5  through 8335.
6          (Exhibit 17 was marked.)
7  BY MR. SHULMAN:
8     Q.  Have you seen this document before?
9     A.  It was shown to me three weeks ago, yes.
10    Q.  By who?
11    A.  By Illumina's counsel.
12    Q.  Okay. And Exhibit 12, the March 9 email, was
13  also shown to you three weeks ago. Correct?
14    A.  I'm sorry?
15    Q.  The March 9 --
16    A.  Yes, it was.
17    Q.  -- 1998 email.
18          Were any of the other emails that I've shown to
19  you today shown to you three weeks ago?
20    A.  There might have been one, but I can't remember
21  which one. I sort of remember seeing another document.
22    Q.  Where were you when you were shown these

Page 208

1  documents?
2     A.  At Foley's offices at their old location that
3  was south of here.
4     Q.  In San Diego?
5     A.  San Diego.
6     Q.  And who was present at the time?
7     A.  Mr. Costakos.
8     Q.  Anybody else?
9     A.  No.
10    Q.  And how long did the meeting last?
11    A.  Hour.
12    Q.  Was that the only meeting you had concerning
13  these documents?
14    A.  No. We had one more meeting yesterday
15  afternoon.
16    Q.  How long did that meeting last?
17    A.  About an hour and a half.
18    Q.  Was anyone else present?
19    A.  No.
20    Q.  So if you'd look at the third paragraph of
21  Exhibit 17, read that to yourself.
22          In that paragraph, Dr. Kirk stated that he is

Page 209

1   forwarding a copy of Illumina's June 1998 patent filing,
2   as well as a copy of his own March 1998 email that he had
3   sent to you and Mr. Bock three years earlier. Do you see
4   that?
5      A. I do.
6        MR. SHULMAN: Now, let me mark as the next
7   exhibit a copy of the patent filing that's identified as
8   an attachment to his email, and that's Exhibit 18.
9      (Exhibit 18 was marked.)
10   BY MR. SHULMAN:
11      Q. And this exhibit is a copy of an international
12   application published under the Patent Cooperation Treaty
13   that has No. W099/67641 naming Mr. Chee, Dr. Stuelpnagel,
14   and Dr. Czarnik as inventors. And this is a copy of
15   the -- I'm sorry. This patent application is entitled
16   "Decoding of array sensors with microspheres." Correct?
17      A. Where's the title?
18      Yes.
19      Q. And this patent application, on the first page,
20   claims priority from a June 1998 application filed in the
21   United States. Do you see that?
22      A. Yes.

Page 210

1      Q. Okay. And the number of this application,
2   namely 67641, filed in '99 matches the number in the
3   attachment to Dr. Kirk's email. Correct?
4      A. Yes.
5      Q. Dr. Kirk's email being Exhibit 17.
6       Now, the March 1998 email to you and Mr. Bock
7   is copied into the body of Dr. Kirk's February 24, 2001,
8   email, Exhibit 17. Do you see that?
9      A. I do.
10      Q. Okay. Now, let's look at the third sentence of
11   this February 24, 2001, email.
12       In there, Dr. Kirk stated that "It really seems
13   like I did outline the approach of binding and stripping,
14   decoding oligos in order to calibrate the location of
15   each cDNA-containing bead prior to use in an assay." Do
16   you see that?
17      A. I see that.
18      Q. And with respect to this oligo decoding idea
19   contained in his March 1998 email, in the last sentence
20   of the third paragraph of Exhibit 17, Dr. Kirk says that
21   he would like to ask if any of the three inventors on the
22   attached Illumina patent filing was motivated by his

Page 211

1   oligo decoding idea in his March 1998 email. Do you see
2   that?
3      A. I do.
4      Q. And Mr. Roberts, who received Exhibit 17,
5   forwarded to you Dr. Kirk's February 24, 2001, email.
6   Correct?
7      A. Based upon the documents that I was shown by
8   Illumina's counsel, that's correct.
9      Q. And you read the forwarded -- forwarded
10   February 24, 2001, email and responded to it on
11   February 26 of 2001?
12       MR. COSTAKOS: Objection. Form.
13   BY MR. SHULMAN:
14      Q. Right?
15       MR. COSTAKOS: Foundation.
16       THE WITNESS: You'd have to show me the
17   documents before I could agree that that was the date and
18   the timing. I'm sorry. I just don't remember that kind
19   of detail.
20       MR. SHULMAN: Okay. Here they are. Paralegals
21   are so organized, I'm disorganized.
22       Exhibit 19, please mark a document bearing

Page 212

1   production No. AFMX 1808299 through 300.
2      (Exhibit 19 was marked.)
3   BY MR. SHULMAN:
4      Q. Do you see the top of this email chain is an
5   email from Bryan Roberts to Greg Kirk dated February 26
6   2001?
7      A. Yes.
8      Q. And you're shown as a carbon copy recipient of
9   that email. Correct?
10      A. It's shown that way, yes.
11      Q. Do you have any reason to doubt that you
12   received a copy of Mr. Roberts' February 26, 2001, email?
13      A. I --
14       MR. COSTAKOS: Objection. Form.
15       THE WITNESS: I have no reason to assume that I
16   did not receive a copy.
17   BY MR. SHULMAN:
18      Q. Okay. And by this February 26 email,
19   Mr. Roberts is forwarding to Dr. Kirk an email that you
20   sent to Mr. Roberts earlier that same day. Correct?
21      A. Yes.
22      Q. And your email to Mr. Roberts responds to

53 (Pages 209 to 212)

| Page 213 |
|---|

1    Dr. Kirk's inquiry that we saw in Exhibit 18 -- I'm

2    sorry -- Exhibit 17.  Do I have the numbers wrong here?

3    Exhibit 17, yes.  Let me start over.

4        And your email to Mr. Roberts contained in

5    Exhibit 19 responds to Dr. Kirk's inquiry contained in

6    Exhibit 17 about whether any of the three inventors on

7    the Illumina patent was motivated by Dr. Kirk's oligo

8    decoding ideas set forth in his March 1998 email.

9    Correct?

10       MR. COSTAKOS:  Object -- objection.  Form,

11   foundation.

12       THE WITNESS:  I'm sorry.  Could you ask again,

13   please?

14       MR. SHULMAN:  Sure.

15   BY MR. SHULMAN:

16    Q.  Your email of February 26 that is contained in

17   Exhibit 19 responds to Dr. Kirk's inquiry about

18   inventorship that is set forth in Exhibit 17.  Correct?

19       MR. COSTAKOS:  Same objections.

20       THE WITNESS:  Yes.

21   BY MR. SHULMAN:

22    Q.  Okay.  And let's look at what you said in your

| Page 214 |
|---|

1   email of February 26, 2001.

2       First you thanked Mr. Roberts for sending you

3   Dr. Kirk's March 1998 email that Dr. Kirk had saved.  Do

4   you see that?

5    A.  Yes.

6    Q.  Okay.  Were you surprised that Dr. Kirk had

7   saved his March '98 email?

8       MR. COSTAKOS:  Objection.  Form.

9       THE WITNESS:  I have -- I have no idea whether

10   I was surprised or not.  I don't -- can't remember back

11   that many years to understand what my motivation might

12   have been.

13   BY MR. SHULMAN:

14    Q.  Did you save a copy of Dr. Kirk's email in

15   1998?

16    A.  No, I would not have.

17    Q.  Do you know what happened to the copies of the

18   1998 email that you received from Dr. Kirk?

19    A.  No.  Because they would have stayed with

20   CW Group, and I don't have any idea what they did with my

21   old email account.

22    Q.  Okay.

| Page 215 |
|---|

1    A.  I don't have any idea what I did with my emails

2   in my email account.

3    Q.  Okay.  But at the time that you wrote the email

4   in Exhibit 19, you were no longer at CW.  Right?

5    A.  Yes.

6    Q.  You were at Illumina?

7    A.  That's right.

8    Q.  And where would the copies of your emails that

9   you received and sent in February of 2001 reside?

10       MR. COSTAKOS:  Objection.  Foundation.

11       THE WITNESS:  If Illumina has them, they would

12   reside at Illumina.

13   BY MR. SHULMAN:

14    Q.  Did Illumina have a policy about preserving

15   emails?

16    A.  They encouraged us to clean up our email

17   because it was taking up too much of the server time.  I

18   don't know -- I'm trying to remember what the formal

19   policy was.

20    Q.  Anyway, after thanking Bryan Roberts for

21   sending you the email that Greg had saved, you go on to

22   say, "I have reviewed the email and discussed it with

| Page 216 |
|---|

1   Mark Chee."  Do you see that?

2    A.  I do.

3    Q.  Was that a true statement?

4    A.  I assume it was if I wrote it.

5    Q.  Okay.  And what did you and Mr. Chee discuss?

6    A.  Probably the issue that was raised in the email

7   that Greg Kirk had sent to Bryan, specifically whether we

8   were motivated by anything Greg had told us in developing

9   the oligo decoding methods that Illumina uses.

10    Q.  Okay.  And do you see that you copied Nicky

11   Espinosa on your February 26 email?

12    A.  I see that.

13    Q.  Why did you do that?

14    A.  She was in charge of intellectual property at

15   that time.

16    Q.  So why did you copy her?

17    A.  Because it would have been appropriate for

18   something that was dealing with inventorship that she be

19   informed of that and have a record of it for her own use

20   if she wanted to keep a record.

21    Q.  Would she -- would you have sent her not only

22   your email but the email you received from Mr. Roberts

54  (Pages 213 to 216)

Page 217

1  that is contained in -- that he forwarded to you, rather?
2       A.  Well --
3            MR. COSTAKOS:  Objection.  Form.
4            THE WITNESS:  -- I don't want to be paranoid
5  here, but I think that that might not have happened like
6  that.  So unless you have a document that Mr. --
7  Dr. Roberts had sent me an email, I have a vague
8  recollection that he actually called me on the phone as
9  opposed -- and said, "Hey," you know, "Greg's worried
10  about your decoding patents and inventorship on that."
11       I'm not sure there was actually an email.
12  Somehow Dr. Roberts communicated to me that Greg had an
13  issue that needed to be addressed.
14       What I don't know is whether that was through
15  an email or a telephone call.  And unless you can help my
16  recollection with documents, I just don't know.
17  BY MR. SHULMAN:
18       Q.  Why don't you look at your email of
19  February 26.
20       A.  Okay.
21       Q.  In the second paragraph, first sentence, you
22  wrote to Mr. Roberts, Dr. Roberts, "Thanks also for

Page 218

1  sending me the email that Greg had saved."
2       A.  Fine.  That solves that question that I had.  I
3  appreciate the help there.
4       Q.  So you had a copy of it.  Right?
5       A.  Absolutely.
6       Q.  Okay.
7       A.  Thank you for helping me.
8       Q.  And did you send a copy to Nicky Espinosa to
9  give her the full picture of what was going on here?
10       A.  I have no idea because it's -- I didn't even
11  remember whether Bryan had called me or emailed me about
12  this issue.  I have no idea -- I had no idea whether I
13  received -- I had no idea -- I had no remembrance of
14  receiving the email; so I have absolutely no idea whether
15  I forwarded that email on to Nicky or not.
16       Q.  Would it have been your practice, in order to
17  keep Miss Espinosa apprised of this important
18  inventorship issue, to inform her of what the basis was
19  for the inquiry that caused you to write this response?
20            MR. COSTAKOS:  Objection.  Form, foundation.
21            THE WITNESS:  And what I'm trying to be careful
22  of is I don't know in what form it would have been

Page 219

1  standard for me to communicate with her.  And what I
2  don't know is whether I would have done that through a
3  forwarded email or whether I would have walked to the
4  cube next door, because that's where she sat, and talked
5  to her about it.
6            MR. SHULMAN:  Okay.  We need to take a break
7  because we're running out of tape.
8            VIDEOGRAPHER:  This is the end of disk No. 2 of
9  Volume I.  We're off the record at 3:05 p.m.
10            (Recess.)
11            VIDEOGRAPHER:  This is the beginning of disk 3
12  of Volume I.  We're on the record at 3:19 p.m.
13  BY MR. SHULMAN:
14       Q.  Dr. Stuelpnagel, so do you believe that either
15  by hard copy, walking it down the hallway, or by sending
16  it by email, you would have sent to Miss Espinosa the
17  March 9, 1998, email that Bryan Roberts had forwarded to
18  you that was the basis for the underlying inquiry?
19            MR. COSTAKOS:  Objection.  Form, foundation.
20            THE WITNESS:  I have no idea.
21  ///
22  BY MR. SHULMAN:

Page 220

1       Q.  You believe that would have been your practice?
2            MR. COSTAKOS:  Same objections.
3            THE WITNESS:  I have no idea.
4  BY MR. SHULMAN:
5       Q.  Okay.  Did you have any discussions with
6  Miss Espinosa about the subject matter addressed in your
7  email of February 26?
8            MR. COSTAKOS:  Objection.  Foundation.
9            THE WITNESS:  I cannot recall specific
10  conversation about it.
11  BY MR. SHULMAN:
12       Q.  Do you recall generally discussing it with her?
13       A.  No.
14       Q.  So you stated in the second paragraph of your
15  February 26 email that you've reviewed the email and
16  discussed it with Mark Chee.  Do you see that?
17       A.  I'm sorry.  What was the exhibit number again,
18  please?
19       Q.  Exhibit 19?
20       A.  Exhibit 19.
21       Yes.
22       Q.  Okay.  And did you provide Mr. Chee with a copy

Page 221

1    of the March 1998 email?
2              MR. COSTAKOS: Lacks foundation.
3              THE WITNESS: I have no idea.
4    BY MR. SHULMAN:
5       Q. You just don't recall?
6       A. Don't recall.
7       Q. One way or the other?
8       A. That's correct.
9       Q. Okay. But you read the email. Right?
10      A. I would assume I read the email.
11      Q. Well, you said you did right here. Right?
12      A. Fair enough.
13      Q. Okay.
14      A. I haven't, again, memorized this email to know
15   everything I said in this email either.
16      Q. Okay. And in your February 26, 2001, email,
17   you referred to the idea set forth in Dr. Kirk's March
18   1998 email as "Greg's invention." Do you see that?
19             MR. COSTAKOS: Where are you -- where are you
20   referring to?
21             MR. SHULMAN: If he needs help, I'll give it to
22   him.

Page 222

1              THE WITNESS: Yes, please.
2    BY MR. SHULMAN:
3       Q. You said that in the first sentence of the
4    paragraph numbered one. Right? Correct?
5              MR. COSTAKOS: Wait, wait. Hold on. What --
6    say the question all over again.
7    BY MR. SHULMAN:
8       Q. Isn't it true that in your email of February 26
9    you referred to Greg's ideas as "Greg's invention"?
10             MR. COSTAKOS: Objection. Mischaracterizes
11             THE WITNESS: I don't see that, so if you could
12   just refer me --
13   BY MR. SHULMAN:
14      Q. Sure.
15      A. -- to the right sentence, I'll be happy to
16   reread that.
17      Q. Look at the paragraph numbered one in your
18   February 26 email. There you referred to "Greg's
19   invention." Correct?
20             MR. COSTAKOS: Objection. Mischaracterizes
21   out of context, form.
22             THE WITNESS: Paragraph 1 to me says,

Page 223

1    "Congratulations on having Greg Kirk join" --
2    BY MR. SHULMAN:
3       Q. Paragraph --
4       A. -- "Surface Logic. I am sure he will be a
5    valuable contributor." Am I looking at the wrong place
6       Q. Yes, you are, because I said the paragraph
7    numbered one.
8       A. Paragraph numbered one. Okay.
9       Q. And there you referred to "Greg's invention,"
10   quote-unquote. Correct?
11      A. Okay.
12      Q. Yes?
13      A. Yes, yes.
14      Q. And in paragraph No. 2, you said, "We don't use
15   Greg's invention." You see that?
16             MR. COSTAKOS: Objection. Out of context.
17             THE WITNESS: I do see that.
18             MR. COSTAKOS: Form.
19   BY MR. SHULMAN:
20      Q. So you twice referred to Greg's ideas as
21   "Greg's invention." Correct?
22             MR. COSTAKOS: Same objections.

Page 224

1              THE WITNESS: Yes.
2    BY MR. SHULMAN:
3       Q. Okay. And Greg is Dr. Kirk. Right?
4       A. Yes.
5       Q. Okay. Now, in the sentence that says, quote,
6    "We do not use Greg's invention," who is the "we" in that
7    sentence?
8       A. I would assume it was Illumina.
9       Q. Was it Illumina, or was it you, Czarnik, and
10   Chee?
11             MR. COSTAKOS: Objection. Asked and answered
12             THE WITNESS: Since it's present tense, I
13   assume it means Illumina.
14   BY MR. SHULMAN:
15      Q. Okay. Now, which of Dr. Kirk's inventions set
16   forth in his March 1998 email were you referring to when
17   you stated that, quote, "We do not use Greg's invention"?
18      A. Ask the question again, please.
19      Q. Which of Dr. Kirk's inventions set forth in his
20   March 1998 email were you referring to when you stated i
21   your email that, quote, "We do not use Greg's invention"?
22             MR. COSTAKOS: Objection. Form.

56  (Pages 221 to 224)

Page 225

1    THE WITNESS: And, again, I apologize because
2    I'm overly suspicious of your motives. You used the term
3    "inventions" to characterize Greg's email.
4        I think you've pointed out to me that I used
5    "Greg's invention," singular, here. And so when you ask
6    which of Greg's inventions, that would be assuming that I
7    thought there were many inventions in his email, and I
8    don't see any support for that in this email. Perhaps
9    you have it somewhere else.
10       MR. SHULMAN: No. Let me rephrase the question
11   since you're quite picky.
12   BY MR. SHULMAN:
13       Q. Which invention of Dr. Kirk's were you
14   referring to in your email when you stated, quote, "We do
15   not use Greg's invention"?
16       MR. COSTAKOS: I'm going to object to the
17   preface of that question. In the future, it really would
18   be better if you would just ask your question and not
19   comment on the witness's testimony. Okay?
20   BY MR. SHULMAN:
21       Q. Can you answer the question?
22       MR. COSTAKOS: So -- why don't we have the

Page 226

1    question read back without the paraphrase or the preface.
2        THE REPORTER: "Q. Which invention of
3    Dr. Kirk's were you referring to in your email when you
4    stated, quote, 'We do not use Greg's invention'?"
5        THE WITNESS: I assume that I was specifically
6    addressing Greg's concern about his ideas for decoding
7    the beads.
8    BY MR. SHULMAN:
9        Q. So you were referring to the oligo-detecting
10   invention?
11       MR. COSTAKOS: Objection. Form.
12       THE WITNESS: His format in which he did that
13   yes.
14   BY MR. SHULMAN:
15       Q. Okay. You were not referring to his idea of
16   simultaneously inserting an array of fiberoptic arrays
17   into individual wells of a microtiter well plate because
18   Illumina was using that idea. Right?
19       MR. COSTAKOS: Objection. Form.
20       THE WITNESS: I think first -- there's a couple
21   of questions there, aren't there?
22       I think I was being responsive to the inquiry

Page 227

1    that had been made of me around our decoding. I don't
2    think I was evaluating anything other than Greg's
3    comments about decoding in my response email.
4    BY MR. SHULMAN:
5        Q. Now, could you please answer my question, and
6    I'll ask it again.
7        Is it correct that you were not referring to
8    Greg's idea of simultaneously inserting an array of
9    fiberoptic arrays into individual wells of a microtiter
10   well plate because Illumina was, in fact, using that
11   idea?
12       MR. COSTAKOS: Objection. Form. That's
13   argumentative. And I suggest you improve your tone,
14   Counsel. Okay?
15   BY MR. SHULMAN:
16       Q. Can you answer that, please?
17       A. I think I'd like a break.
18       MR. COSTAKOS: Okay.
19       THE WITNESS: I'm just getting a little
20   frustrated.
21       MR. SHULMAN: Okay. We just took a break five
22   minutes ago.

Page 228

1        THE WITNESS: Yeah, well, I'm taking another
2    one.
3        MR. SHULMAN: All right.
4        VIDEOGRAPHER: Off the record at 3:26.
5        (Recess.)
6        VIDEOGRAPHER: We're on the record at 3:34 p m.
7    BY MR. SHULMAN:
8        Q. During the break, Dr. Stuelpnagel, did you
9    speak with your counsel about the deposition?
10       A. No, I did not.
11       Q. Okay. So going back to the question that was
12   pending before you took a break, is it correct that in
13   your February 26, 2001, email you were not referring to
14   Greg's idea of simultaneously inserting an array of
15   fiberoptic arrays into individual wells of a microtiter
16   well plate because Illumina was, in fact, using that
17   idea?
18       MR. COSTAKOS: Objection. Form, asked and
19   answered, compound.
20       THE WITNESS: First I'd like to apologize to
21   the court reporter and the videographer and the attorneys
22   in the room for having to take a break.

Page 229

1       My frustration level with you, Counsel, has
2    risen to a point where I want to make sure I continue to
3    give very accurate answers to questions in which you
4    create implications that are not substantiated by fact or
5    background.
6       The question that's on the record right now has
7    multiple components to it; so let me answer those
8    individually.
9       The first component is about whether I was
10   referring to the decoding ideas of Greg Kirk or his ideas
11   of using multiple arrays.
12       The answer there is very clear.  I was
13   referring to his decoding ideas and that they were not
14   things that we think we had developed at Illumina.
15       Your other question implied that somehow we
16   were using Kirk's idea in the use of our arrays and that
17   we somehow knowingly did that.  I don't also agree that
18   that's a correct characterization of what we were doing.
19       We developed an ArrayMatrix product.  That, I
20   have testified to.  And it does simultaneously address
21   multiple wells in a microtiter plate.
22   BY MR. SHULMAN:

Page 230

1       Q.  Okay.  You were using the idea at Illumina in
2    2001 of simultaneously inserting an array of fiberoptic
3    arrays into individual wells of a microtiter well plate.
4    Correct?
5       A.  Correct.
6       Q.  Okay.  And that idea is documented in
7    Exhibit 12, which is months before you claim to have come
8    up with it in the summer of '98.  Right?
9           MR. COSTAKOS:  Objection.  Form.
10          THE WITNESS:  It is in that email, yes.
11   BY MR. SHULMAN:
12       Q.  And that email is months before you claim to
13   have come up with the idea in the summer of '98.
14   Correct?
15       A.  Before I contributed to that, yes.
16       Q.  Did Mr. Kirk contribute to it?
17       A.  I -- I think where I am stumbling and -- and
18   don't know how to correctly answer is it's clear that he
19   had the idea.
20       Where I think there is a difference of opinion
21   is whether that was the invention that we have in our
22   patents and whether that was sufficiently similar to what

Page 231

1    we were doing at Illumina.
2       Q.  Okay.  But the idea that he had, plainly, is
3    documented in March of 1998.  Correct?
4       A.  There is a --
5           MR. COSTAKOS:  Objection.  Form.
6           THE WITNESS:  -- one-sentence or two-sentence
7    discussion about that, yes.
8    BY MR. SHULMAN:
9       Q.  Okay.  And that idea --
10          MR. COSTAKOS:  Form.
11   BY MR. SHULMAN:
12       Q.  -- was communicated to you in March of '98 by
13   the email.  Correct?
14          MR. COSTAKOS:  Objection -- I'm sorry.
15   Objection.  Foundation, form.
16          THE WITNESS:  I'm sorry.  Bouncing between the
17   objections.
18       I saw the email, yes.
19   BY MR. SHULMAN:
20       Q.  Okay.  And apart from the testimony that you've
21   given on prior occasions which you've repeated here
22   today, can you point to anything to demonstrate that your

Page 232

1    conception in the summer of '98 was not derived from the
2    information that Dr. Kirk provided to you in his email of
3    March of 1998?
4           MR. COSTAKOS:  Objection.  Form.
5           THE WITNESS:  I think we've gone over that
6    multiple times.  And so, again, I apologize for my
7    frustration.
8       I think the answer that I've given, and I will
9    continue to give, is I have no indication that I did
10   not -- that I -- I have no knowledge of using Greg's
11   email in the formation of what became Illumina's products
12   and that patent application.
13          MR. SHULMAN:  That's not what I asked.
14   BY MR. SHULMAN:
15       Q.  I said, can you point to anything other than
16   your own testimony to demonstrate that you did not derive
17   from Dr. Kirk the idea that you claim to have come up
18   with in the summer of '98?
19          MR. COSTAKOS:  Objection.  Form.
20          THE WITNESS:  No.
21   BY MR. SHULMAN:
22       Q.  Now, in the paragraph numbered three in this

58  (Pages 229 to 232)

7/13/2010          **Illumina Inc. v. Affymetrix Inc**          John R. Stuelpnagel
**Attorneys' Eyes Only**

### Page 233

1  February 26 email, Exhibit 19, on the back you state that
2  the method of decoding that Illumina uses was invented by
3  Mark Chee before he joined Illumina.  Do you see that?
4  **A.  I do.**
5  Q.  And then you state that upon joining Illumina,
6  Mr. Chee assigned that invention to Illumina.  Do you see
7  that?
8  **A.  I do.**
9  Q.  What was the method of decoding that was
10  invented by Chee?
11  **A.  An oligo-based method using longer oligos and a**
12  **combinatorial collection of probes to decode large data**
13  **sets.**
14  Q.  And how did it differ from Dr. Kirk's oligo
15  decoding invention?
16  **A.  I'd have --**
17  MR. COSTAKOS:  Objection.  Foundation.
18  THE WITNESS:  I'd have to go back and review
19  Dr. Kirk's email.  I'm happy to do that right now.
20  BY MR. SHULMAN:
21  Q.  If you want.  Or you can also look at how you
22  distinguished it in your own email.

### Page 234

1  **A.  Fair enough.**
2  Q.  That's a little bit shorter.  But look at
3  whatever you want to to answer the question.
4  **A.  In my own email, I point to the fact that Greg**
5  **talked about using short oligos.  Having looked at that**
6  **email, I think it's six to eight mers, m-e-r-s, and we**
7  **didn't do that, nor would it work.**
8  Q.  Why did you tell Bryan Roberts that Mr. Chee
9  had assigned his invention to Illumina?
10  **A.  Mr. Robert -- Dr. Roberts is a -- an investor**
11  **in Illumina, and I wanted to be clear that we had**
12  **resolved any potential inventorships between things that**
13  **Mark might have invented before he joined Illumina that**
14  **related to the Illumina technology.**
15  Q.  So you wanted to demonstrate to Dr. Roberts
16  that Illumina, in fact, owned Mr. Chee's invention?
17  **A.  Yes.  I think that's what I stated here.**
18  Q.  Okay.  Now, in paragraph No. 3 on the back of
19  this exhibit, you state that you don't remember ever
20  sharing Dr. Kirk's March 1998 email with Mark Chee prior
21  to February 26, 2001.  Correct?
22  **A.  That's what I wrote here, yes.**

### Page 235

1  Q.  But you and Mr. Chee did go over the March 1998
2  email in February of 2001.  Correct?
3  MR. COSTAKOS:  Objection.  Form.
4  THE WITNESS:  It appears from this email, but I
5  don't know which email, so I'm going to back up because,
6  again, I don't want to be tricked here.
7  I do not remember ever sharing Greg's email to
8  Mark prior to today.
9  Now, I guess there's some ambiguity what --
10  which Greg email that I was to share, but if I was
11  referring to Greg's 1998 March email that we've been
12  looking at today, I would agree that I'd never shared it
13  with him, but it looks like I probably did share it with
14  him on this date or thereabouts.
15  BY MR. SHULMAN:
16  Q.  Okay.  Now, you didn't tell Dr. Roberts that
17  you don't recall ever seeing Kirk's March 1998 email, did
18  you?
19  **A.  No.**
20  Q.  If that were the case, why didn't you?
21  MR. COSTAKOS:  Objection.  Form.
22  THE WITNESS:  Consistent with my testimony

### Page 236

1  today, I'm under the assumption that I did see Greg's
2  March 1998 email.  I just don't remember it after March
3  1998.
4  BY MR. SHULMAN:
5  Q.  Well, that was my question.
6  Why didn't you tell Dr. Roberts that you don't
7  recall having seen the March 1998 email?
8  **A.  I have no idea why I wrote exactly the words**
9  **wrote.  I wrote the words I wrote in this email.**
10  Q.  It was a much simpler explanation to
11  Dr. Roberts to simply tell him, "I don't remember ever
12  having seen Greg's email," rather than the elaborate
13  explanation that you gave in paragraph 4.  Correct?
14  MR. COSTAKOS:  Objection.  Form.
15  THE WITNESS:  I'm now -- which -- are you
16  talking about numbered paragraph 4, or are you talking
17  about 1, 2, 3, 4 paragraph -- fourth paragraph?
18  MR. SHULMAN:  Let me rephrase the question.
19  THE WITNESS:  Yes.
20  BY MR. SHULMAN:
21  Q.  Turn to the paragraph numbered four.
22  **A.  Okay.**

59 (Pages 233 to 236)

7/13/2010                    **Illumina Inc. v. Affymetrix Inc**              John R. Stuelpnagel
                             **Attorneys' Eyes Only**

| Page 237 | Page 239 |
|---|---|

Page 237

1  Q. There you state that although your name appears
2  on the Illumina patent, about which Dr. Kirk inquired,
3  your contribution to the patent that he was inquiring
4  about has nothing to do with the oligo decoding method
5  that Illumina uses. Do you see that?
6  A. Yes.
7  Q. And you go on to say that because you made no
8  contribution to Illumina's oligo decoding method, it is
9  obvious that you did not use any of the oligo decoding
10  information that Kirk sent to you in his March 1998
11  email. Correct?
12  A. Yes. That Illumina did not use.
13  Q. Correct.
14      And in this email of yours dated February 26,
15  you didn't tell Dr. Roberts, "Of course, I didn't use
16  Kirk's information because I don't even recall having
17  read the email," did you?
18      MR. COSTAKOS: Objection. Form.
19      THE WITNESS: I wrote what I wrote.
20      MR. COSTAKOS: The document speaks for itself.
21  BY MR. SHULMAN:
22  Q. Okay. And that's a much simpler explanation,

Page 238

1  if, in fact, it were true, than the elaborate explanation
2  you put together in paragraph 4, isn't it?
3      MR. COSTAKOS: Objection. Form, argumentative.
4      THE WITNESS: I actually think that this is a
5  more satisfactory answer for Greg. And I would have, if
6  I were Greg receiving this information, been happy with
7  this information that I provided him.
8  BY MR. SHULMAN:
9  Q. When you received and reviewed the March 1998
10  email in February of 2001 and read it in order to respond
11  to Bryan Roberts, did it refresh your recollection about
12  the subject matter that you had reviewed back in March of
13  '98 when you first received Kirk's email?
14      MR. COSTAKOS: Objection. Form.
15      THE WITNESS: I'm sorry. I really have a hard
16  time following your questions. Could you simplify that
17  one for me, please.
18      MR. SHULMAN: No. But we can read it back.
19      THE REPORTER: "Q. When you received and
20  reviewed the March 1998 email in February of 2001 and
21  read it in order to respond to Bryan Roberts, did it
22  refresh your recollection about the subject matter that

Page 239

1  you had reviewed back in March of '98 when you first
2  received Kirk's email?"
3      MR. COSTAKOS: Objection. Form.
4      THE WITNESS: The only recollection I have is
5  making sure that I understood what Greg was claiming
6  about an oligo decoding method and how we decode oligo
7  and making sure that I properly assigned contributions to
8  the respective parties.
9      I don't think I focused at all on anything in
10  that email other than the oligo decoding in February. I
11  would have had no reason to.
12  BY MR. SHULMAN:
13  Q. Well, you had to read the entire email -- March
14  1998 email in February of 2001 to see what Kirk had to
15  say about oligos. Right?
16      MR. COSTAKOS: Objection. Form.
17      THE WITNESS: I'm sure I read the email at some
18  level of superficiality or maybe in great depth. I don't
19  recall.
20      I remember that it was appropriate for me to
21  concentrate on the oligo piece because that's what, in
22  fact, was being raised as a question mark.

Page 240

1  BY MR. SHULMAN:
2  Q. Sure. But you had to read through the entire
3  Kirk email from March of '98 in order to find out where
4  the oligo piece was. Right?
5      MR. COSTAKOS: Objection. Asked and answered.
6      THE WITNESS: I think that's a fair assumption.
7  BY MR. SHULMAN:
8  Q. Okay. And upon reading through the entire Kirk
9  email in February of 2001, did it strike you that, Oh,
10  my, he has disclosed here simultaneous dipping of an
11  array of array of fiberoptic bundles into separate wells
12  of a microtiter plate?
13      MR. COSTAKOS: Objection. Form --
14      THE WITNESS: No, it did not.
15      MR. COSTAKOS: -- foundation.
16  BY MR. SHULMAN:
17  Q. You just skipped right over that part?
18      MR. COSTAKOS: Same objections.
19      THE WITNESS: I have no recollection of
20  focusing on it, that it wasn't relevant to the question
21  being raised.
22  BY MR. SHULMAN:

60  (Pages 237 to 240)

7/13/2010           Illumina Inc. v. Affymetrix Inc           John R. Stuelpnagel
                         Attorneys' Eyes Only

Page 241

1   Q. Was it relevant to the way things were being
2   done at Illumina with respect to their budding Sentrix
3   ArrayMatrix project?
4           MR. COSTAKOS: Objection. Form.
5           THE WITNESS: I don't think so because I think
6   that what we invented in June is quite different than
7   what Greg disclosed in his email.
8   BY MR. SHULMAN:
9   Q. Did what you invented in June include the idea
10  of simultaneously inserting into separate wells of a
11  microtiter well plate separate bundles in an array of
12  array of fiberoptic bundles?
13  A. Yes.
14  Q. So it was relevant to what you were doing.
15  Correct?
16          MR. COSTAKOS: Objection. Form, argumentative.
17          THE WITNESS: You asked me what I was focused
18  on. I was focused on addressing Greg's concern that he'd
19  raised with Bryan Roberts around the decoding. That's
20  what I focused on. That's what I was responsive to.
21  BY MR. SHULMAN:
22  Q. Okay. So there's no doubt that in 2001 you

Page 242

1   read Mr. Kirk's -- or Dr. Kirk's March '98 email.
2   Correct?
3           MR. COSTAKOS: Objection. Form, foundation
4           THE WITNESS: I at least read the parts around
5   the decoding.
6   BY MR. SHULMAN:
7   Q. And you told us you had to read the whole thing
8   in order to find out what parts were directed to the
9   decoding. Correct?
10          MR. COSTAKOS: Same objections.
11          THE WITNESS: Well, again, I'm not -- I don't
12  know. Because if you look at the email, you can actually
13  focus on the one or two paragraphs that he talked about
14  decoding. And so I might have only read those. So I
15  think there is a doubt. I just don't know.
16  BY MR. SHULMAN:
17  Q. You told us just not five minutes ago that it
18  was a fair assumption to make that you read through the
19  entire email in order to find the oligo decoding parts.
20  Are you now changing your testimony?
21  A. It's a question of what you scan through and
22  what you focus on, and that's what I'm trying to -- to

Page 243

1   differentiate. It was clear that I needed to look at the
2   oligo methods to be responsive to Greg's inquiry here.
3   It's not clear that I paid any attention to the rest of
4   the email.
5   Q. Did you read the entire email?
6   A. I have no idea.
7   Q. Okay. So that's the truth?
8           MR. COSTAKOS: Oh, come on. Let's not do any
9   more of that.
10  BY MR. SHULMAN:
11  Q. And --
12          MR. COSTAKOS: Wait. Hold on, hold on.
13  BY MR. SHULMAN:
14  Q. -- in 2007 --
15          MR. COSTAKOS: Hold on, hold on. He's a third
16  party here. He's here by subpoena, and you cannot behave
17  like that with him or we're going to turn this off and
18  leave. Do you understand that?
19          MR. SHULMAN: I heard what you said.
20          MR. COSTAKOS: Okay. So why don't you improve
21  your behavior.
22  BY MR. SHULMAN:

Page 244

1   Q. In 2007 when you gave your trial testimony in
2   the prior Illumina action, there's no doubt that you had
3   read at least the oligo portion and perhaps the entirety
4   of Kirk's March 1998 email. Correct?
5           MR. COSTAKOS: Objection. Form, foundation.
6           THE WITNESS: I struggle with your term
7   "no doubt." I don't know what "no doubt" means.
8           All I can say is that there is an email from
9   Greg in March of 1998. I probably read it. What I
10  understood about it and what I concentrated on, I don't
11  recall.
12          That email came into question later in 2001
13  around oligos. I responded to the oligo portion. That,
14  I'm certain of. The rest of it I'm just not certain of.
15  BY MR. SHULMAN:
16  Q. Okay. Was it true that, quote, "I have
17  reviewed the email," when you wrote that to Bryan Roberts
18  in February 26 of 2001?
19  A. Sure. And what it doesn't say is did I review
20  every word of the email or did I concentrate on the oligo
21  portions.
22  Q. Fine. So in 2007 there's no doubt that while

Page 245

1  you were sitting on the witness stand in the prior
2  litigation you had reviewed the email?
3  **A. At some level.**
4  Q. Okay. And in 2007 when you gave your testimony
5  in the prior action, the applications for the 841 and 020
6  patents had not yet issued as patents. Correct? They
7  issued in 2009?
8  **A. I'll take that as true.**
9  Q. Okay.
10  **A. I think to the best of my knowledge, too. I**
11  **don't follow when these patents issue.**
12  Q. I'll represent that to you.
13  **A. Fine. I really appreciate that.**
14  Q. And if I'm wrong, then this is all useless.
15  Between the time that you testified in March of
16  2007 and the time the patents issued in 2009, did you do
17  anything to bring to the attention of the examiner
18  handling your applications for the 841 and 020 patents
19  your 2007 trial testimony or Dr. Kirk's March 1998 email?
20  MR. COSTAKOS: Objection. Form. I'm sure this
21  has been asked and answered multiple times as well.
22  THE WITNESS: I have no knowledge of doing

Page 246

1  either one of those.
2  ///
3  BY MR. SHULMAN:
4  Q. Okay. Did you discuss the possibility of doing
5  so with any of the attorneys responsible for the
6  applications that led to the 841 and 020 patents?
7  MR. COSTAKOS: Same objections.
8  THE WITNESS: I do not.
9  BY MR. SHULMAN:
10  Q. The question was, did you discuss?
11  **A. I do not think I did.**
12  Q. With respect to the examiners handling your 841
13  and 020 patent applications, why is it that you never
14  disclosed to them Dr. Kirk's March 1998 email or its
15  content?
16  MR. COSTAKOS: Objection. Form, also asked and
17  answered --
18  THE WITNESS: I never --
19  MR. COSTAKOS: -- about two hours ago.
20  THE WITNESS: I never thought it was relevant.
21  I never -- I never even recalled it, actually.
22  BY MR. SHULMAN:

Page 247

1  Q. Well, you knew about it as of February 26,
2  2001?
3  **A. I never thought about it in the context of the**
4  **prosecution, and I didn't think about it a whole lot**
5  **before or after.**
6  Q. Why did you think it was not relevant, as you
7  mentioned a moment ago?
8  **A. Because I didn't even think of it. How could I**
9  **think it's relevant if I didn't even remember that Greg**
10  **had made any assertions about how to put multiple fibers**
11  **together.**
12  Q. Sir, you said a moment ago that "I didn't think
13  it was relevant." So how could you conclude it was not
14  relevant if you hadn't thought about it?
15  MR. COSTAKOS: Hold on.
16  THE WITNESS: Exactly.
17  MR. COSTAKOS: Hold on.
18  THE WITNESS: That's what I'm trying to say. I
19  didn't think about it.
20  MR. COSTAKOS: There you go.
21  We could read back the entire answer. I'm
22  tired of you mischaracterizing his testimony. It's just

Page 248

1  not proper, and I think you know it.
2  MR. SHULMAN: I'm not mischaracterizing
3  anything.
4  MR. COSTAKOS: You absolutely are. You know
5  you are.
6  Read his whole answer back.
7  BY MR. SHULMAN:
8  Q. Did you make a determination about whether the
9  Kirk email was or was not relevant to be disclosed to the
10  examiner handling your patent applications?
11  **A. No, I did not.**
12  Q. Okay. Did you make the decision not to
13  disclose Dr. Kirk's March 1998 email or its content to
14  the examiner handling your patent applications?
15  MR. COSTAKOS: Objection. Form.
16  THE WITNESS: I'm sorry. Could you repeat the
17  question?
18  MR. SHULMAN: Sure.
19  BY MR. SHULMAN:
20  Q. Were you the person who made the decision not
21  to disclose Dr. Kirk's email in March of '98 or its
22  content to the examiner who was handling your 841 and 020

Page 249

1  patent applications?
2      MR. COSTAKOS: Objection. Form.
3      THE WITNESS: There was no decision made. It
4  just didn't happen for whatever reason, and I think it's
5  because I didn't -- I didn't -- I didn't even remember.
6  BY MR. SHULMAN:
7      Q.  Did you remember it on February 26, 2001?
8      A.  I remember -- I don't even know what I
9  remembered on February 26, 2001, but what I paid
10 attention to was the decoding, and that's what I thought
11 I took care of here.
12     Q.  Are you saying that you skipped over the
13 portions of the March 1998 email concerning inserting
14 arrays of arrays into microtiter plates when you read it
15 in February of 2001?
16     A.  I have no idea.
17         MR. COSTAKOS: Objection. Form, asked and
18 answered.
19 BY MR. SHULMAN:
20     Q.  Okay. Did you ever disclose the March 1998
21 email to anyone other than Mr. Chee who is referred to as
22 having had a discussion with you about the email in

Page 250

1  February of 2001?
2      A.  Would you ask the question again?
3      Q.  Sure.
4          In your email of February 26, you state
5  somewhere in here that you reviewed Greg's email with --
6  or discussed Greg's email with Mark Chee. Do you see
7  that? Second paragraph.
8      A.  I do see that I had. Yes, I do see that.
9      Q.  Okay. So apart from Mr. Chee and whatever
10 discussion you may have had with him in February of 2001
11 about Greg's March 1998 email, did you ever discuss or
12 disclose that email with anyone else?
13     A.  I do not believe so.
14     Q.  How about with Larry Bock who was a carbon copy
15 recipient of the email?
16     A.  I don't believe I did.
17         MR. SHULMAN: Let's mark as Exhibit 20 a notice
18 of allowance issued by the U.S. Patent and Trademark
19 Office and the application that resulted in issuance of
20 the 841 patent.
21         (Exhibit 20 was marked.)
22 BY MR. SHULMAN:

Page 251

1      Q.  I have no reason to believe that you've ever
2  seen this before, but let me just tell you what it is.
3  I'll make the representation to you.
4          It is the document by which the examiner
5  allowed the claims of the 841 patent to issue as a
6  patent. Will you accept my representation?
7      A.  Yes.
8      Q.  And do you see that it is dated, on the first
9  page, date mailed, December 2 of 2008?
10     A.  Where am I supposed to be looking?
11     Q.  Here, right on the first page up here, it says
12 "date mailed."
13     A.  Okay.
14     Q.  Do you see that?
15     A.  Yes.
16     Q.  Okay. And after the notice of allowance
17 issued -- pardon me -- in December of 2008 and before the
18 841 patent issued in March of 2009, did you read the
19 allowed claims to satisfy yourself that you were the
20 original and first inventor of the subject matter being
21 claimed?
22     A.  I do not believe I did.

Page 252

1      Q.  Okay. Do you recall that after these claims
2  were allowed, you executed an oath and declaration under
3  penalty of perjury in which you stated that you and your
4  co-inventors were the first and original inventors of the
5  subject matter claimed in this application?
6      A.  I -- I don't recall.
7          MR. SHULMAN: All right. Let's mark as
8  Exhibit 21 a transmittal letter from Jerry Hefner to the
9  patent office in connection with the application that
10 resulted in the issuance of the 841 patent.
11         (Exhibit 21 was marked.)
12 BY MR. SHULMAN:
13     Q.  Do you see that this cover letter -- let's just
14 look at the first page first. The cover letter is dated
15 January 29, 2009. Do you see that?
16     A.  Yes.
17     Q.  And the cover letter -- cover letter states
18 that it is being submitted in connection with application
19 10/767249. Do you see that?
20     A.  I do.
21     Q.  Okay. And the 841 patent, which I'll show you
22 a copy of, has the same application number. Correct?

Page 253

1  A. Okay.
2  Q. All right. And in this cover letter, your
3  attorney Mr. Hefner stated that pursuant to the
4  examiner's request, he is submitting a new declaration of
5  inventorship. Do you see that? First page.
6  A. Here?
7  Q. I'll repeat the question.
8  In the cover letter --
9  A. Yes.
10 Q. -- your attorney Mr. Hefner stated that
11 pursuant to the examiner's request, he, Mr. Hefner, is
12 submitting a new declaration of inventorship. Do you see
13 that?
14 **A. Pardon me. I -- I'm so distrustful of**
15 **questions at this point in the deposition that when you**
16 **said he was my attorney, I'd actually say he's not my**
17 **attorney. He was Illumina's attorney.**
18 Q. He was representing you as the applicant for
19 this patent. Correct?
20 **A. He was Illumina's attorney, and I had assigned**
21 **all rights to Illumina.**
22 Q. Right. And the application was being taken out

Page 254

1  in your name, Mr. Chee's name, and Mr. Auger's name.
2  Right?
3  **A. Okay. If that qualifies him as my attorney. I**
4  **never thought of him as my attorney.**
5  Q. Okay. Well, even if he wasn't your attorney,
6  he was Illumina's attorney. Right?
7  A. Correct.
8  Q. And according to this cover letter, Illumina's
9  attorney stated that pursuant to the examiner's request,
10 he, Illumina's attorney, is submitting a new declaration
11 of inventorship. Do you see that?
12 MR. COSTAKOS: Objection. Document speaks for
13 itself.
14 THE WITNESS: Yes.
15 BY MR. SHULMAN:
16 Q. Okay. And the enclosure with this letter is a
17 declaration of inventorship that was signed by you as
18 well as Mr. Chee and Mr. Auger. Correct?
19 A. Yes.
20 Q. Okay. And your signature page is the
21 second-to-last page in this exhibit. Correct?
22 A. Yes.

Page 255

1  Q. And that's your signature dated January 14,
2  2009?
3  **A. Right. Yes.**
4  Q. Okay. And you signed the declaration under the
5  penalties set forth in the last big paragraph above your
6  signature. Correct?
7  **A. I signed this, yes.**
8  Q. Subject to the penalties that are set forth in
9  the last big paragraph above your signature. Correct?
10 A. Yes.
11 Q. Okay. And you acknowledge in this declaration
12 that any willful false statements you make in the
13 declaration may jeopardize the validity of your
14 application or patent. Correct?
15 **A. I'll let the paragraph speak for itself.**
16 Q. Well, did you sign that?
17 **A. I did.**
18 Q. Okay. And it says, "I hereby declare that all
19 statements made herein of my own knowledge are true and
20 that all statements made on information and belief are
21 believed to be true and, further, that these statements
22 were made with the knowledge that willful, false

Page 256

1  statements and the like so made are punishable by fine or
2  imprisonment or both under Section 1001 of Title 18 of
3  the United States Code and that such willful, false
4  statements may jeopardize the validity of the application
5  or any patent issued thereon."
6  That was your understanding at the time.
7  Correct?
8  A. Yes.
9  Q. And one of the statements that you swore to in
10 this declaration is that, quote, "I believe the inventors
11 named below to be the original and first inventors of the
12 subject matter which is described and claimed and for
13 which a patent is sought." Do you see that?
14 A. Yes.
15 Q. And the inventors named below were you, Chee,
16 and Auger. Correct?
17 A. Yes.
18 Q. Okay. And you further swore that the following
19 statement is true: "I have reviewed and understand the
20 contents of the above-identified application, including
21 the claims." Do you see that?
22 A. I do see that.

7/13/2010      **Illumina Inc. v. Affymetrix Inc**      **John R. Stuelpnagel**
**Attorneys' Eyes Only**

---

Page 257

1   Q. Okay. And was that statement true when made?
2   A. Yes.
3   Q. Okay.
4   A. Well -- I'm sorry. I answered too quickly.
5   Could you repeat the question?
6   Q. Was that statement true when made?
7   A. I don't recall whether I read the claims or not
8   when I signed the statement. And shame on me if I did
9   something wrong.
10   Q. You swore that the statements were true.
11   Correct?
12   A. Again, if I -- I might have -- I might have
13   read the claims. I just don't recall whether I read the
14   claims or not at the time that I signed this invention --
15   this declaration.
16   Q. Well, you -- by signing this you, averred to
17   the fact, you swore to the fact that the statement you
18   made about reviewing and understanding the claims was
19   true. Right?
20   A. I understand that.
21   Q. So was it true or wasn't it?
22   A. I don't --

---

Page 258

1   MR. COSTAKOS: Objection. Asked and answered.
2   THE WITNESS: I don't recall whether I read the
3   claims when I signed this.
4   BY MR. SHULMAN:
5   Q. So you may have made an untrue statement?
6   A. I don't know.
7   Q. Well, if you don't know, then it follows that
8   you may have made an untrue statement when you stated
9   here that "I have reviewed and understand the claims"?
10   MR. COSTAKOS: Objection. Form --
11   THE WITNESS: I understand --
12   MR. COSTAKOS: -- mischaracterizes.
13   THE WITNESS: -- your interpretation. My
14   testimony is I don't know.
15   BY MR. SHULMAN:
16   Q. Okay. So if you don't know, then you don't
17   know whether you were telling the truth when you swore
18   under oath that you had reviewed the claims. Right?
19   MR. COSTAKOS: Objection. Argumentative.
20   THE WITNESS: I don't know.
21   BY MR. SHULMAN:
22   Q. You don't know if you were telling the truth?

---

Page 259

1   A. I don't know.
2   Q. Okay. Were you telling the truth when you
3   said, "I believe that the inventors named below are the
4   original and first inventors of the subject matter which
5   is described and claimed"?
6   A. Because I was familiar with the application, I
7   assume that that was a true statement.
8   Q. I didn't ask for an assumption.
9   I said, do you know whether or not the
10   inventors named below were the first and original
11   inventors of the subject matter that's described and
12   claimed?
13   A. I don't -- I'm sorry. I don't know whether I
14   read the claims before signing this declaration or not.
15   Q. Did you take this oath seriously?
16   MR. COSTAKOS: Objection. Argumentative, form.
17   THE WITNESS: I signed this declaration.
18   BY MR. SHULMAN:
19   Q. My question was slightly different.
20   Did you take the oath seriously?
21   A. I may have not -- I may or may not have read
22   the claims, and so to the extent that I either took the

---

Page 260

1   oath seriously or not, I'm sorry.
2   Q. Do you want to take a break?
3   A. No. I'm fine.
4   Q. Okay. I don't believe you've answered my
5   question.
6   The question once again is, did you take the
7   oath seriously?
8   MR. COSTAKOS: Objection. Form.
9   THE WITNESS: I don't know what I thought when
10   I signed this. I thought I was doing what I was supposed
11   to do to validate the patent and get it issued for
12   Illumina.
13   BY MR. SHULMAN:
14   Q. Was this just a ministerial act, as far as you
15   were concerned, signing this declaration?
16   MR. COSTAKOS: Objection. Form.
17   THE WITNESS: Yes, actually, I thought it was.
18   BY MR. SHULMAN:
19   Q. Notwithstanding your acknowledgment that you
20   could go to prison if you make false statements?
21   A. I understand that.
22   MR. SHULMAN: Why don't we take a break.

---

Page 261

1    VIDEOGRAPHER: Off the record at 4:07 p m.
2    (Recess.)
3    VIDEOGRAPHER: We're on the record at 4:15.
4    THE REPORTER: "Q. Notwithstanding your
5    acknowledgment that you could go to prison if you could
6    make false statements?
7    "A. I understand that."
8    MR. SHULMAN: And the question and answer
9    before that?
10   THE REPORTER: "Q. Was this just a ministerial
11   act, signing this declaration?
12   "Mr. Costakos: Objection. Form.
13   "The Witness: Yes, actually, I thought it
14   was."
15   BY MR. SHULMAN:
16   Q.  What, if anything, did you do prior to signing
17   the declaration of inventorship in Exhibit 21 to satisfy
18   yourself that the following statement was true?
19   "I believe the inventors named below to be the
20   original and first inventors of the subject matter which
21   is described and claimed and for which a patent is
22   sought."

Page 262

1    A.  I had read the claims when they were being
2    prosecuted. And at that time I had no objection to the
3    inventorship based upon those prosecuted claims. What I
4    don't remember is precisely whether I read the issued
5    claims right before I signed this.
6    Q.  Okay. And the claims that you read that you
7    just referred to, when did you read those claims?
8    A.  They would have been in probably 2008, 2009
9    time period.
10   Q.  Okay. And were the claims that you read at
11   that time directed to this idea of dipping into separate
12   wells of the separate arrays that make up this array of
13   arrays?
14   A.  I think it had to do with the two substrates
15   that we looked at when we looked at Claim 1 earlier
16   today.
17   Q.  Okay. What did you do to satisfy yourself that
18   this statement was true before you signed your
19   declaration in January of '09? Quote, "I've reviewed and
20   understand the contents of the above-identified
21   application, including the claims."
22   A.  So I've reviewed this application many times

Page 263

1    through the period from which it was originally submitted
2    to the date of this declaration of inventorship. And as
3    I just mentioned, I had reviewed the claims during the
4    prosecution of this specific patent.
5    Q.  Okay. Let me direct you to issued Claim 1 of
6    the 841 patent and the Kirk email which is Exhibit 12.
7    MR. COSTAKOS: Can you just give me a copy of
8    that 841 patent?
9    MR. SHULMAN: Oh, I'm sorry.
10   And the Kirk email which is Exhibit 12.  See if
11   we can dig that one out.
12   BY MR. SHULMAN:
13   Q.  Have you got those two documents before you?
14   A.  I do.
15   Q.  In light of what is set forth in Dr. Kirk's
16   email, can you explain to the judge, to the jury, as well
17   as to the rest of us here, the basis for your sworn
18   statement in January of '09 that you and your first --
19   I'm sorry -- you and your co-inventors were the original
20   and first inventors of Claim 1 of the 841 patent?
21   MR. COSTAKOS: Objection. Form, foundation.
22   THE WITNESS: As we've discussed before, I

Page 264

1    believe the second substrate is different than anything
2    contemplated by Kirk in his email.
3    BY MR. SHULMAN:
4    Q.  Okay. Any other differences?
5    A.  That was the one that I think is the most
6    important.
7    Q.  Well, I want to know if there are any others.
8    A.  I haven't looked at it enough to compare them
9    to -- to know if there's any other differences.
10   Q.  Well, I'm asking you to do so now.
11   MR. COSTAKOS: Same objections, also to the
12   extent it calls for a legal conclusion, and on
13   foundation, competence grounds.
14   THE WITNESS: I think it's the second
15   substrate, which is different.
16   BY MR. SHULMAN:
17   Q.  Okay. Now, could we return to Exhibit 19,
18   which is your February 26 email.
19   Now, your February 26 email concerned this
20   topic of inventorship of the oligo detection method.
21   Correct?
22   A.  Yes.

66 (Pages 261 to 264)

Page 265

1    Q.  Okay.  And did you understand at the time that
2    the topic of inventorship was important because one of
3    the conditions for obtaining a patent is that the true
4    and correct inventors must be named on your patent
5    applications?
6         MR. COSTAKOS:  Objection.  Form.
7         THE WITNESS:  Yes.
8    BY MR. SHULMAN:
9    Q.  Okay.  And you understood that the true
10   identity of the actual inventors is information that is
11   material to whether or not your patent application can
12   issue as a patent?
13   A.  Yes.
14        MR. COSTAKOS:  Objection.  Form.
15   BY MR. SHULMAN:
16   Q.  While the applications for your 841 and 020
17   patents were pending before the patent office starting
18   back in 1998, did you regard the information in
19   Dr. Kirk's March 1998 email about simultaneously
20   inserting an array of fiberoptic arrays into individual
21   wells of a well plate as important to identifying who the
22   true inventors were of your claimed invention?

Page 266

1    A.  I did not consider it.
2    Q.  Having looked at it today, do you have a view
3    about whether that information is important?
4         MR. COSTAKOS:  Objection.  Form.
5         THE WITNESS:  I think that that might be an
6    interpretation that's best left to an attorney.  My own
7    perspective is, based upon the claims that issued, no.
8    BY MR. SHULMAN:
9    Q.  Okay.  And that's because of the second
10   substrate?
11   A.  Yes.
12   Q.  Okay.  Now, after Illumina was formed in the
13   spring of 1988 -- I'm sorry -- 1998, it began hiring
14   employees.  Correct?
15   A.  Yes.
16   Q.  And is it correct, sir, that everyone who was
17   hired as an Illumina employee since April of '98 when it
18   was incorporated had an agreement with Illumina by which
19   they were required to assign to Illumina any inventions
20   they made relating to Illumina's business?
21   A.  Yes.
22   Q.  And the reason Illumina imposed such a

Page 267

1    requirement, as most companies do, on its hired employee
2    was to make sure that Illumina would own the rights to
3    any inventions that its employees made.  Correct?
4    A.  That's my understanding.
5    Q.  And since 1998 have you understood that absent
6    such an agreement to assign the inventions to Illumina,
7    Illumina would not own the rights to any such invention?
8         MR. COSTAKOS:  Objection.  Form.
9         THE WITNESS:  Could -- absent such an
10   agreement.  I -- I think -- I'm going to let that be
11   something that an attorney can comment on.  I think,
12   actually, there might be laws that say if you're an
13   employee, even if you haven't signed the assignment
14   document, you're --
15   ///
16   BY MR. SHULMAN:
17   Q.  You're absolutely right.
18   A.  Sorry.  I don't mean to play an attorney --
19   Q.  Let me rephrase the question.
20        Since 1998, you understood that absent such an
21   agreement, Illumina might not own the rights to any
22   invention made by some person?

Page 268

1         MR. COSTAKOS:  Objection.  Form and foundation
2         THE WITNESS:  I guess that's a possibility.
3    BY MR. SHULMAN:
4    Q.  Okay.  Now, in March of 1998, Illumina did not
5    yet exist.  Right?
6    A.  That's -- as a corporate entity, that's
7    correct.
8    Q.  Okay.  And as of March of 1998, Illumina had
9    not hired any employees.  Correct?
10   A.  Correct.
11   Q.  And as of March 1998, Dr. Kirk had not been
12   hired by Illumina.  Correct?
13   A.  That's correct.
14   Q.  And, in fact, Illumina never hired Dr. Kirk.
15   Right?
16   A.  That's right.  He turned us down.
17   Q.  And Dr. Kirk never entered into any agreement
18   with Illumina to assign any of his ideas or his
19   inventions that he came up with to Illumina.  Correct?
20   A.  That's correct.
21   Q.  And Dr. Kirk never assigned to Illumina any of
22   the inventions or other ideas that he came up with that

67  (Pages 265 to 268)

Page 269

1    are described in his March 1998 email. Correct?
2          MR. COSTAKOS: Objection. Form.
3          THE WITNESS: And I don't know whether anything
4    in Dr. Kirk's email's an invention. I would prefer to
5    call those ideas. Inventions, as I understand, are a
6    result of a patent application.
7    BY MR. SHULMAN:
8       Q. Well, you referred to at least the oligo
9    decoding idea as Dr. Kirk's invention. Correct?
10      A. Yeah, and that was probably -- reading it today
11   in this context, that was probably an incorrect reference
12   on my part. I think the more accurate way to refer to
13   Dr. Kirk's information contained in his email is that
14   they're ideas.
15      Q. Okay. So let me rephrase the question and use
16   the term "ideas."
17         Is it correct that Dr. Kirk never assigned to
18   Illumina or agreed to assign to Illumina any of the ideas
19   that he came up with that are described in his March 1998
20   email?
21      A. Yes.
22      Q. Now, you and Dr. Chee and Mr. Auger assigned

Page 270

1    your rights in the 841 and 020 inventions to Illumina at
2    or about the time that the original application for those
3    inventions were filed. Correct?
4       A. Correct.
5       Q. Did you understand at that time of assignment
6    that if you and Chee and Auger had not assigned your
7    ownership rights in the 841 and the 020 inventions to
8    Illumina, each of you might have retained an ownership
9    right in those patents?
10         MR. COSTAKOS: Objection. Form, foundation,
11   competence.
12         THE WITNESS: Again, I don't mean to play an
13   attorney, but my understanding is Illumina had those
14   rights and they could march through whatever they needed
15   to do to document the invention.
16   BY MR. SHULMAN:
17      Q. Okay.
18      A. And that I -- if I refused to sign something,
19   it would have no bearing on whether Illumina owned it or
20   not. That's my understanding. I could be wrong.
21      Q. Okay.
22      A. You guys are the attorneys.

Page 271

1       Q. Let me ask you a slightly different question.
2          Did you understand that if you had named
3    Dr. Kirk as a co-inventor on the 841 and 020 patent
4    applications, he would have had an ownership interest in
5    those patents unless Illumina acquired Dr. Kirk's
6    ownership rights from Dr. Kirk?
7       A. I never considered it.
8       Q. But you understand that today?
9       A. I --
10         MR. COSTAKOS: Objection to form.
11         THE WITNESS: I understand what you're saying,
12   yes.
13   BY MR. SHULMAN:
14      Q. Okay. And had Illumina been forced to acquire
15   Dr. Kirk's rights had he been named as an inventor, that
16   would have cost Illumina some money. Correct?
17      A. I have no idea.
18      Q. When you filed the applications for the 841 and
19   020 patents, you believed that those applications covered
20   a fundamental invention from Illumina as you explained to
21   us earlier. Correct?
22      A. Correct.

Page 272

1       Q. So it was a valuable invention, in your view?
2       A. Yes.
3       Q. Potentially worth millions of dollars?
4       A. What -- most important was that we had a
5    product that came out of that brainstorming session, and
6    that was fundamentally important for Illumina.
7       Q. And so the invention that led to that product
8    was very valuable to Illumina?
9       A. Well, it's an interesting question because I
10   would say that up until this lawsuit, the invention had
11   no bearing on the economics of that product. There was
12   nobody -- while we had that product on the market, there
13   was no real competition for that product. And so having
14   a patent or not having a patent had no material impact on
15   whether we generated additional dollars worth of revenue
16   for Illumina.
17      Q. Well, I didn't ask that. But the patent
18   applications were considered valuable assets of Illumina.
19   Correct?
20      A. Patent applications are considered valuable
21   assets of Illumina.
22      Q. Okay.

68 (Pages 269 to 272)

Page 273

1    A.  But it had no bearing on the -- on the economic
2    returns from that product, and that product was
3    fundamentally important to Illumina.
4        Q.  And so was the invention?
5        MR. COSTAKOS:  Objection.  Form.
6        THE WITNESS:  Well, you know, the -- and I
7    don't know what the right word is here with -- I'm just
8    struggling because I don't know what implications -- when
9    I agree that something's an invention, if I think of an
10   invention as being what ultimately comes out of a patent
11   application, then that had no bearing on Illumina's
12   ability to gain economic return from its ArrayMatrix
13   product.
14       If you regard an invention to encompass the
15   idea that led to a product, then, yes, we generated lots
16   of money on that product.  Whether we had the patent or
17   not was immaterial in generating those revenues.
18       So that's why I'm tripping up on the term .
19   "invention" because I want to be more careful than I was
20   in this February 26, 2001, email where I describe
21   something as an invention.
22   BY MR. SHULMAN:

Page 274

1        Q.  Okay.  And so the idea that led to what was
2    ultimately the Sentrix ArrayMatrix product is the idea
3    that you conceived in the summer of 1998.  Correct?
4        A.  Correct.
5        Q.  Okay.  And that idea was valuable.  As it
6    turned out, you developed a product that sold a lot of
7    money?
8        A.  Yes, we can agree on those things.
9        Q.  Okay.  And because you and Mr. Chee and
10   Mr. Auger had assigned all of your ownership rights to
11   Illumina, the entire value of the applications for the
12   020 and the 841 was owned solely and exclusively by
13   Illumina as long as you, Chee, and Auger were the only
14   inventors.  Correct?
15       MR. COSTAKOS:  Objection.  Form.
16       THE WITNESS:  Unless there was somebody else
17   obligated, some -- this is all hypothetical.  I think if
18   there was a fourth inventor and they were also an
19   Illumina employee or had rights assigned to Illumina for
20   any invention that it wouldn't matter.  In terms of
21   Illumina's perspective, they just need to make sure they
22   corrected the inventorship.  All of that is strictly

Page 275

1    hypothetical because none of that happened.
2    BY MR. SHULMAN:
3        Q.  Right.
4        A.  I think what you're referring to is for
5    somebody -- a potential fourth inventor, which I don't
6    think existed, that was not an Illumina employee --
7        Q.  Right.
8        A.  -- that did not have rights to assign, and so
9    it depends on which way you look at that.
10       Q.  If Illumina had to share the ownership of the
11   applications for the 020 and the 841 with Dr. Kirk, for
12   example, the value of Illumina's ownership interest would
13   be less.  Correct?
14       MR. COSTAKOS:  Objection.  Form.
15       THE WITNESS:  And, again, there was no value to
16   having ownership of the patents.  The value to date,
17   other than whatever may come out of this lawsuit, has
18   strictly been based upon the products.
19       If we didn't file those patent applications, it
20   would have had no impact on Illumina's ability to
21   generate value from that idea.  Zero.
22       And so, you know, if we really thought there

Page 276

1    was a fourth inventor, the right thing would have been
2    not to even file a patent, if we thought that somehow
3    there would be an obligation to a fourth inventor.  I
4    don't believe there was a fourth inventor.  I believe
5    we've correctly identified the inventorship.  I believe
6    we have done the right things in prosecuting these
7    patents.  And whatever you guys want to do -- come out
8    with is fine with me.
9        MR. SHULMAN:  Okay.  Let me repeat my question
10   because I don't think you've answered it.
11   BY MR. SHULMAN:
12       Q.  If Illumina had to share the ownership of the
13   applications for the 020 and the 841 with, for example,
14   Dr. Kirk, then whatever the value of Illumina's ownership
15   interest in those applications was would be less?
16       A.  Absolutely.
17       MR. COSTAKOS:  Objection.  Asked and answered.
18       THE WITNESS:  So -- so I'm glad you answered
19   the question again because the answer is absolutely no,
20   because as long as Illumina had freedom to operate as a
21   co-inventor, it would have freedom to operate, then it
22   could produce the products and generate all the revenue

69  (Pages 273 to 276)

Page 277

1   that we were able to from the ArrayMatrix.
2        The only case where exclusivity would matter is
3   if we were trying to keep somebody else from performing
4   the same invention, and that's the subject of this
5   lawsuit. And I have no idea whether there's any value
6   there or not.
7        All I can say is it had no impact. Having
8   exclusivity would have had no impact in our ability to
9   generate revenue and value from the ArrayMatrix.
10  BY MR. SHULMAN:
11   Q.  Okay. Did there come a time at Illumina when
12  you were considering the concepts of using silicon
13  chiplets that contain an array of bioactive agents?
14   A.  Yes, I believe there was.
15   Q.  Okay. And approximately when did that idea
16  arise?
17   A.  Somewhere -- the idea of using a silica
18  substrate happened very early in Illumina's history. I
19  believe Steve Auger thought of the idea and -- with help
20  from Todd Dickinson in the 1998 standpoint.
21       So now I'm trying to get to your other question
22  about the chiplets and -- which are -- I assume you mean

Page 278

1   what I think you mean, which is to make small, little
2   chips that you might glue to the surface of an
3   ArrayMatrix or something like that.
4        I think that idea probably surfaced in 2000,
5   2001, but I -- you know, I just remember it happened.
6        MR. SHULMAN: Okay. Let me see if I can
7   refresh your recollection.
8        What are we up to? Exhibit 22.
9        Let me mark as Exhibit 22 some April 15, 2004,
10  product planning meeting notes produced by Illumina with
11  production No. 3024965.
12       (Exhibit 22 was marked.)
13  BY MR. SHULMAN:
14   Q.  Take whatever time you need to --
15   A.  Okay.
16   Q.  -- review the document, at least briefly. And
17  then if you need to review it in greater detail, you can.
18       Do you see -- first of all, did you receive a
19  copy of this memo or these minutes from Aaron Jones on or
20  about the date that they bear?
21   A.  The only reason that I would think I would is
22  because I'm in the sub- -- in the "to" line.

Page 279

1    Q.  Okay. And you also attended the meeting,
2   didn't you?
3    A.  I think I did.
4    Q.  Okay. And this meeting took place on or about
5   April 15 of 2004?
6    A.  Yes.
7    Q.  And what was the product planning meeting back
8   in that time frame?
9    A.  I think it was a time in which scientists could
10  bring to the product advisory committee, the PAC, idea
11  that they had for new products.
12   Q.  Okay. And at this meeting, one of the new
13  products that was being discussed was something called
14  the Chiplet ArrayMatrix. Do you see that?
15   A.  Yes.
16   Q.  Do you recall that?
17   A.  Vaguely, yes.
18   Q.  Okay. And according to this document, it says
19  that the Chiplet ArrayMatrix concept is chips on posts.
20  Do you see that?
21   A.  Yes.
22   Q.  And it's further described as bonding one

Page 280

1   chiplet to the end of each of 96 posts.
2    A.  Yes.
3    Q.  Do you see that?
4    A.  Yes.
5    Q.  And it's described as a marriage of the
6   BeadChip and Sentrix ArrayMatrix concepts.
7    A.  Yes.
8    Q.  Do you see that?
9        Can you explain to me how it's a marriage of
10  those two concepts?
11   A.  The idea that you could use a bead array with a
12  different substrate --
13       THE REPORTER: I'm sorry?
14  BY MR. SHULMAN:
15   Q.  I'm sorry. Say that again. Two of us didn't
16  get it.
17   A.  Again, I'm interpreting somebody else's notes
18  here, but I think what that person meant, although you're
19  fine to go talk to that person personally, was that the
20  idea that was proposed as a product was that you could
21  combine the bead array platform in the ArrayMatrix using
22  the silica substrate instead of using the fiber bundle

70  (Pages 277 to 280)

7/13/2010                 **Illumina Inc. v. Affymetrix Inc**              **John R. Stuelpnagel**
**Attorneys' Eyes Only**

| Page 281 |
|---|

1   substrate.
2       Q.  Okay.  The chiplet that's referred to here, is
3   that a planar silicon chip?
4       A.  My understanding of it would be -- would be a
5   diced small piece of silica.  I guess you could call it
6   planar, but, again, it's going to undulate with the wells
7   because it would have had the wells already etched into
8   the surface.
9       Q.  Was this chiplet going to be used with beads?
10      A.  Yes.
11      Q.  So it was a planar surface, a chip into which
12  you etched wells for beads, and then you contemplated
13  putting the beads in those wells?
14      A.  Yes.
15      Q.  And each of those chiplets were going to be
16  bonded to one end of a post, according to this?
17      A.  According to this, yes.
18      Q.  No. 2 says "Chiplet might be LCA or another
19  BeadChip product."  Do you see that?
20      A.  I see that.
21      Q.  What does LCA stand for?
22      A.  I can't remember right now.

| Page 282 |
|---|

1       MR. SHULMAN:  From the -- I think I'm just
2   about done, but I want to ask you a couple of things on
3   the record.
4       The invention disclosure form that he referred
5   to earlier today -- oh, I'm sorry.
6       The invention disclosure form that
7   Dr. Stuelpnagel referred to earlier today, I know it
8   hasn't been produced.  I don't know if it was overlooked
9   or whether you're choosing to withhold it as privileged,
10  but we need that document if you're willing to produce
11  it, or we need to find out whether or not you're willing
12  to produce it.
13      And the final business plan, we don't have that
14  either, which is an important document, and we need that.
15      There may be other things we need that I don't
16  know about, but those are the two that I can think about.
17      Subject to resolving those two discovery
18  issues, I have no further questions at this point.
19      Should we get the documents, I may have, you
20  know, half an hour's worth of examination just to touch
21  on those two topics, but other than that, I'm done.
22      MR. COSTAKOS:  Okay.  Let me respond to your

| Page 283 |
|---|

1   points, and then let's take just a quick break and see
2   whether I -- whether I have any follow-up.
3       As far as the invention disclosure, I'll look
4   into that.  I don't know which of those categories it
5   falls into, but I'll get back to you on that.
6       As far as the business plan, it's certainly not
7   being withheld on any grounds, so to -- best of my
8   information, if we have it, we've produced it, but I'll
9   have someone double-check on that.
10      MR. SHULMAN:  And I'll be very upfront with you
11  about why I'm interested in it.
12      In the copy, the draft that we looked at
13  earlier, which is Exhibit 5 --
14      MR. COSTAKOS:  Uh-huh.
15      MR. SHULMAN:  -- and this was handed out to
16  strangers from the corporation -- there are sections that
17  are redacted.  And I can understand why you might redact
18  a draft because it could go to a lawyer or what have you.
19  But these sections seem to suggest that they talked about
20  IP and various things.  And to the extent that was
21  disclosed to third parties, as undoubtedly it was if you
22  didn't have a non-confidential version, we want to see

| Page 284 |
|---|

1   what the final plan said because that's the one that went
2   out the door.  This one obviously didn't because it's
3   still a draft.
4       And so we haven't challenged your redactions
5   here because it's draft and God knows who you showed it
6   to, and maybe there's lawyers' advice all over these
7   pages.  I don't know.
8       But the final one we're plainly interested in
9   in an un-redacted form.  So those are the two bullet
10  point areas that I'm interested in.
11      And if we're able to make progress on that, I
12  may have a few more questions for him at some future
13  date, but other than that, I'm done.
14      MR. COSTAKOS:  Okay.  Well, we'll see what we
15  can do about that.
16      So let's take a short break and then we'll come
17  back.
18      (Discussion off the record.)
19      MR. SHULMAN:  Off the record at 4:42.
20      (Recess.)
21      VIDEOGRAPHER:  We're on the record at 4:51 p.m.
22

71  (Pages 281 to 284)

Page 285

1        EXAMINATION
2   BY MR. COSTAKOS:
3        Q.  Dr. Stuelpnagel, you testified a couple times
4   today about how the notion that you derived the invention
5   from Dr. Kirk was inconsistent with your recollection of
6   the brainstorming meeting.  Can you explain what you mean
7   by that?
8        MR. SHULMAN:  I object to the form of the
9   question.
10       Go ahead.
11       THE WITNESS:  Well, there's a number of
12  elements to that.  The first is my recollection of what
13  initiated the brainstorming session, which was out
14  running and thinking about how these arrays were really
15  fundamentally different than what Affymetrix and other
16  people were doing.
17       And I realized that by itself isn't the
18  invention, but the concept of putting the array into
19  something as opposed to putting the solution onto the
20  array was really unique and different embedded in Walt's
21  technology.  And that's the kernel that I taught -- took
22  back with me to the brainstorming session with Mark Chee

Page 286

1   and Steve Auger.
2        And from that, we came up with the idea of the
3   ArrayMatrix, and we were all really excited.  We thought
4   it was novel.  And the reason why we were excited is
5   because we thought we had invented -- or came up with the
6   idea.  I won't say invented, but came up with the idea of
7   what Illumina's first products were going to be.
8        And if this was simply reading someone else's
9   email and then making a further transition from that to
10  what became the ArrayMatrix, we wouldn't have had that
11  kind of excitement, and I wouldn't have had the
12  recollection that I had where this whole thing was
13  stimulated by a run and me thinking that the arrays at
14  Walt's are different.
15       And clearly the other people thought that the
16  arrays were different.  David Walt thought it.  And
17  clearly in that email Greg Kirk had thought how the
18  arrays were different, that you could actually
19  interrogate a well on a microtiter plate.  But the fact
20  that I had developed that -- what I think -- what I
21  recall is in- -- independently as the kernel to the
22  brainstorming session is consistent with me not thinking

Page 287

1   that the Kirk email had any influence at all in how we
2   came up with the ArrayMatrix.
3   BY MR. COSTAKOS:
4        Q.  What do you recall about Mr. Auger and
5   Dr. Chee's reaction at the brainstorming session?
6        A.  My recollection is everybody was similarly
7   excited, that we thought we had fundamentally figured ou
8   something that we thought was going to be important from a product
9   standpoint and that this really gave us a lot of meat to
10  what became our business plan.  It was a big part of our
11  business plan.
12       Q.  You saw an exhibit earlier today from February
13  of 2001 where Dr. Kirk, through Bryan Roberts -- strike
14  that.  Let me move back.
15       You saw an email earlier today from Bryan
16  Roberts where Dr. Kirk had suggested that he was an
17  inventor or at least that he was the source, let's say,
18  of the oligo decoding technology that Illumina was using.
19  You recall that email generally?
20       A.  I do.
21       Q.  From 2003?
22       A.  Yes.

Page 288

1        Q.  Did Dr. Kirk ever come to you, to your
2   knowledge, and say, "I'm the inventor of the SAM
3   product"?
4        A.  No, he did not.
5        MR. SHULMAN:  I'm sorry.  Of the?
6        MR. COSTAKOS:  SAM product.
7        THE WITNESS:  Just for clarification, SAM is an
8   abbreviation that we used at Illumina for Sentrix
9   ArrayMatrix.  And, no, Dr. Kirk never came to me to
10  suggest that he was an inventor of that product.
11  BY MR. SHULMAN:
12       Q.  After the Sentrix ArrayMatrix product was
13  introduced, he never came to you?
14       A.  No, he did not.
15       Q.  Did he ever follow up with you on the -- after
16  the email exchange in 2001, to your knowledge?
17       A.  No.  I thought that he realized everything was
18  resolved and everything was fine.
19       MR. COSTAKOS:  I have no further questions.
20       MR. SHULMAN:  I have nothing.
21       Thank you very much for your time.  We may or
22  may not see you again.

7/13/2010          Illumina Inc. v. Affymetrix Inc          John R. Stuelpnagel
                        Attorneys' Eyes Only

---

**Page 289**

1    VIDEOGRAPHER: There is the end of disk No. 3
2    of Volume I. It concludes the deposition.
3        We're off the record at 4:56 p m.
4        (The deposition concluded at 4:56 p.m.)
5              * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 291**

1    John R. Stuelpnagel c/o
2    Foley & Lardner
3    777 East Wisconsin Avenue
     Milwaukee, Wisconsin 53202-5306
4    Case: Illumina v Affymetrix -
5    Date of deposition: 07/13/10
6    Deponent: John R. Stuelpnagel
7    Please be advised that the transcript in the above
8    referenced matter is now complete and ready for signature
9    The deponent may come to this office to sign the transcript,
10   a copy may be purchased for the witness to review and sign,
11   or the deponent and/or counsel may waive the option of signing
12   Please advise us of the option selected
13   Please forward the errata sheet and the original signed
14   signature page to counsel noticing the deposition, noting the applicable
15   time period allowed for such by the governing Rules of Procedure
16   If you have any questions, please do not hesitate to call our office at
17   (202)-232-0646
18
19   Sincerely,
20
21   Digital Evidence Group
     Copyright 2009 Digital Evidence Group
22   Copying is forbidden, including electronically, absent express written consent

---

**Page 290**

1
2        REPORTER'S CERTIFICATE
3
4        I, Veronica S. Thompson, Certified Shorthand
5    Reporter for the State of California, do hereby certify:
6        That the witness named in the foregoing
7    deposition was by me duly sworn; that the deposition was
8    then taken before me at the time and place herein set
9    forth; that the testimony and proceedings were reported
10   stenographically by me and were transcribed through
11   computerized transcription by me; that the foregoing is a
12   true record of the testimony and proceedings taken at
13   that time; and that I am not interested in the event of
14   the action.
15       Witness my hand dated July 14, 2010.
16
17
18       _____
19       Veronica S. Thompson
20       CSR 6056, RPR, CRR
21
22

**Page 292**

1    Digital Evidence Group, L.L.C.
2    1111 16th Street, Northwest, Suite 410
3    Washington, D.C. 20036
4    (202) 232-0646
5
     SIGNATURE PAGE
6
7
8    Case Name: Illumina v. Affymetrix -
9    Witness Name: John R. Stuelpnagel
10   Deposition Date: 07/13/10
11   I do hereby acknowledge that I have read
     and examined the foregoing pages
12   of the transcript of my deposition and that:
13
14   (Check appropriate box):
15   ( ) The same is a true, correct and
     complete transcription of the answers given by
16   me to the questions therein recorded.
17   ( ) Except for the changes noted in the
     attached Errata Sheet, the same is a true,
18   correct and complete transcription of the
     answers given by me to the questions therein
19   recorded.
20
21
22   DATE          WITNESS SIGNATURE

---

Page 293

1    Digital Evidence Group, L.L.C.
2    1111 16th Street, Northwest, Suite 410
3    Washington, D.C. 20036
4    (202) 232-0646
5

                    E R R A T A   S H E E T
6
7
8    Case Name: Illumina v. Affymetrix -
9    Witness Name: John R. Stuelpnagel
10   Deposition Date: 07/13/10
11      Page No.  Line No.       Change
12
13
14
15
16
17
18
19
20
21   _____        _____
22      Signature              Date